UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Maria Bruner and Laura Cerda,  )
                               )
              Plaintiffs,      )      CV-18-0664-PHX-DJH
                               )
        vs.                    )      Phoenix, Arizona
                               )      September 11, 2019
City of Phoenix, an Arizona    )         1:31 p.m.
municipal corporation,         )
                               )
              Defendant.       )
_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING/EVIDENTIARY HEARING

APPEARANCES:
For the Plaintiffs:
          Montoya Lucero & Pastor
          By: STEPHEN G. MONTOYA, ESQ.
          3200 North Central Avenue, Suite 2550
          Phoenix, AZ  85012

For the Defendant:
          BurnsBarton
          By: CATHERINE CHRISTINE BURNS, ESQ.
             KATHRYN H. KING, ESQ.
          2201 East Camelback Road, Suite 360
          Phoenix, AZ  85016


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

## INDEX

### SUMMARY OF COURT PROCEEDINGS                    PAGE:

| | |
|---|---|
| Opening Statement by Defendant | 6 |
| Closing Summation by Defendant | 139 |
| Closing Summation by Plaintiffs | 144 |

### INDEX OF WITNESSES

| WITNESSES FOR THE DEFENDANT: | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|
| CERDA, Laura | 9 | 52 | 64 | | |
| BRUNER, Maria Anjelica | 68 | 78 | 91 | 92 | 93 |
| ENGLANDER, Jefford | 96 | 101 | | 106 | 104 |

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|
| NAUMANN, Jerry | 108 | 116 | 118 | | 119 |
| CARDWELL, Mark S. | 120 | 135 | | | 137 |

UNITED STATES DISTRICT COURT

1          THE CLERK:  This is case number CV 18-664, Bruner and

2     others versus the City of Phoenix, on for oral argument and

3     evidentiary hearing.

4          Counsel, please announce your presence for the record.

5          MR. MONTOYA:  Good afternoon, Your Honor.  Steve

6     Montoya here on behalf of both of the plaintiffs who are with

7     me, Maria Anjelica Bruner and Laura Cerda.

8          Your Honor, Ms. Bruner goes by her middle name

9     Anjelica.  So if you hear her referred to her middle name, that

10    will be very usual.

11         THE COURT:  All right.

12         MR. MONTOYA:  Thank you.

13         THE COURT:  Good afternoon.

14         MS. BURNS:  Good afternoon, Your Honor.  Christine

15    Burns and Kathryn King here on behalf of the City of Phoenix,

16    and with us today is our corporate representative, Victoria

17    Torrilhon.

18         THE COURT:  All right.  And good afternoon to you.

19         As I've indicated in the Court's minute entry, this is

20    a fully briefed matter.  And I guess, just for clarity sake,

21    let me ask you, Ms. Burns, pending before the Court are

22    currently two motions for sanctions.  As I view it -- and let

23    me know if it's something that you see differently -- the

24    second motion for sanctions largely incorporates the arguments

25    in your first motion for sanctions.

1          So what I was inclined to do, unless you see it some

2    other way or unless Mr. Montoya objects, I was going to simply

3    order that the first motion for sanctions be denied as moot and

4    only rule on the second motion for sanctions.  Do you agree or

5    disagree?

6          MS. BURNS:  Without looking back specifically at the

7    motions, Your Honor, I'm not 100 percent sure, but I think

8    you're correct.  The focus of the first motion for sanctions

9    was the purposeful destruction of evidence as well as the

10   tampering with evidence by deactivating the Facebook accounts.

11         But at that point in time the only evidence that we

12   had of social media by the plaintiffs were things that the City

13   of Phoenix had discovered.  So --

14         THE COURT:  Well, why don't --

15         MS. BURNS:  I'm sorry.

16         THE COURT:  I was going to say why don't we do it this

17   way then.  Why don't you incorporate the arguments in your

18   first motion into your second motion, and then I will likewise

19   treat Mr. Montoya's first response -- incorporate his response

20   in his second response to the second motion.

21         MS. BURNS:  That makes perfect sense, Your Honor.

22         THE COURT:  All right.  So I will treat it in that way

23   as one consolidated motion.

24         Now, I have set aside one hour and 30 minutes in total

25   for your entirety of your examination of witnesses, production

1    of evidence, and so on.  And so with that in mind, I'm going to

2    keep time.  Again, I have -- all of the documents, in my view,

3    have, I think, been previously provided to the Court in

4    exhibits and so on.  And if you want to introduce something

5    new, you certainly can.  But I've reviewed the totality of the

6    record as it has come in.  And so be mindful of that, and use

7    your time wisely.

8          Yes, sir.

9          MR. MONTOYA:  Your Honor, I have a question for the

10    Court.

11          Is cross-examine -- Which cross-examination is

12    included in whose time, Your Honor?

13          THE COURT:  In your respective time.

14          MR. MONTOYA:  Understood.  Thank you.

15          THE COURT:  All right.  So it is your motion,

16    Ms. Burns, and so you may proceed.

17          MS. BURNS:  Thank you, Your Honor.  May I step to the

18    podium?

19          THE COURT:  Yes.  And we are at 1:35.

20          MS. BURNS:  And just before we begin, Your Honor, I

21    wanted to tell you we've kind of worked out some arrangements

22    with respect to the exhibits.  I think we're just going to

23    proceed with using the exhibits and not get bogged down in

24    a lot of the admissibility type of issues since this isn't --

25    You know, it's a hearing about a discovery dispute as opposed

1      to admissibility to a jury or to the judge.

2              So we've provided binders for the witnesses to just

3      flip through as we use the exhibits.  Rather than move them all

4      in at once, we're just going to use them as we go.  Does that

5      work?

6              THE COURT:  That sounds fine.  Mr. Montoya.

7              MR. MONTOYA:  Thank you, Your Honor.

8              Your Honor, is Your Honor going to allow opening

9      arguments?  Because I don't know if the defendant is going to

10     make -- or the moving party is going to make their opening

11     argument.

12             THE COURT:  I will permit closing.

13             MR. MONTOYA:  Understood.

14             THE COURT:  If you wish to have summation, that's

15     fine.  It will be within your time.

16             MS. BURNS:  Thank you, Your Honor.  I was just going

17     to use maybe five minutes to introduce the case before we call

18     our first witness.  Is that permissible?

19             THE COURT:  You may do so.  Do with your time whatever

20     it is that you may wish, but you have a total of one hour and

21     30 minutes.  Okay?  And we will start the clock then at 1:36.

22             MS. BURNS:  Thank you very much, Your Honor.

23             As you're very well aware, the City of Phoenix is here

24     today because the plaintiffs have destroyed evidence and

25     engaged in a pattern of discovery abuse in an intentional

1    effort to deprive the City of Phoenix of discoverable evidence

2    that is both directly relevant and goes to the heart of this

3    case and that is purposefully deleted because it is harmful to

4    the plaintiffs' case.

5          At its core, this case is about two current City of

6    Phoenix employees, Ms. Bruner and Ms. Cerda, who claim that

7    they suffered emotional distress as a result of being exposed

8    to racial and sexual language at work by a co-worker named

9    Christina Chavez.  The issue of whether Ms. Chavez actually

10   engaged in any of that language is highly disputed.  But what

11   is absolutely not disputed in this case is that in order to

12   prove that they were the victims of race discrimination, under

13   Title VII the plaintiffs must prove, among other things, that

14   they were subjectively offended by Ms. Chavez's alleged

15   language and that they suffered emotional distress as a result

16   of being exposed to this alleged language.

17         So for these reasons the City of Phoenix sought

18   discovery in this case regarding the plaintiffs' social media.

19   This is something that is requested in virtually every

20   employment law case where emotional distress damages are at

21   issue, because it is not uncommon for a defendant to unearth

22   social media evidence of plaintiffs discussing their work in

23   their social media or posting photos and comments that are

24   inconsistent with their emotional distress claim, and

25   sometimes, like in this case, posting photos and comments that

1   demonstrate that they and not the accused are actually engaging

2   in the type of harassing and discriminating conduct that's at

3   issue in the litigation.

4          And that is why, since the very inception of this

5   case, the City of Phoenix has put the plaintiffs and its

6   counsel on notice that it would be seeking this information.

7          In the very first discovery document that the City of

8   Phoenix filed in this case, its Mandatory Initial Discovery

9   requests back in August of 2018, it put the parties on notice

10  that it believed that social media would be relevant to this

11  case and that the plaintiffs were the custodians of those

12  documents.

13         In the very first joint document filed in this case

14  after the answer, the joint case management plan, the parties

15  put the Court on notice that it believed -- that they believed

16  that social media would be at issue in this case.

17         And in the very first set of written discovery

18  requests that the City served on the plaintiffs, it issued

19  interrogatories and requests for production seeking the

20  production of relevant social media from both of the

21  plaintiffs.

22         But instead of producing this evidence in response to

23  the Mandatory Initial Discovery Protocol obligations or in

24  response to the discovery requests served by the City of

25  Phoenix, the plaintiffs took steps to deprive the City of this

1    information.

2          Knowing that it was harmful to their case, they lied

3    under oath about the existence of their social media.  They

4    lied about how much they used their social media.  They lied

5    about their use of vulgar and crude language.

6          And once they were caught engaging in the very

7    language that they claimed to take offense to, they

8    purposefully destroyed it or tampered with it.

9          So in its two motions for sanctions, the City of

10   Phoenix is asking this Court to fashion an appropriate remedy

11   to address the plaintiffs' misconduct, including their

12   violation of General Order 17-08, which this Court entered at

13   docket number four, the Rules of Civil Procedure, and this

14   Court's specific orders.

15         And with that, Your Honor, the City of Phoenix calls

16   Ms. Laura Cerda to the witness stand.

17         THE COURT:  Ms. Cerda, please come forward and be

18   sworn.

19            LAURA CERDA, DEFENDANT'S WITNESS, SWORN

20         THE CLERK:  Would you please state and spell your full

21   name for the record.

22         THE WITNESS:  Laura Cerda, L-a-u-r-a, Cerda,

23   C-e-r-d-a.

24

25

DIRECT EXAMINATION

BY MS. BURNS:

Q.  Good morning -- Good afternoon, Ms. Cerda.

A.  Good afternoon.

Q.  My name is Christine Burns.  We've met several times through the course of this lawsuit.  You're a plaintiff in this lawsuit that you brought against the City of Phoenix, correct?

A.  Yes.

Q.  And in this lawsuit you claim that you suffered emotional distress as a result of being exposed to offensive racial and sexual language by Ms. Christina Chavez, correct?

A.  Yes.

Q.  And you claim that you didn't encourage or consent to this language, right?

A.  Correct.

Q.  And you testified in your deposition that it was the language, specifically the language that Ms. Chavez used toward you that constitutes your racial harassment claim, correct?

A.  Yes.

Q.  Okay.  Now, you had your deposition taken by me on February 20th of 2019, right?

A.  Yes.

Q.  Now, Your Honor, Exhibit 37 contains portions of Ms. Cerda's deposition that we will be referring to today because we didn't want to bog the Court down with too many

1    pages.  But we do have a complete copy if you need it.  And we

2    will also be using clips from the video deposition.

3                THE COURT:  All right.

4                MS. BURNS:  But we'll refer to the page and line

5    numbers as we go through.

6                THE COURT:  I have it here.

7    Q.  (BY MS. BURNS)  Okay.  Now, Ms. Cerda, you swore to tell

8    the truth at your deposition, right?

9    A.  Yes.

10   Q.  And you understood that you were to testify truthfully as

11   though you were in front of a judge or a jury, correct?

12   A.  Yes.

13   Q.  And you also understood that the videotape that we were

14   taking and the transcript that was being made could be used in

15   a future proceeding in this lawsuit, right?

16   A.  Yes.

17   Q.  Okay.  And you testified that day on February 20th that

18   there was no reason that you couldn't testify truthfully and

19   accurately, right?

20   A.  Correct.

21   Q.  Okay.  Liliana, will you please turn that on.

22            Ms. Cerda, let's go ahead and look at Exhibit No. 6.

23   And you have in front of you a binder that contains all of the

24   exhibits.  So you can go ahead and flip to it, or you can just

25   rely on the one that's on the screen that I'm putting up for

1    you.  Okay?

2    A.  Okay.

3    Q.  And can you read for the record what that document is

4    please.

5    A.  The one in my -- This one?

6    Q.  The one on the screen.

7    A.  Yeah.

8    Q.  Right here.

9    A.  Okay.  It's a response to defendant's first set of requests

10   for production of documents.

11   Q.  Okay.  And if you looked at the very last page of this

12   document, you'll see a verification.  Do you see that?

13   A.  Yes.

14   Q.  And is that your signature above the line that says Laura

15   Cerda?

16   A.  Yes.

17   Q.  So in this document, Ms. Cerda, you were swearing that the

18   answers that you were providing were true under oath, correct?

19   A.  Yes.

20   Q.  Okay.  And you were making that certification under the

21   penalty of perjury, right?  Right here?  Correct?

22   A.  Okay.

23   Q.  Now, if you take a look at Exhibit or go -- I'm going to

24   scroll up to request for production number six.  Do you see

25   that?

1              Now, this request for production requests that you

2    provide for the City an unredacted, unedited digital copy of

3    your social media archives including, without limitation, your

4    Facebook page, right, from January 1st, 2010, through present,

5    and that includes all postings, comments, or pictures that in

6    any way relate to your employment with the City, any current or

7    former City employee, the City, your claims and allegations in

8    the lawsuit, the facts and circumstances giving rise to the

9    lawsuit, your decision to bring the lawsuit, defendant's

10   defenses, any witnesses or potential witnesses in the lawsuit.

11   Correct?

12   A.   Correct.

13   Q.   And it went on to explain that a full and fair response to

14   this request would include posts, comments, and pictures that

15   may in any way relate to your emotional, mental, or

16   psychological state during the period in question.   Correct?

17   A.   Correct.

18   Q.   Okay.   And would you please read what your response was to

19   that request for production.

20   A.   "None".

21   Q.   "None".   You didn't object to the question, did you?

22   There's no objection in there, is there?

23   A.   Of my response?

24   Q.   Right.

25   A.   It says, "None."

1    Q.   It just says, "None."

2    A.   Right.

3    Q.   Okay.  You didn't claim that the question was overbroad or

4    unfair in any way or that it was seeking information that it

5    shouldn't be able to seek.  You just said there was none,

6    correct?

7    A.   Correct.

8    Q.   So you knew that the City was requesting social media from

9    you, correct?

10   A.   Correct.

11   Q.   And you verified under the penalty of perjury that there

12   was none, correct?

13   A.   Yes.

14   Q.   And it's true, Ms. Cerda, that you did not produce a single

15   Facebook, Instagram, or any other social media document in this

16   case before your deposition, did you?

17   A.   I don't recall.

18   Q.   Okay.  Well, we'll let the record reflect that.

19          Let's go ahead and look at Exhibit No. 3.  I'm sorry.

20   Number 9.  Do you recognize that document, Ms. Cerda?

21   A.   Yes.

22   Q.   That's a screenshot from your Facebook page, correct?

23   A.   Correct.

24   Q.   Your Facebook name is Laura Christina Cerda?

25   A.   Yes.

1   Q.  And if we look at the meme that I've now put on the screen

2   before you, what does that meme say?

3   A.  Do I have to read it out loud?

4           THE COURT:  Yes.

5           THE WITNESS:  "Niggas be like let me hold a few

6   dollars till I get back on my feet."

7   Q.  (BY MS. BURNS)  Okay.  And what does the comment that you

8   put right underneath your name at the top of your post say?

9   A.  "To funny".

10  Q.  "To funny", right?

11  A.  Uh-hmm.

12  Q.  So you thought that this meme about an African American man

13  in a wheelchair begging for money until he gets back on his

14  feet was too funny, right?

15  A.  From my post, yes.

16  Q.  Okay.  And you thought this meme referring to an African

17  American man as the N-word was too funny, didn't you?

18  A.  I'm not sure if the word is what I was referring to.

19  Q.  But your comment about this meme in general which includes

20  the N-word referring to an African American man in a

21  wheelchair, your comment was "to funny"?  Right?

22  A.  I suppose.

23  Q.  Okay.  Now, you're Facebook friends with other employees at

24  the City --

25          THE COURT:  Let me interrupt really quickly.  You said

```
 1    Exhibit 9.  This is not Exhibit 9 in my book.

 2              MS. BURNS:  It's 9 at the back of the discovery.

 3              THE COURT:  The very back.  Okay.

 4              MS. BURNS:  Yes.  Sorry, Your Honor.  That would be

 5    found on Page --

 6              MR. MONTOYA:  It's the very last page, Your Honor, of

 7    Exhibit 9.

 8              THE COURT:  Oh, I see.  Okay.  Okay.  Okay.  Thank

 9    you.

10    Q.  (BY MS. BURNS)  You're Facebook friends with other

11    employees at the City of Phoenix, right, Ms. Cerda?

12    A.  Some, yes.

13    Q.  Yes.  So any of your other City of Phoenix employee friends

14    could see this post when you used the N-word and comment that

15    you find it too funny, right?

16    A.  I suppose.

17    Q.  Now, your Facebook profile was actually public for some

18    period of time, right?

19    A.  It was.

20    Q.  Right.  And that's how the City actually came across this

21    post.

22              Now, this post from you, Ms. Cerda, was made on

23    January 23rd of 2014, right?

24    A.  From what it looks like, yes.

25    Q.  Yes.  And that was the very time period when in this
```

1    lawsuit you're claiming that you were suffering emotional

2    distress by being exposed to the N-word by Ms. Chavez, right?

3    A.  Not the N-word that I'm looking at on the screen, no.

4         The N-word using E-R at the end is what I was talking

5    about, Christina.

6    Q.  Oh, so you're making a distinction between the language

7    that Ms. Chavez used, that you claim she used, where the word

8    ended with E-R?

9    A.  Correct.

10   Q.  And you see that as different than the N-word with

11   n-i-g-g-a?

12   A.  I do.

13   Q.  And did you think that that was a reason for you to not

14   provide discovery responses and answers to our questions

15   because you didn't think that n-i-g-g-a was the N-word?

16   A.  Not at all.

17   Q.  You don't think the n-i-g-g-a word is the N-word,

18   Ms. Cerda?  Is that your testimony under oath before this Court

19   today?

20   A.  I don't -- I honestly don't remember the post.  I don't

21   remember the post.

22   Q.  That wasn't my question, though, ma'am.  My question was

23   it's your testimony now that you don't think n-i-g-g-a is the

24   N-word?

25   A.  Well, it just depends on how somebody words it or how

1    they're using it.

2    Q.   Okay.  But you agree with me that n-i-g-g-a is another form

3    of n-i-g-g-e-r, correct?

4    A.   No.

5    Q.   You disagree with that?

6    A.   Yeah.

7    Q.   It's funny you say that now for the very first time in this

8    case, Ms. Cerda, because I'm curious why did you delete this

9    post if you didn't think it was offensive?

10             MR. MONTOYA:  Your Honor, I would object to the, you

11   know, the speech that came before the factual question.

12             THE COURT:  Overruled.  Go ahead and answer.

13             THE WITNESS:  Why I deleted the post?

14   Q.   (BY MS. BURNS)  Yes.

15   A.   First off, because I didn't remember posting it.  And I

16   just, looking back, I, you know, there's some people that could

17   find it offensive, so I took it down.  Yes, I took it down,

18   but --

19   Q.   Let's see what you told the Court about this.

20             Let's look at Exhibit No. 26.  This is the affidavit

21   that you provided to this Court, right, Ms. Cerda?  Court

22   ordered you to provide an affidavit as to why you hadn't turned

23   over any of your social media, right?  Is that correct,

24   Ms. Cerda?  Do you see your signature here on the last page?

25   Is that your signature, ma'am?

1    A.   That is my signature.

2    Q.   Okay.  And you swore under oath that this affidavit was

3    true and honest to the best of your abilities, right?

4    A.   Yes.

5    Q.   Okay.  And in your -- oops -- in your affidavit that you're

6    making to the Court -- This is not provided to the City of

7    Phoenix.  This was requested by the Judge and provided to the

8    Court.

9            You indicate that you take responsibility for this,

10   don't you?

11   A.   Since it is on my Facebook, yes, I do take responsibility

12   for that post.

13   Q.   Okay.  And you also certified that you deactivated your

14   Facebook account shortly after it was discovered that the City

15   was seeking your social media, correct?

16   A.   Correct.

17   Q.   So you went into -- Now, just a minute.  I want to back up.

18   The post where you used in Exhibit No. 9, when you used

19   n-i-g-g-a, you deleted that post, right?

20   A.   Yes, after you guys presented it to me, yes, I did.

21   Q.   Yes.  And you testified in your deposition that you did

22   that because you didn't condone it; you didn't approve of it,

23   correct?

24   A.   Of -- Yes.

25   Q.   Okay.  So you didn't say I had a post that used n-i-g-g-a,

1  but it's not offensive to me because it ends in A and not E-R,

2  right?

3  A.  Like I said, I don't remember the post, but I see it -- I

4  saw the post as offensive in other ways.

5  Q.  Okay.  And it wasn't the N-word that offended you?

6  A.  It was the whole post in general.

7  Q.  Okay.  So I just want to make sure that I understand your

8  position today, Ms. Cerda, which is that in the last year when

9  the City has been seeking social media from you that's relevant

10  to this lawsuit, and your claims are that one of the words that

11  Ms. Chavez used in the workplace was the N-word, that you

12  didn't feel that you had to respond to discovery where you were

13  using n-i-g-g-a.  Is that correct?

14  A.  I'm not sure.

15  Q.  Well, you didn't ever say, "I'm sorry, Ms. Burns.  When you

16  say the N-word, I'm not sure if you mean this variation or that

17  variation," did you?

18  A.  I believe we did.  I believe I did.

19  Q.  Is there anywhere in your deposition where you can point to

20  that or anywhere in this record where you've ever made a

21  distinction between n-i-g-g-a and n-i-g-g-e-r?

22  A.  I don't see anything.  I guess not.

23  Q.  Okay.  This is the first time, right, this case?  This

24  hearing today is the first time you're making that argument,

25  correct?

1    A.  Yes.  But I do believe that -- I'm not sure.  I just -- I

2    don't remember.

3    Q.  Let me ask you this, Ms. Cerda.  You deleted this post the

4    day before your deposition, correct?

5    A.  I'm not sure.  I don't recall.

6    Q.  Let's look at what you said in your deposition.  This is on

7    Page 298, Lines 22 to 23.

8        (The following deposition excerpt was played:

9            Q.  When did you delete it?

10           A.  I deleted it yesterday.)

11   Q.  (BY MS. BURNS)  So you deleted it the day before your

12   deposition, correct?

13   A.  That's what I said, yes.

14   Q.  Okay.  And that's also the same day that you met with your

15   lawyer to prepare for your deposition, correct?

16   A.  Yes.

17   Q.  And when you deleted this post, you understood that it was

18   evidence in your federal lawsuit against the City, didn't you?

19   A.  I didn't think it was a big deal because you guys already

20   presented to me in paper, so I didn't think that I was deleting

21   evidence due to you guys having the paper.

22   Q.  Okay.  Let's see what you said about that in your

23   deposition.

24       (The following deposition excerpt was played:

25           Q.  But you deleted that knowing, Ms. Cerda, that this

CERDA - DIRECT

1              was evidence that the City of Phoenix felt was

2              relevant to your lawsuit, correct?

3              MR. MONTOYA:  Objection.  Foundation.

4              A.  Why I had deleted it after the fact that I found

5              this from you guys, yes, that you showed me, presented

6              it to me, because I don't condone this.)

7     Q.  (BY MS. BURNS)  Okay.  Let's just stop right there.  You

8     testified that you don't condone this, right?  Correct?

9     A.  Yes.

10    Q.  You don't -- So you were -- you were telling us, the City

11    of Phoenix, that you didn't condone the use of n-i-g-g-a in a

12    post, right?  That's what you testified to under oath?

13    A.  Okay.

14    Q.  Correct?

15    A.  That's what I said.

16    Q.  You didn't say I don't condone this because it's made other

17    comments.  You just said you don't condone this meme, correct?

18    You didn't clarify that it was because it was n-i-g-g-a or

19    n-i-g-g-e-r, right?

20    A.  Yes.

21    Q.  Okay.  Let's continue to see what you said.

22         (The following deposition excerpt was played:

23              Q.  But you understand that that's evidence in your

24              federal lawsuit, and you destroyed it by taking it off

25              of your Facebook page?

| | |
|---|---|
| 1 | MR. MONTOYA:  Objection.  Foundation. |
| 2 | Q.  Yes or no? |
| 3 | MR. MONTOYA:  Is that a -- is that a -- |
| 4 | A.  I don't know. |
| 5 | MR. MONTOYA:  Is that a factual question you've asked? |
| 6 | It sounds more like an argument to me.  Where's the |
| 7 | fact in it? |
| 8 | Q.  Did you just delete this message knowing that it |
| 9 | was evidence in a -- the federal lawsuit that you have |
| 10 | brought? |
| 11 | MR. MONTOYA:  Objection.  Asked and answered.  You can |
| 12 | answer it again, but you don't have to change your |
| 13 | answer. |
| 14 | A.  Yes.) |
| 15 | Q.  (BY MS. BURNS)  You testified under oath at your deposition |
| 16 | that you understood that it was evidence in your federal |
| 17 | lawsuit, and you destroyed it nonetheless, correct? |
| 18 | A.  Correct. |
| 19 | Q.  And you knew that the City produced this post because it |
| 20 | believed that it was relevant to your case, correct? |
| 21 | A.  I'm not sure. |
| 22 | Q.  Okay.  Well, let's see what you said at your deposition. |
| 23 | (The following deposition excerpt was played: |
| 24 | Q.  And you're aware that the City of Phoenix |
| 25 | disclosed this and produced it in this case because |

1            obviously the City thinks it's relevant, correct?

2            A.   I guess.

3            Q.   Okay.  And you're aware that the City of -- )

4    Q.  (BY MS. BURNS)  Now, once you deleted this post, Ms. Cerda,

5    it no longer existed on your Facebook account, right?

6    A.  Correct.

7    Q.  So even if you wanted to, you couldn't go back and restore

8    it?

9    A.  I'm not sure.

10   Q.  It's permanently deleted, correct?

11   A.  I don't know how Facebook works as far as deleting stuff.

12   I don't know.

13   Q.  But you didn't ever retrieve it or recover it and produce

14   it in this case?

15   A.  No.

16   Q.  Okay.  And this post, at least before it was deleted, had

17   received one like; is that correct?

18   A.  I'm not sure.

19   Q.  Well, that's shown right here by the little thumbs-up, blue

20   thumbs-up symbol and the one beside it, right?

21   A.  I can't see it?

22            THE COURT:  It's not on the screen.

23            MS. BURNS:  Oh, I'm sorry.

24   Q.  (BY MS. BURNS)  Do you see the one like right there?

25   A.  Okay.

1    Q.  Yes.  So it contained one like, right?

2    A.  It looks like it.

3    Q.  And by deleting that post, it's now impossible for you or

4    the City or for the Court to know who liked it, correct?

5    A.  If that's how Facebook works, then yes.

6    Q.  Okay.  And you were Facebook friends with Ms. Bruner,

7    correct?

8    A.  Yes.

9    Q.  So it could have been her that liked that post?

10         MR. MONTOYA:  Objection, Your Honor.  Calls for

11   speculation.

12         THE COURT:  Sustained.

13   Q.  (BY MS. BURNS)  We'll never know who liked that post, will

14   we, Ms. Cerda?

15         MR. MONTOYA:  Your Honor, objection.  She's already

16   testified she doesn't know how Facebook works.

17         THE COURT:  Sustained.

18   Q.  (BY MS. BURNS)  Okay.  Now, at your deposition, Ms. Cerda,

19   you were asked a lot of questions about your social media use,

20   correct?

21   A.  Right.

22   Q.  And at the time of your deposition, your Facebook account

23   was active, right?

24   A.  Yes.

25   Q.  Now, shortly after your deposition, you deactivated your

1    Facebook account, correct?

2    A.  Yes.

3    Q.  And you did this while knowing that the City was seeking

4    your social media information, right?

5    A.  Yes.

6    Q.  Okay.  And before you deactivated your social media, you

7    didn't take any steps to preserve your Facebook account.  You

8    didn't download it or save the archive or take an image of it.

9    Right?

10   A.  No.

11   Q.  Okay.  Let's look back at Exhibit No. 26.  This was the

12   affidavit that you submitted to the Court.  And let's take a

13   look at Exhibit No. -- or, I'm sorry, paragraph number four.

14            Now, here you indicate to the Court that you've

15   reviewed her orders of June 27th and August 7th, correct?

16   A.  Yes.

17   Q.  Now, if we look at that order, which is Exhibit No. 18,

18   this is the order from June 27th of 2019.  This requires that

19   you produce certain documents, correct?  The June 27th order

20   requires you, Ms. Cerda, to produce all documents from 2011 to

21   present that relate to your employment or any allegations

22   contained in the complaint, right?

23   A.  Correct.

24   Q.  And you had to produce all likes and comments on other

25   posts, right?

1   A.   I'm sorry.  Could you repeat that.

2   Q.   Yeah.  If you just look up here in the Court's order, it

3   says that you have to produce likes on other users' posts and

4   likes on your own posts, correct?

5   A.   Okay.

6   Q.   And comments, right?

7   A.   Okay.

8   Q.   And you have to produce all Facebook chat messages.  The

9   Court specifically notes that all chat messages that relate to

10  your employment or the allegations in the complaint, they have

11  to be produced, right?

12  A.   Okay.

13  Q.   And you must produce this information by July 19th of 2019.

14  Right?

15  A.   Yes.

16  Q.   That's at the bottom of the order right here.

17           But your July 19th, 2019 -- On July 19, 2019, you

18  didn't produce another single document in this case from any of

19  your social media, did you?

20  A.   I'm not sure.  I -- I'm not sure.

21  Q.   Okay.  Well, the City directs the Court to Exhibit No. 20,

22  which is the sixth supplemental disclosure statement which was

23  produced on July 19th of 2019, and it does not contain any

24  social media from Ms. Cerda whatsoever.

25           So you were representing that there was no social

1   media posts or Facebook Messenger conversations that you

2   believed were responsive to this Court's order, correct --

3   A.   Correct.

4   Q.   -- Ms. Cerda?

5   A.   Correct.

6   Q.   But that's not true, is it?

7   A.   I'm not sure.

8   Q.   Well, you've since, in fact just Friday, five days ago,

9   produced a lot of Facebook Messenger pages for the very first

10  time in this case, didn't you?

11  A.   Yes.

12  Q.   And one in particular is 38 pages long, and it's a chat

13  between you and Ms. Bruner, right?

14  A.   I'm not sure.

15  Q.   Okay.  Well, we'll get to that.  It's Exhibit 32.  But you

16  produced a lot of Facebook Messenger posts and chats just last

17  week in this case, but you didn't produce them on July 19th

18  when the Court ordered you to do so, right?

19  A.   I went -- I went through my Facebook.

20  Q.   Okay.  But you didn't produce any Face --

21  A.   And I found nothing that had to do with what's going on,

22  with -- Yeah.

23  Q.   So your testimony is your review of Facebook before this

24  July 19th date uncovered no Facebook Messenger conversations

25  and no social media posts or likes that you believed were

1   relevant to this case?

2   A.   Correct.

3   Q.   Is that your position?

4   A.   Correct.

5   Q.   Okay.  Well, we'll get there.

6            Now, the Court then issued a second order, right?

7   Exhibit No. 24 is the Court's second order where she learns

8   that you had not produced a single social media piece of

9   evidence on July 19th and again orders you to produce social

10  media, correct?  You indicated in your declaration that you

11  read that order too, right?

12  A.   Correct.

13  Q.   Okay.  And it was only on that date, August 13th, almost a

14  month after the July 19th deadline and almost a year after the

15  City had asked you for your relevant social media posts, did

16  you produce a single piece of your social media in this case,

17  right?

18  A.   I'm not sure.

19  Q.   Okay.  Well, that would be found in plaintiffs' response to

20  defendant's second set of requests for production.  And in fact

21  you didn't produce any Facebook Messenger exchanges until last

22  week, did you, Ms. Bruner -- I'm sorry -- Ms. Cerda?

23  A.   I think so.

24  Q.   And you didn't provide any data about your likes and your

25  comments until last Friday either, did you?

1    A.   I think so.

2    Q.   And, importantly, that meant that the City of Phoenix was

3    prohibited from asking you any questions about any of your

4    social media in your -- except for your deleted post -- in your

5    deposition, right?

6    A.   I guess.

7    Q.   Okay.  And it also prevented the City of Phoenix from doing

8    any discovery about anything that was in your social media

9    because discovery in this case closes in two days, right?

10   A.   Okay.

11   Q.   Okay.  Now, if you look at Paragraph 22 of your

12   declaration, you're talking about the picture that you deleted,

13   and you say, "The post was dated in 2011, and I had forgotten

14   that it was in my Facebook account."  Do you see that?

15   A.   Uh-hmm.

16   Q.   So you're sort of suggesting, like, oh, it was so long ago

17   I just completely forgot about it, right, because, Your Honor,

18   it was dated in 2011, right?

19   A.   Yes.

20   Q.   Okay.  But that's actually not true, is it?  This post is

21   dated January 23rd, 2014, which is right in the middle of when

22   you are claiming you were suffering damages in this case,

23   right?

24   A.   Yes.

25   Q.   Yeah.  So that was also a misrepresentation to the Court,

1    correct, Ms. Cerda?

2    A.  I'm not sure.

3    Q.  Okay.  Well, Exhibit -- Going back to your declaration

4    here, Paragraph 28, "Although I believe that the City has a

5    right to know what I said at work, I don't think it has a right

6    to know what I said to my friends or family in private,

7    especially given that the facts of these -- and these comments

8    have nothing to do with my job or the City."  Right?

9    A.  Right.

10   Q.  So you're telling this Judge, this Court, that your posts

11   and comments on social media have nothing to do with your job,

12   right?

13   A.  Correct.

14   Q.  Okay.  Let's take a look at Exhibit No. 32.  This is your

15   Facebook Messenger posts that were produced to the City of

16   Phoenix on Friday along with tens of thousands of pages of

17   additional data that was dumped on us three days before this

18   hearing.  And this is a conversation between you and

19   Ms. Bruner.  Correct?

20   A.  That's what it looks like.

21   Q.  And this document, Ms. Cerda, is full of information about

22   the City of Phoenix and your work, right?

23       Here's Lena Chacon.  That's a witness in this case,

24   right?  Yes?

25   A.  Yes.

1   Q.  Yes.  Manny and Randy, those are City employees, right?

2   A.  I know Manny, but I don't know who Randy is.

3   Q.  Okay.  And you're talking about Stanley and admin right

4   here, and you're talking about Christine Cordova?  That's

5   someone who also works at the City, right, custodian?

6   A.  Correct.

7   Q.  So this entire document is about work, yet you affirmed to

8   this Court that there was nothing in your social media,

9   messengers, posts, likes, data, that had anything to do

10  with your job at the City?

11          MR. MONTOYA:  Your Honor, objection.  Form.  She says

12  that everything in this document is about her work.  The

13  document, when Your Honor reviews it, Your Honor will

14  discover that's not correct.  So objection, form.  She's

15  misstating the document.

16          THE COURT:  Well --

17          MR. BURNS:  I'll clarify it, Your Honor.

18          THE COURT:  -- as to form, sustained.

19  Q.  (BY MS. BURNS)  Ms. Cerda, this document discusses work,

20  right?

21  A.  People that work there, yes.

22  Q.  Yes.  People at work, which was specifically what the City

23  of Phoenix asked for, right?

24  A.  Okay.

25  Q.  Yes?

1    A.  Yes.

2    Q.  Okay.  While we're on it, let's go through this document a

3    little bit more carefully.

4         First of all, let's look back at RFP number two, which

5    is Exhibit No. 6, and the second request for production that we

6    asked you for was to produce any and all correspondence, data,

7    memoranda, notes, recordings, et cetera, such as Facebook

8    Messenger.  Do you see that?

9    A.  Yes.

10   Q.  Okay.  And this was sent in September of 2018, right?

11   A.  Okay.

12   Q.  Okay.  And you didn't produce Exhibit 32, which is your

13   38 -- 37-page long Facebook Messenger exchanges with Ms. Bruner

14   until last Friday, right, almost a year later, correct?

15   A.  I'm not sure.

16   Q.  Okay.  Let's look at -- We already looked at the Court's

17   June 27th order.  I'd like to direct the Court there as well,

18   which is Exhibit 18, which also directly requests that the

19   party produce Facebook chat messages no later than July 19th.

20        Now, your Facebook Messenger chats in this

21   conversation span from August, 2015, to February, 2019, right?

22        I'll show you.  Last one here, the top of the page, is

23   February 2nd, 2019, right?

24   A.  Okay.

25   Q.  So you haven't produced any Facebook Messenger chats since

1   that time, right?

2   A.  I'm not sure.

3   Q.  Okay.  So how are you communicating with Ms. Bruner now?

4   Text message?

5   A.  We talk over the phone.

6   Q.  Is it your testimony that you don't send text messages to

7   each other?

8   A.  We have sent text messages to each other.

9   Q.  Okay.  And you know that the City requested those, but you

10  haven't produced them, right?  Yes?

11  A.  I'm not sure.

12  Q.  That's Exhibit 50, which is our discovery request to you,

13  request for production number 12, requesting all communications

14  between plaintiff Cerda and plaintiff Bruner, including without

15  limitation text messages, e-mail, social media messaging,

16  correct?

17  A.  Yes.

18  Q.  And you haven't produced a single text message in this

19  case, have you?

20  A.  I'm not sure.

21  Q.  Okay.  Let's go back to 32.  This is your Facebook

22  Messenger.  Let's look specifically at Page 28.

23          Now, this reads sort of like e-mail from the bottom to

24  the top.  Would you read your first entry on the bottom of that

25  page right in front of you, please, starting with first --

1    Well, I'll read it.

2        "First I had a choice now it was just a temporary

3    thing WTF."

4        What does that stand for?

5    A.  What the fuck.

6    Q.  "WTF crawled up her ass and died," I assume is what that's

7    supposed to mean, right?

8    A.  I'm not sure.

9    Q.  "I'm look for another job.  I'm not working with Christina

10    anymore.  They probably most likely do not do shit to her.  I'm

11    so pissed."

12        You're talking about Christina Chavez, correct?

13    A.  I'm -- I'm not sure.

14    Q.  Do you work with another Christina, Ms. Cerda?

15    A.  No.

16    Q.  Okay.  Now, the next two -- And this is sent to Ms. Bruner

17    directly through Facebook Messenger, correct?

18    A.  I'm not sure.

19    Q.  Okay.  Well, that's what this document is, your Facebook

20    Messenger, right?

21    A.  Okay.

22    Q.  Okay.  And you would agree with me that this is a document

23    where you're discussing Ms. Chavez, who's your alleged

24    harasser, right?

25    A.  Okay.

1    Q.  And it's about work, right?

2    A.  Okay.

3    Q.  Yes?

4    A.  That's what it says.

5    Q.  So then the next two things that you sent to Ms. Bruner are

6    actually just these little images, right?  They don't show you

7    what you sent.  It could be a GIF.  It could be a video.  It

8    could be a photograph.  But we don't know, right?

9    A.  I'm not sure.

10   Q.  Because we can't see it, right?  It hasn't been preserved,

11   correct?

12   A.  Okay.

13   Q.  So we'll never know what you actually sent Ms. Bruner right

14   after your comment about Ms. Chavez, will we?

15          MR. MONTOYA:  Objection, Your Honor.  Foundation.  How

16   would she know that answer?

17          THE COURT:  Sustained.

18   Q.  (BY MS. BURNS)  You can't see from this document that you

19   produced in this lawsuit what it was that you sent to

20   Ms. Bruner, can you, Ms. Cerda?

21          MR. MONTOYA:  Same objection, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  It doesn't look like it.

24   Q.  (BY MS. BURNS)  Okay.  Let's look at Page 25.  This is a

25   message that you sent to Ms. Bruner on November 28th of 2016:

1    "Just got an idea.  We should spread the rumor that that girl

2    Tonya got it.  See if this one goes off and spreads.  LOL.

3    Hah-hah.  To fun.  I wonder what her face would look like.

4    She'd be, like, oh, my God, she's my friend or, oh, my God,

5    she's so bad.  LOL."

6            That's your words, right, Ms. Cerda?

7    A.   That's my name, yes.

8    Q.   Yes.  Now, you know that in this very case Ms. Chavez's

9    position and her complaint to the Equal Opportunity Division at

10   the City of Phoenix was that you and Ms. Bruner were spreading

11   false rumors about her, isn't it?

12   A.   I'm not sure.

13   Q.   You were issued an NOI, a notice of inquiry, from the City

14   of Phoenix regarding an EOD complaint that Ms. Cerda --

15   Ms. Chavez filed against you and Ms. Bruner, correct?

16   A.   She filed a complaint supposedly that I called her a

17   b-i-t-c-h.

18   Q.   Okay.  And also that you were spreading false rumors,

19   correct?

20   A.   I didn't see that on there.

21   Q.   Okay.  You don't remember that that was part of the

22   complaint?

23   A.   I don't remember.

24   Q.   Okay.  Nevertheless, this document that you refused to

25   produce in this lawsuit pursuant to your Mandatory Discovery

1    rules, our requests for production, and this Court's two orders

2    demonstrates that you and Ms. Bruner are purposefully spreading

3    rumors in the workplace, correct, and that you think it's,

4    hah-hah, too fun to spread rumors, right?

5    A.  No.

6    Q.  That's what you wrote, isn't it, Ms. Cerda?

7    A.  That's what it looks like, but no.

8    Q.  That's what you wrote:  "We should spread the rumor about

9    Tonya."  And this ironically is in 2016, the very same time

10   that you and Ms. Bruner went to Robyn Cramer and started

11   telling people that Ms. Chavez was using the N-word at work,

12   right?

13   A.  No.

14   Q.  Well, we'll let the records reflect themselves, but that is

15   the exact time that the EOD report was filed.

16           You would agree with me, Ms. Cerda --

17           MR. MONTOYA:  Your Honor, I would object to Ms. Burns

18   testifying about documents and matters that are not in

19   evidence.

20           THE COURT:  All right.  Sustained.

21   Q.  (BY MS. BURNS)  Ms. Cerda, you would agree with me that

22   this document at Exhibit 32 is harmful to your case, right?

23   A.  I'm not sure.

24   Q.  Well, you would agree with me that that's not exactly a

25   favorable presentation for the Court, is it?

1   A.  I don't know.

2   Q.  Well, that's the real reason you didn't produce this

3   document, right?  Right?

4           THE COURT:  Please answer the question.

5           THE WITNESS:  I'm not sure.

6   Q.  (BY MS. BURNS)  Yes, Ms. Cerda?

7   A.  I'm not sure.

8   Q.  Okay.  The next -- There's one more conversation here that

9   I'd like to discuss.  It's on December 19th, which is on

10  Page 22, and it starts with Ms. Bruner asking you are you

11  coming to the meeting downtown?  Do you see that, Ms. Cerda?

12  A.  Yes.

13  Q.  Okay.  And you respond:  "I didn't know about it, but I

14  have phone stuff to get ready for tomorrow."

15          And she responds and says, "It's a budget meeting" --

16  right? -- "I wonder if the hefer is coming."  Do you see that?

17  A.  I do.

18  Q.  The heifer is what Ms. Bruner referred to Ms. Chavez as in

19  your conversations, right?

20  A.  I'm not sure.

21  Q.  You're under oath, Ms. Cerda.  Did Ms. Bruner testify or

22  did Ms. Bruner call Ms. Chavez a heifer in your correspondence

23  and in your communications?

24  A.  I don't remember.

25  Q.  Okay.  Now, you respond:  "Oh, no.  You want her to go.

1    LOL.  She's still here.  What time is it?"

2         Ms. Bruner says:  "Hell, no, but she will complain

3    saying RC is playing favoritism."

4         RC was all of your boss, right?  RC was your boss and

5    Ms. Chavez's boss and Ms. Bruner's boss, right?

6    A.  Correct.

7    Q.  And you're saying that she'll claim that you're playing

8    favorites, right?  Yes?

9    A.  That's what that says.  I'm not sure.

10   Q.  Okay.  And then you say, "LMAO".  What does that mean?

11   A.  Laughing my ass off.

12   Q.  Then Ms. Bruner says, "The hefer is here, hah hah hah."

13        And you respond:  "She went.  No way.  Why?  She don't

14   do shit anyway."

15        Right?

16        "Probably just to get out of here."

17        Right?  That's what you're saying about your

18   colleague, Ms. Chavez?

19   A.  I'm not sure that I'm talking about her there.  I don't

20   know who I'm talking about.

21   Q.  Who else would you be talking about, Ms. Cerda?  Who else

22   worked for Robyn Cramer and who Ms. Bruner called a heifer in

23   your communications?

24        MR. MONTOYA:  Objection, Your Honor.  Now she's saying

25   that Ms. Bruner is calling Ms. Chavez a heifer even though

1   Ms. Cerda has already testified she didn't know who that

2   referred to.  So once again the lawyer is testifying.

3              THE COURT:  Overruled.  I think -- She's asking who is

4   she calling this.  Who is it they're referring to?  That's

5   simply the crux of the question.

6              MS. BURNS:  Correct.

7              MR. MONTOYA:  Yes, Your Honor.

8   Q.  (BY MS. BURNS)  Who else would the heifer be that the two

9   of you both work with and report to Robyn Cramer?

10  A.  I'm not sure.

11  Q.  Okay.  Now, you go on and on.  And then she indicates that

12  she got killed by looks by Ms. Chavez or the heifer, whomever

13  you happen to be referring to.  And what's your comment on the

14  top?

15  A.  "Laughing my ass off."  Okay.

16             THE COURT:  What did you say?

17  Q.  (BY MS. BURNS)  Please read that.

18  A.  "Dog the bitch back or just laugh out loud so it makes her

19  more mad."

20  Q.  Right.  Now, it's interesting that you're using the phrase

21  bitch when you're referring to the heifer, who we believe to be

22  Ms. Chavez in this case, because you were issued a notice of

23  inquiry from the City of Phoenix about whether or not you ever

24  called Ms. Chavez that name, right?

25  A.  Yes.

1    Q.  And you denied it, correct?

2    A.  I believe that the investigation was that I called her that

3    to her face, and that was not the case.

4    Q.  Okay.  And then I asked you in your deposition if you ever

5    called Ms. Chavez a bitch, right?

6    A.  You did.

7    Q.  And you denied it under oath, correct?

8    A.  I'm not sure.

9    Q.  Okay.

10        (The following deposition excerpt was played:

11            Q.  Have you ever called Ms. Chavez a bitch?

12            A.  No.

13            Q.  To her face?

14            A.  No.

15            Q.  Have you ever called her that name to anyone

16            else --

17            A.  No.

18            Q.  -- at the City of Phoenix?

19            A.  No.)

20   Q.  (BY MS. BURNS)  So you denied under oath that you've ever

21   called her a bitch, correct?

22   A.  I'm not sure who the message was -- who I was talking about

23   in the message.  I can't answer that.

24   Q.  Okay.  Let's look at Exhibit 40.

25            This is another Facebook exchange, Messenger exchange,

1    that you produced three days ago to the City, and this is a

2    Facebook conversation between you and Tammy Hernandez Blaise,

3    right?

4    A.  Yes.

5    Q.  She's a former City of Phoenix employee?

6    A.  Was, I believe.

7    Q.  Yes.  And here she says to you:  "Hey, girl.  I saw that

8    you put a lawsuit against City of Phoenix 'cuz of Christina.

9    Right on.  Good for you."  Do you see that?

10   A.  Yes.

11   Q.  And then why don't you read your response, what you said

12   here.  Highlight it.

13   A.  "Hey, girl.  Yes.  We were sick of it, and no one would do

14   anything, so we had to.  And the bitch is still there.  They

15   moved her to the ninth floor now.  She tried to -- She tried --

16   She tried to run me over with a car.  It was bad, girl."

17   Q.  So here you are in Exhibit 40 calling Ms. Chavez a bitch to

18   a former City of Phoenix employee after testifying under oath

19   that you never called her that word, right?

20   A.  I guess.  I guess --

21   Q.  And you would agree with me --

22   A.  -- that's what it says.

23   Q.  I'm sorry.  I didn't mean to interrupt you.

24        You would agree with me, Ms. Chavez, that this

25   document that you just produced for the first time on Friday is

1    talking about your lawsuit, right?

2    A.  This, yes.

3    Q.  And it's a communication about Ms. Chavez, your alleged

4    harasser?

5    A.  That's what it says.

6    Q.  Okay.  Now, just quickly, going back here to your long

7    conversation about the heifer, who is believed to be

8    Ms. Chavez, again, you say here that Ms. Bruner says to you: "I

9    told Robyn Cramer to quiz her and see what she learned.

10   Nothing."

11           Oh, I'm sorry.

12           And then you sent one, two, three, four images that we

13   can't recover, right, or that aren't -- aren't visible on this

14   document that you produced?  Right?

15   A.  That's what it looks like.

16   Q.  Okay.  And then the two of you continue conversing about

17   whether she's going to come back to work.  And then you call

18   her a fat ass.  And then you say that her actions suck and that

19   you're going to tell Robyn Cramer.  Correct?

20           MR. MONTOYA:  Objection, Your Honor.  Her actions

21   suck, that's by someone -- that's by Anjel -- that purports to

22   be by Anjelica Bruner, not Ms. Cerda.

23           MS. BURNS:  That's true.

24           MR. MONTOYA:  So she's saying -- Now she's pinning

25   somebody else's words to her.

1          MS. BURNS:  I apologize.

2          THE COURT:  Rephrase the question.

3    Q.  (BY MS. BURNS)  Yes.  Your conversation goes on with

4    Ms. Bruner about how the heifer's actions suck and that you're

5    going to tell -- someone's going to tell Robyn Cramer, RC,

6    correct?

7    A.  That's what it looks like.

8    Q.  Okay.  Now, just one more comment about this document

9    before we move on.

10         This -- The 37-page document, Ms. Cerda, contains

11   a lot of information about Ms. Chavez and your complaints and

12   your concerns about her and you following her around and

13   checking on her time and telling on her.  But nowhere in this

14   document does it say anything about Ms. Chavez using racial

15   slurs, does it?

16         MR. MONTOYA:  Objection, Your Honor.  She hasn't had

17   the opportunity to read the document yet.  It's voluminous.

18         MS. BURNS:  She produced the document.

19         THE COURT:  I'm sorry.  I was going to just say didn't

20   she produce the document?

21         MR. MONTOYA:  Your Honor, they -- our expert

22   downloaded each of my clients' Facebook account.  His name is

23   Mark Cardwell.  And so there would be no allegation that we

24   withheld it or -- we gave it directly to the defendant.  And,

25   Your Honor, it was because of the --

1              THE COURT:  So she hasn't reviewed all of the pages?

2              MR. MONTOYA:  No, Your Honor, because it's

3    thousands -- it's thousands of pages that we gave them.

4              THE COURT:  All right.  Let's move forward.

5    Q.  (BY MS. BURNS)  Ms. Cerda, one -- Let's move on.

6              But I will say this for the Court -- because this is

7    oral argument and an evidentiary hearing -- that if it examines

8    Exhibit No. 32, it will find that there is nowhere anywhere any

9    concerns or complaints about Ms. Chavez using any kind of

10   racial language, and it spans the very time period in this case

11   at issue.

12             Now, Ms. Cerda, you testified in your deposition that

13   you were offended by the N-word, correct?

14   A.  Correct.

15   Q.  And you testified under oath that even though you're not

16   African American, you're offended by that word being used in

17   your presence, right?

18   A.  Correct.

19   Q.  Okay.  And you testified that it's offensive no matter who

20   uses it?  Right?

21   A.  Right.

22   Q.  You testified that you don't have any friends or family

23   members who use it?

24   A.  Right.

25   Q.  You testified that you've never used the N-word, correct?

1    A.   Yes.

2    Q.   Okay.  You also testified that you'd never written it down,

3    right, other than in this case with the EOD and in your

4    complaint?

5    A.   That I could remember.

6    Q.   That's a long clip.  I'm not going to play it right now.

7         But you testified at least in your deposition that you

8    couldn't recall any time when you had ever written that word

9    down, right?

10   A.   Right.

11   Q.   Okay.  Now let's take a look at the documents that were

12   produced in this case after you testified that you'd never used

13   the N-word and that it was so terribly offensive to you.  Let's

14   look at Exhibit No. 31.

15        So first we have the N-word post that you deleted,

16   right, and then on Page No. 416, Bates label 416, halfway down,

17   what's that say right there, Ms. Cerda?

18   A.   "Hey hey.  What up, what up, my nigga."

19   Q.   And then on Page No. 429 right there highlighted, what do

20   you see there?

21   A.   "My lil nigga."

22   Q.   And this is a conversation with Vincent Cerda?  That's

23   someone from your family?

24   A.   Correct.

25   Q.   Now -- And then next page, 430, what do you say right

| | |
|---|---|
| 1 | there, Ms. Cerda, to your -- in your conversation with Carrie |
| 2 | Cantu? |
| 3 | A.  "Wow that's what you call a motha fucking low life nigga |
| 4 | punk ass dick." |
| 5 | Q.  Okay.  Now, Ms. Cerda, I think you just testified that you |
| 6 | don't think that n-i-g-g-a is offensive, right, only |
| 7 | n-i-g-g-e-r is offensive? |
| 8 | A.  Correct. |
| 9 | Q.  What about this comment that you say right in here is not |
| 10 | offensive? |
| 11 | A.  This was a direct message to one of my friends.  It was -- |
| 12 | I didn't know that the world was going to see this. |
| 13 | Q.  You didn't know the world was going to see this when you |
| 14 | testified under oath that you never use the N-word, right? |
| 15 | A.  Well, my understanding was the N-word as E-R.  That's the |
| 16 | word that I don't use. |
| 17 | Q.  But that's my point.  Is it your testimony, Ms. Cerda, that |
| 18 | you don't find n-i-g-g-a offensive? |
| 19 | A.  Well, that was my friend, so we were talking.  I don't |
| 20 | use -- I don't use that language. |
| 21 | Q.  But you use it here, don't you? |
| 22 | A.  It was a direct message to one of my friends that I didn't |
| 23 | think that anybody else could see that. |
| 24 | Q.  So, again, you -- when you didn't think anyone was going to |
| 25 | see this, you testified under oath that you never used the |

 1   N-word, right?

 2   A.  Yes, I did.

 3   Q.  And at no point in time did you say, "I don't know what you

 4   mean by the N-word.  That's a confusing word to me," right?

 5   A.  No, I did not.

 6   Q.  You didn't say it was vague or ambiguous, right?

 7   A.  I think I said how you -- depending on how you use that

 8   word.

 9   Q.  Actually, no, you didn't.  You said you never used the

10   N-word?  That's what you just testified to two minutes ago,

11   that you testified in your deposition that you never used that

12   word, and you never said I used variations of it, did you?

13   A.  No.

14   Q.  Okay.  And you deleted the n-i-g-g-a post when you had the

15   opportunity, right?

16   A.  I did.

17   Q.  Now, Ms. Cerda, I'm going to finish up here because I don't

18   want to use up anymore time, but there's one other

19   inconsistency that I think is really important to point out.

20          Before I do that, Your Honor, I would encourage the

21   Court to look at Exhibit No. 31, which contains multiple

22   additional uses of the N-word by Ms. Cerda.

23          Finally, Ms. Cerda, you testified in this case that

24   you don't use Facebook very often, do you?

25   A.  No.

1    Q.   You testified that you use it not often; is that correct?

2    A.   Right.

3    Q.   And you testified that you use it for family stuff, maybe a

4    picture here and there?  That was your testimony, right?

5    A.   Correct.

6    Q.   But that wasn't true, right, because we now have hundreds

7    of documents that show that you're using Facebook for things

8    other than family stuff, correct?

9    A.   I'm not sure.

10   Q.   Well, I would point the Court to Exhibit No. 32,

11   Exhibit No. 41.  Let's look at Exhibit 41 really quickly

12   together.

13          This is a document that was produced to the

14   plaintiff -- the defendants on Friday.  This is a 6,653-page

15   document that represents itself as being your posts and

16   comments that you've liked or reacted to and your posts and

17   comments.  Do you see that?

18   A.   Yes.

19   Q.   Yes.  This is a, like I said, over 6,000 pages of all of

20   your Facebook activity, Ms. Cerda, right, in the relevant time

21   period?  This goes from July 21st, 2019, to the end of the

22   document is January 5th, 2011?

23   A.   Okay.

24   Q.   Okay.  6,652 pages with about 15 records of activity per

25   page.  Do you see that?

1    A.   Okay.

2    Q.   I'll represent to you, Ms. Cerda, the math on that is that

3    over this time period, you had over 93,000 activities on

4    Facebook.   Okay?

5    A.   Okay.

6    Q.   Do you consider that not using it very often?   That's more

7    than one Facebook communication per hour every day, 24 hours a

8    day, 365 days a year, for over eight years.   Do you consider

9    that not often?

10   A.   I guess not.

11   Q.   But when you had the opportunity in your deposition and we

12   didn't have this document, you told us under oath that you

13   didn't use Facebook very often, right?

14   A.   I use it for family things, to communicate with family

15   members or lost friends, yes.

16   Q.   That's still your testimony to this day under oath, is that

17   you use it for family?

18   A.   Right.

19           MS. BURNS:   Okay.   No further questions.

20           THE COURT:   All right.   Mr. Montoya.

21           MR. MONTOYA:   Thank you, Your Honor.

22           THE COURT:   And, Mr. Montoya, it is 2:39.

23           MR. MONTOYA:   Thank you, Your Honor.

24

25

|    |                                                                |
|----|----------------------------------------------------------------|
| 1  | CROSS-EXAMINATION                                              |
| 2  | BY MR. MONTOYA:                                                 |
| 3  | Q.  Good afternoon, Ms. Cerda.                                  |
| 4  | A.  Good afternoon.                                             |
| 5  | Q.  Have you ever testified in court before?                   |
| 6  | A.  Never.                                                      |
| 7  | Q.  Have you ever sued anyone before?                          |
| 8  | A.  No.                                                         |
| 9  | Q.  When did you first -- When do you have a first recollection |
| 10 | of the Facebook post that has the man in the wheelchair and    |
| 11 | uses -- That would be Exhibit No. 9, and it's the very last     |
| 12 | page of Exhibit No. 9.  That is Page 15 of Exhibit 9.          |
| 13 | Do you see that, Tab 9?  Just go to the last page of           |
| 14 | Exhibit 9.                                                      |
| 15 | A.  Okay.                                                       |
| 16 | Q.  Okay.  When's the first time that you remember seeing that? |
| 17 | A.  When they present it to me.                                 |
| 18 | Q.  Who's they?  The City of Phoenix?                          |
| 19 | A.  Yes.                                                        |
| 20 | Q.  In this lawsuit?                                            |
| 21 | A.  Yes.                                                        |
| 22 | Q.  So the City of Phoenix showed it to you?                   |
| 23 | A.  Yes.                                                        |
| 24 | Q.  What was your reaction to it?  Tell the Court.             |
| 25 | A.  I didn't know it was in there.                             |

1   Q.  And it was posted apparently in 2014?

2   A.  Yes.

3   Q.  And your deposition was taken in 2019 or late 2018?

4   A.  Yes.  I think it was the beginning of the year, so 2019.

5   Q.  Okay.  Yeah.  You're right.  Your deposition was taken on

6   February 20th of 2019, right?

7   A.  Correct.

8   Q.  Now, when you -- You deleted the post?

9   A.  Right.

10  Q.  Why?

11  A.  Because I don't remember putting it on there.

12  Q.  Are you denying that you put it on there?

13  A.  I'm not denying.  It's on there.  I mean, it's my name.  I

14  just don't recall putting it on there.

15  Q.  Okay.  And you knew the City had a copy of it?

16  A.  Right.

17  Q.  Explain to the Court what the concept of metadata is.

18  Explain to the Judge what metadata is.

19          MS. BURNS:  Objection.  Foundation.  This witness has

20  already testified she doesn't know anything about Facebook and

21  how it works.

22          THE COURT:  Sustained.

23  Q.  (BY MR. MONTOYA)  So it's true you don't know what metadata

24  is?

25  A.  I'm not sure how certain things on Facebook work, no.

1   Q.  Okay.  When you deleted that post, did you think you were

2   deleting anything that the City didn't already have?

3   A.  No.

4   Q.  Did you delete anything else?

5   A.  No.

6   Q.  Tell the Court how many hours that you have spent going

7   through your Facebook account trying to find things that were

8   responsive to the Court's order.  Tell the Judge.  Don't tell

9   me.

10  A.  The hours, hours and days, and we also had IT people look

11  through there to see if there was any findings of the N-word.

12  We had two people look through them.

13  Q.  Did -- First of all, did you -- did you authorize an

14  individual named Jerry Naumann to look through your Facebook

15  account?

16  A.  Yes.

17  Q.  Explain to the Judge why you did that.

18  A.  To make sure that the City of Phoenix had everything that

19  they could tell that I wasn't -- I'm not hiding anything.

20  Q.  Okay.  And you're familiar -- Do you remember reviewing in

21  my offices two orders from the Court?  One was on June 27th,

22  and the other one was on August 7th.  Do you remember those?

23  A.  Yes.

24  Q.  Do you remember -- Do you remember meeting a guy in my

25  office so you could give him your Facebook account information

1   named Mark Cardwell?

2   A.  Yes.

3   Q.  Did you give Mr. Cardwell authorization to access your

4   account?

5   A.  I did.

6   Q.  Were you aware that Mr. Cardwell was going to look for all

7   kinds of information through your account and give it to me,

8   and then I was going to give it to the City of Phoenix?

9   A.  Yes.

10  Q.  And you authorized that?

11  A.  I did.

12  Q.  You deactivated your account, right?

13  A.  Correct.

14  Q.  How many kids do you have?  Tell the Judge.

15  A.  I have five.

16  Q.  How old are they?

17  A.  22, 20, 18, two and a half, and two months.

18  Q.  Okay.  Do you communicate with your children on your

19  Facebook account sometimes?

20  A.  Sometimes.

21  Q.  Do you communicate about your children on your Facebook

22  account sometimes?

23  A.  Yes.

24  Q.  Is information regarding your children private to you?

25  A.  Yes.

1    Q.  Did you want to preserve that privacy?

2    A.  Yes.

3    Q.  Why didn't you just allow the City of Phoenix to download

4    your entire account?

5    A.  To protect the privacy of my children and family.

6    Q.  Now, the City of Phoenix, without your authorization, got

7    Page 15 of Exhibit 9, right?

8    A.  Is this the last page?

9    Q.  Yeah.

10   A.  Yes.

11   Q.  Do you remember that?

12   A.  Yes.

13   Q.  That was produced by the City.  Do you remember that?

14   A.  Yes.

15   Q.  Was your Facebook account -- Did you think it was on

16   private, or did you know it was on public, or did you know the

17   difference?

18   A.  I didn't know that it was on -- not on private.  And I

19   didn't know how exactly Facebook works.  So I thought only my

20   friends could see my post.  I didn't know it was public.  I

21   didn't know other people could see my Facebook activities.

22   Q.  When did you first learn that?  Tell the Court.

23   A.  When this document was presented to me.

24   Q.  Okay.  Now, when you deactivated your account, were you

25   able to reactivate it?  Explain that to the Court.

1    A.  Yes.  I -- Well, when I did reactivate it, it was to look

2    for things that could -- just to look for things that needed to

3    be given to them.

4    Q.  Understood.  Now, turn your attention to Exhibit 32, Laura,

5    please, if you would.

6    A.  32?

7    Q.  It's, yeah, Exhibit 32, Tab 32.  You've seen it before.

8    It's a series of text messages.

9    A.  Okay.

10   Q.  Now, did you even remember this conversation with Anjelica

11   Bruner before it was produced by our expert to us, which I in

12   turn produced to the defendant?  That's how they have it now.

13   Did you even remember it?

14   A.  I don't.

15   Q.  Now, when you looked through your Facebook, okay, you

16   authorized Jerry Naumann to go through your Facebook, right?

17   A.  Yes.

18   Q.  And you authorized Mark Caldwell to go through your

19   Facebook, right?

20   A.  Yes.

21   Q.  When you went through your Facebook yourself, did you see

22   these text messages in there?

23   A.  I don't -- I don't remember seeing it.  I don't remember

24   seeing it.

25   Q.  Do you know where all your Facebook messages are stored in

1   Facebook?

2   A.  No.

3   Q.  Okay.  You also authorized me to go through your Facebook

4   and my assistant, April Arvizu, to go through your Facebook,

5   right?

6   A.  Right.

7   Q.  Why did you do that?

8   A.  I'm not sure.

9   Q.  Okay.  Now, did you -- when you -- have you -- did you

10  instruct Mr. Naumann to withhold any information regarding your

11  Facebook from the Court?

12  A.  No.

13  Q.  Did you instruct Mr. Cardwell to withhold any information

14  from your Facebook account from me or from the City of Phoenix

15  or from -- or from the Court?

16  A.  No.

17  Q.  Now, let's talk about the N-word a little bit.  Now, in

18  your deposition was the N-word defined for you?

19  A.  No.

20  Q.  Okay.  Spell out, when I say the N-word, do you know what I

21  mean by it?

22  A.  Yes.

23  Q.  What is -- Now spell out the word for the Court to reflect

24  what you understand -- what word you understand the N-word to

25  mean.

1   A.  N-i-g-g-e-r.

2   Q.  Okay.  Have you ever used that word?

3   A.  No.

4   Q.  Do you use that word?

5   A.  No.

6   Q.  Why not?

7   A.  Because that word's offensive.

8   Q.  Okay.  Now, the other word, n-i-g-g-a, have you ever heard

9   that word?

10  A.  Yes.

11  Q.  Do you consider that to be the same identical thing as the

12  N-word?

13  A.  No.

14  Q.  Okay.  Do you listen to music a lot?

15  A.  I do.

16  Q.  What kind of music do you listen to?

17  A.  I listen to hip-hop.  I listen to a variety of music.

18  Q.  Does your music contain the N-word or the -- or the word

19  n-i-g-g-a?

20  A.  Yes.  It contains the A-R at the end and not E-R.

21  Q.  The G-E-R word?  The G-A?  I'm sorry.

22  A.  A-R, yes.

23  Q.  I'm getting confused.

24          Okay.  Now, have you ever -- Is your significant other

25  whom -- Is your husband African American?

1    A.   Yes, he is.

2    Q.   Okay.  You're not lawfully married, though, are you?

3    A.   No.

4    Q.   But you live with someone who you call your husband, right?

5    A.   Correct.

6    Q.   And does he have two children with you?

7    A.   Yes.

8    Q.   Is he African American?

9    A.   Yes.

10   Q.   Now, have you ever heard -- Have you ever socialized with

11   African Americans?

12   A.   Yes.

13   Q.   Have you ever heard them use the n-i-g-g-a word?

14   A.   Yes.

15   Q.   Is -- When they're using it, is it used in an insulting

16   way, the way the N-word is used?

17   A.   No.  It's like a -- It's like a slang word for, like, a

18   friend or family.

19   Q.   So now do they use -- do they use the N-word?  When you

20   hang out with your husband's friends who are African American,

21   do they use the N-word?

22   A.   Some people, yes.

23   Q.   Do they use it as an insult or what?

24   A.   No.

25   Q.   What do they use -- And they call each other the N-word

UNITED STATES DISTRICT COURT

1   with the E-R ending?

2   A.  No.

3   Q.  Oh, so they use the G-A ending?

4   A.  Correct.

5   Q.  Let's get this straight for the Court, because I think I

6   misheard you or I misunderstood you.  When you socialize with

7   your African American friends, do you hear them use n-i-g-g-a?

8   A.  Yes.

9   Q.  Do they use it insultingly?

10  A.  No.

11  Q.  When you hang out with your African American friends, do

12  they use the N-word, which we've already defined to be

13  n-i-g-g-e-r?

14  A.  No.

15  Q.  They don't use that?

16  A.  No.

17  Q.  Now, when you denied in your deposition using the N-word,

18  why did you deny that?

19  A.  Because my -- my understanding of using the N-word in the

20  deposition was E-R at the end of it.

21  Q.  Okay.  And you actually sat through Anjelica Bruner's

22  deposition, didn't you?

23  A.  Yes.

24  Q.  And do you remember the N-word being spelled out in

25  Anjelica Bruner's deposition on Page 119 as n-i-g-g-e-r?

1    A.   I'm not sure.  119?

2    Q.   Well, okay.  Let me ask you this.  When you were asked

3    questions regarding the N-word at your deposition, what word

4    did you understand the N-word to be?

5    A.   E-R, n-i-g-g-e-r.

6    Q.   Now, in reference to your social media account -- Okay.  Do

7    you have Instagram?

8    A.   Yes.

9    Q.   Do you use it?

10   A.   Not often but --

11   Q.   Do you --

12   A.   -- yeah.

13   Q.   Do you have Snapchat or whatever it's called?

14   A.   No.

15   Q.   Do you have face -- Well, you have Facebook.  What's --

16   MySpace?

17   A.   No.

18   Q.   Okay.  Do you have InSync?

19   A.   No.

20   Q.   Have you given -- Did you give Mark Caldwell access to the

21   only social media account that you have that you use, Facebook?

22   A.   Yes.

23   Q.   Is there anything else that you have that you haven't given

24   Mr. Caldwell the codes -- Cardwell the codes for?

25   A.   No, I don't think so, no.

1    Q.  And in fact Mr. Cardwell has given very large amounts of

2    data to the City that he derived from your Facebook account,

3    correct?

4    A.  Yes.

5    Q.  Are you aware that we obtained a list from the City of all

6    the search terms that they were interested in in your Facebook

7    account?

8    A.  Yes.

9    Q.  Are you aware that we gave that to Mr. Cardwell?

10   A.  Yes.

11   Q.  Are you aware that he ran a search regarding those terms?

12   A.  Yes.

13   Q.  And that he gave it through me to the City in toto, like,

14   completely?

15   A.  Yes.

16   Q.  Are you aware that Mr. Cardwell was able to isolate all of

17   your likes and comments on your Facebook account?

18   A.  Yes.

19   Q.  Are you aware that he -- he gave that to me, and I gave

20   that in toto to the City?

21   A.  Yes.

22   Q.  Is there anything else to give the City?

23   A.  No.

24        MR. MONTOYA:  Thank you, Your Honor.

25        Thank you, Ms. Cerda.

1          MS. BURNS:  Thank you, Your Honor.  I have two more

2    questions for Ms. Cerda here.

3                    REDIRECT EXAMINATION

4    BY MS. BURNS:

5    Q.  Ms. Cerda, I think you testified with Mr. Montoya that you

6    think that the n-i-g-g-a word is sort of a term of endearment,

7    something you use for your brother or your friend, right?

8    A.  Yes.

9    Q.  Liliana, may I have the HDMI again please.

10          When you use the phrase here in Exhibit No. 31, do you

11   consider that a phrase of endearment?

12   A.  I'm not sure.

13   Q.  Is that a no?

14   A.  I don't know.

15   Q.  Okay.  It sort of speaks for itself.

16          I'm going to point you to another exhibit.  This is a

17   document that we received from plaintiffs yesterday, Your

18   Honor, and it's been provided to you this morning.  It's called

19   Impeachment 2 because we had already submitted all of our

20   exhibits to the Court, but it's here on the screen.  It was

21   delivered this morning.

22          THE COURT:  All right.

23   Q.  (BY MS. BURNS)  Ms. Cerda, this is a document also provided

24   by your lawyers to us yesterday.  It's a 58-page document, and

25   it appears to be all of the doc -- your search history in your

1   Facebook account.  Do you see that?

2   A.  Okay.

3   Q.  Okay.  And it looks like on June 27th you did indeed search

4   for n-i-g-g-e-r on your Facebook, right?

5   A.  I'm not sure.

6   Q.  Okay.  So you testified with Mr. Montoya that you spent

7   days and days searching your Facebook for relevant information

8   for this lawsuit?

9        MR. MONTOYA:  Your Honor, I need to object.  I think

10  that reflects Mr. Naumann's search, because that fell when he

11  would have been doing that, as he will later testify.

12       THE COURT:  Well, he can so testify, in fact, if

13  that's what he did, but she can answer the question if she can.

14       MR. MONTOYA:  Yes, Your Honor.

15  Q.  (BY MS. BURNS)  So, Ms. Cerda, you testified that you spent

16  days searching your Facebook for relevant documents, right?

17  A.  Right.

18  Q.  Now, this document is your search history, and it shows

19  that you searched for the N-word on June 27th, the day the

20  Court ordered, not before that when you got your discovery

21  requests, right?

22  A.  Okay.

23  Q.  And the only doc -- word that you searched for was

24  n-i-g-g-e-r, right?

25       MR. MONTOYA:  Objection.  Foundation.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  That's what it looks like.
 3   Q.  (BY MS. BURNS)  Okay.  And if you look at the time, it
 4   starts on June 27th at 2:11 p.m., and your last search is June
 5   27th at 2:30 p.m.  So this actually took you 20 minutes, right?
 6              MR. MONTOYA:  Your Honor, objection.  Lack of
 7   foundation.  She's saying as if it's true that Ms. Cerda ran
 8   those searches.
 9              THE COURT:  Well, she can answer if she can.
10              And if this isn't her search, then she just needs to
11   say that.
12              MR. MONTOYA:  Understood, Your Honor.
13              THE WITNESS:  I'm not sure.
14   Q.  (BY MS. BURNS)  Okay.  This is your search history, right,
15   Ms. Cerda?
16   A.  That's what it looks like.
17   Q.  Okay.  And what's really interesting, I think you also
18   testified with Mr. Montoya that you think that it's unfair for
19   the City to look at your public Facebook page and that that was
20   somehow an invasion of your privacy, right?
21   A.  Right.
22   Q.  Let's go ahead and search this document for the last name
23   Chavez.  What you see are 15 different hits here searching for
24   Christina Chavez's posts, Christina Chavez's name, her name
25   again, her posts, her photos, her posts, her photos.  15 times,
```

1    all prior to filing your lawsuit, you are going into your

2    Facebook account searching for Ms. Chavez, right?

3    A.   No.

4    Q.   Well, that's what this document reflects, doesn't it,

5    Ms. Cerda?

6    A.   That's what it looks like, but I didn't look for her.

7    Q.   So it's your testimony under oath that you didn't spend

8    four months conducting 15 searches for Ms. Chavez on Facebook,

9    correct?

10   A.   I don't understand why I would pull her up on my Facebook.

11   Q.   Maybe you were looking for information for the lawsuit?

12   A.   I don't believe that I did that.

13          MS. BURNS:  Okay.  Well, the document speaks for

14   itself.  Thank you.  No further questions.

15          THE COURT:  All right.  You may call your next

16   witness.

17          MS. BURNS:  The City calls Ms. Bruner.

18          THE COURT:  Ma'am, you may --

19          MS. BURNS:  Just to clarify on my time, Your Honor, I

20   just want to make sure I have a few minutes left for closing.

21          THE COURT:  You do.  You started at 1:36.  You ended

22   at 2:38.  And you began at 2:57.

23          MS. BURNS:  So I have about a half an hour left.

24          THE COURT:  So you have roughly a little bit under a

25   half an hour.

1           MS. BURNS:  Okay.

2           THE COURT:  You may step down.

3           And, Ms. Bruner, please come forward and be sworn.

4      MARIA ANJELICA BRUNER, DEFENDANT'S WITNESS, SWORN

5           THE CLERK:  If you would, please state and spell your

6    name for the record.

7           THE WITNESS:  Maria Anjelica Bruner, M-a-r-i-a

8    A-n-j-e-l-i-c-a B-r-u-n-e-r.

9                         DIRECT EXAMINATION

10   BY MS. BURNS:

11   Q.  Good afternoon, Ms. Bruner.

12   A.  Hello.

13   Q.  You too deactivated your Facebook account after the

14   depositions in this case, correct?

15   A.  I'm thinking I deactivated before, but don't quote me on

16   that.  I'm not sure.

17   Q.  Okay.  So is it your testimony -- Well, I am going to quote

18   you because you're under oath.

19   A.  I'm not sure.

20   Q.  You don't know when you deactivated your Facebook account?

21   A.  I don't remember.

22   Q.  Is it your testimony that you did it before your

23   deposition?

24   A.  I'm thinking.

25   Q.  Well, I think that that's different than what you told the

| | |
|---|---|
| 1 | Court in your declaration.  So let's just check. |
| 2 | Well, maybe it doesn't say it in there, but is it your |
| 3 | testimony that you deactivated your -- Nevertheless, you |
| 4 | deactivated your account after this lawsuit started, correct? |
| 5 | A.  Yes, ma'am. |
| 6 | Q.  And your deactivating of your account had the effect of |
| 7 | removing all of your posts and comments on other people's |
| 8 | Facebook accounts, correct? |
| 9 | A.  Yes. |
| 10 | Q.  And you're also aware that the City discovered several |
| 11 | times of you using the terms the N-word on your husband's |
| 12 | Facebook account, correct? |
| 13 | A.  Can you define the N-word, which -- |
| 14 | Q.  Sure.  N-i-c-c-a, n-i-g-g-a, n-i-g-g-e-r, any variation of |
| 15 | the N-word. |
| 16 | A.  Never n-i-g-g-e-r.  Just n-i-g-g-a and n-i-c-c-a. |
| 17 | Q.  And it's interesting that you're asking me to define that |
| 18 | now, because at your deposition you didn't ever ask for that |
| 19 | question to be -- that word to be defined, did you? |
| 20 | A.  I think Ms. Kate did.  I think she did. |
| 21 | Q.  You didn't ever make a distinction between variations of |
| 22 | the N-word, did you, Ms. Bruner? |
| 23 | A.  I think I did, because I remember her asking me that and |
| 24 | what, you know, what the difference of it was. |
| 25 | Q.  When you were asked the question do you ever use the |

1    N-word, what was your answer?

2    A.  No.

3    Q.  Yes.  And is that still your testimony today?

4    A.  I do not use the n-i-g-g-e-r.

5    Q.  Okay.  But in your deposition the question was do you use

6    the N-word, correct?

7    A.  If you're referring to n-i-g-g-e-r, yes, I do not use that

8    word.  If you're referring to the n-i-g-g-a and n-i-c-c-a, yes,

9    I do use those.

10   Q.  Oh, you do use n-i-c-c-a?

11   A.  Yes, ma'am.

12   Q.  Oh, that's interesting.  Let's look at your deposition

13   testimony.  You swore to tell the truth at your deposition,

14   right?

15   A.  Yes, I did.

16   Q.  And you swore under oath as though you were before this

17   Court, correct?

18   A.  Yes, ma'am.

19   Q.  Okay.  Now, Ms. King asked you in your deposition if you

20   had ever heard of the term n-i-c-c-a, correct?

21   A.  Yes, she did.

22   Q.  And I'm going to play for you what your response was.  And

23   when I do, I want you to really look at your reaction when

24   you're asked this question under oath.  Okay?

25            I'd like you to look at your monitor and look at your

1    face and see what your reaction is when my partner asks you if

2    you've ever heard of the term n-i-c-c-a.

3        (The following deposition excerpt was played:

4            Q.  Okay.  Do you know what the word n-i-c-c-a means?

5            Have you ever seen that word or heard it?

6            MR. MONTOYA:  Did you say C-C?

7            A.  I've never --

8            Q.  Yeah, n-i-c-c-a.

9            You don't know what that means?

10           A.  No.)

11   Q.  (BY MS. BURNS)  So when you're under oath in your

12   deposition, you sort of scrunch up your face and say no, I have

13   no idea what this n-i-c-c-a is, right?

14   A.  You said what it means.  I don't know what it means.

15   Q.  The question is have you ever seen that word or heard it.

16   A.  Yes.

17   Q.  Right?  And you say, "I've never"?

18   A.  Yes, that's right.

19   Q.  Right?

20   A.  Yes.

21   Q.  Do you know what it means?

22           No, I have no idea about this phrase.

23           Right?

24   A.  I just said no.

25   Q.  Yeah.  But that's not true, is it, Ms. Bruner?  That was a

1   lie, wasn't it?

2   A.   I'm not going to say a lie because it depends on what term

3   you're using it in.

4   Q.   Well, Ms. King spelled it for you, n-i-c-c-a?

5   A.   Yes, she did.

6   Q.   No more confusion about the term, right?

7   A.   Yes.

8   Q.   Okay.  Let's go ahead and look at Exhibit No. 30,

9   Page No. 1.

10          Right there.  Right there.  What does your first line

11  of that post say?

12  A.   It says, "Hell, no, nicca."

13  Q.   So you're using n-i-c-c-a, right, the exact same spelling

14  that Ms. King put before you?

15  A.   Yes, ma'am.

16  Q.   Right?

17  A.   Yes, ma'am.

18  Q.   Okay.  Let's look at Page 2.  Your husband posts "Why does

19  Taco Bell cost more than Whataburger?"

20          And what's your response Ms. Bruner?

21  A.   "Cause they see big ass niccas like you walk in and say

22  damn, Gina, raise the prices.  Laugh out loud."

23  Q.   Same spelling as the spelling under oath that you shook

24  your head and scrunched your face and said you'd never heard

25  of, right?

BRUNER - DIRECT

1    A.   Yes, ma'am.

2    Q.   Let's look at Page 7, your post.  What's your post say?

3    A.   "Time to kick some peeps out of niggadom."

4    Q.   So that's a different word, right?

5    A.   Yes, but I did not write that.

6    Q.   Well, it's under your post name, right?

7    A.   Yes, but my husband had access to my Facebook.  We used to

8    share Facebook accounts, so for several years he used to use my

9    Facebook.

10   Q.   Okay.  So it's your family that's using it?

11   A.   Yes, ma'am.

12   Q.   And you also testified under oath that your family doesn't

13   use the N-word, right, Ms. Bruner?

14   A.   I -- I can't remember.

15   Q.   Okay.  Well, that's already been briefed in front of the

16   Court.

17   A.   Okay.

18   Q.   Just there's -- I'll represent to the Court, Your Honor,

19   that Exhibit 30 has several instances of Ms. Bruner using the

20   N-word in various forms, but I'd like to direct your attention,

21   Ms. Bruner, to Page 18.  This last post on the bottom, would

22   you read that please.

23   A.   "Selling my husband six foot half-breed nicca

24   jack-of-all-trades loves the Cowboys and drinks Hennessy might

25   get on your nerves cause he's on mine."

1    Q.   You're complaining about your husband, right?

2    A.   Yes, ma'am.

3    Q.   And you're calling him a six-foot, half-breed n-i-c-c-a

4    jack-of-all-trades, right?

5    A.   Yes, ma'am.

6    Q.   And drinks Hennessy.

7              Is that a term of endearment in your opinion?

8    A.   That's between me and him, what happens in our household,

9    in our home, yes.

10   Q.   But this isn't -- This is on Facebook.  It's not in your

11   home, right, Ms. Cerda -- or Bruner?

12   A.   Yes.

13   Q.   Okay.  Now, you also testified in your deposition that you

14   use Facebook very little, correct?

15   A.   Yes.

16   Q.   That was your exact quote, "I use it very little."  And you

17   testified that you use it to post things like family funerals

18   and potlucks and family reunions, right?

19   A.   Yes.

20   Q.   But we now know that that's not true, right, Ms. Bruner?  I

21   mean, we have multiple Facebook presentations and posts of you

22   using Facebook to talk about other things, right?

23   A.   Yes.

24   Q.   And we in fact have now discovered a Facebook Messenger

25   exchange that's 58 pages between you and Ms. Cerda where you're

1   talking about work, and you're talking about Ms. Chavez, right?

2   A.  Yes.

3   Q.  And you're talking about Robyn Cramer, your boss?

4   A.  Yes.

5   Q.  And, by the way, when you referred to the heifer who

6   attended the budget meeting, you were talking about Ms. Chavez,

7   right?

8   A.  Yeah.  I was just returning her favor by her calling me

9   that too.

10  Q.  Okay.  Oh, so now your claim is that she called you a

11  heifer?

12  A.  She used to call me a lot of names, you know, out of

13  content, just her walking by and making comments to me.

14  Q.  Okay.  But we now know that your representation that you

15  used Facebook very little is also not true, right, Ms. Bruner?

16  A.  Yes.

17  Q.  The truth is, as laid out in Exhibit No. 44, which is 3,913

18  pages long and was produced to us on Friday, your posts and

19  comments and all of your activity on Facebook, and that

20  document details your extensive use of Facebook, correct?

21  A.  Yes.

22  Q.  In fact, if you do the math on this one, Ms. Bruner, I

23  think it comes out to something like 32,000 -- I'm sorry --

24  it's 50 something -- 54,782 instances of Facebook communication

25  over the relevant time period.  You wouldn't describe that as

1    very little anymore, would you, Ms. Bruner?

2    A.   I would say very little for myself, because, like I said,

3    other people have access to my Facebook, my mother, my

4    children.   My husband was on there for a while.   But mostly my

5    mother.   She's on there a lot, you know, because she does have

6    relatives from California, and she communicates that way.   So

7    the liking and, you know, looking at stuff, you know, I mean,

8    she's on there.

9    Q.   So when other people use your Facebook account and use the

10   N-word, you don't change your password, right?

11   A.   No.

12   Q.   You don't delete it?

13   A.   No.

14   Q.   You don't take it down?

15   A.   No.

16   Q.   You don't find it offensive?

17   A.   I don't -- I find the n-i-g-g-e-r offensive because it's

18   hateful.   I mean, she would -- Ms. Chavez would use it in a

19   very hateful way toward myself, my children, my husband,

20   towards Ms. Cerda, and towards other employees within the City

21   of Phoenix that were married or are married to African

22   Americans.

23        Now, the n-i-g-g-a and n-i-c-c-a, like I stated

24   before, I mean, there's a difference between those two terms.

25   So, no, I don't find it offensive.

1    Q.  Even though you didn't know what n-i-c-c-a was when you

2    testified under oath the last time?

3    A.  No, I didn't know what it was.  It was just something --

4    Q.  Okay.  You just used it?

5    A.  Yes, ma'am.

6    Q.  Okay.  And, Ms. Bruner, this case isn't just about the

7    N-word.  It's about -- The City of Phoenix asked you for all

8    evidence of racial slurs, correct?

9    A.  Yes, ma'am.

10   Q.  And you did not produce any of these documents voluntarily.

11   Not a single one of these N-word documents in any variation you

12   did not provide to the City of Phoenix until this Court ordered

13   you to do so, and even then you did it months after the Court

14   ordered you to do so, correct?

15   A.  I believe that is not accurate.  We did start -- And I say

16   we as myself and Ms. Cerda, but I can't speak for Ms. Cerda.

17   But as for myself, I did start looking when my attorney advised

18   me to, and --

19   Q.  And when was that?

20   A.  I think it was when the City of Phoenix first asked for

21   them, which was in 2016.  No.  I'm sorry.  2018.  Excuse me.

22   I'm so sorry.

23   Q.  And do you have any documents demonstrating that you did

24   anything to make any searches back then, Ms. Bruner?

25   A.  No.  But you should be able to look on there if you've

1   already pulled that information to see how many times I've been

2   on there.

3   Q.  It's actually your responsibility, isn't it, Ms. Bruner?

4   A.  Yes.  And I did screenshot what I thought was, you know --

5   because you had asked for n-i-g-g-e-r.  So I didn't come up

6   with anything looking for that particular word.  And that's

7   what I thought that, you know, you were asking for, and that's

8   what I went to my attorney and says I don't know -- I don't

9   have that kind of information on my page.

10  Q.  Thank you, Ms. Bruner.

11  A.  You're welcome.

12  Q.  The record will reflect exactly what we asked for, and it

13  was not specifically n-i-g-g-e-r.  Thank you.

14  A.  Okay.  You're welcome.

15          THE COURT:  Mr. Montoya.  And it is 3:16, Ms. Burns.

16          MR. MONTOYA:  Your Honor, can I ask the Court a

17  question?

18          THE COURT:  Yes.

19          MR. MONTOYA:  How much time did I use?  Thank you.

20          THE COURT:  You were -- You started at 2:39.  You

21  ended at 2:57.  18 minutes.

22          MR. MONTOYA:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. MONTOYA:

25  Q.  Now, Ms. Bruner --

1    A.  Yes, sir.

2    Q.  -- tell the Court whether or not you've deleted anything

3    from your Facebook account.

4    A.  No, sir.  I have not deleted anything from my Facebook

5    account.

6    Q.  How many children do you have?

7    A.  I have three children.  Three children.

8    Q.  And how old -- And how old are they?

9    A.  They are 29, 28, and 22.

10   Q.  And how many grandchildren do you have?

11   A.  I have four grandchildren, four.

12   Q.  And how old are they?

13   A.  14, 10, 4, and 3.

14   Q.  Do you -- Do any of your grandkids live with you?

15   A.  Yes, they do, all of them.

16   Q.  All of them do?

17   A.  Yes, sir.

18   Q.  Do you have custody over any of them?

19   A.  I have guardianship over my oldest grandson.

20   Q.  Understood.  Do you ever talk about your grandkids in your

21   Facebook account?

22   A.  Yes, I do.

23   Q.  Your grandkids are minors?

24   A.  Yes, they are.

25   Q.  Do you want to keep your communications regarding your

1    grandchildren and your children private?

2    A.  Yes, I do.

3    Q.  Why did you deactivate your Facebook account?

4    A.  Because I felt the City of Phoenix was just invading my

5    privacy.

6    Q.  Okay.  Talking about the N-word, have you ever -- Okay.  Do

7    you remember in your deposition that you actually defined the

8    N-word?

9    A.  I do.  I do remember something.

10   Q.  Please direct your attention to Exhibit 36, Page 3.

11           Exhibit 36, Page 3, Your Honor, may I publish this?

12           THE COURT:  Yes.

13           MR. MONTOYA:  Thank you.

14           THE COURT:  It's already admitted, my understanding

15   is, under your agreement, so --

16   Q.  (BY MR. MONTOYA)  Okay.  Do you see your --

17           Okay.  You see it says A.  Do you understand that to

18   mean answer?

19   A.  Yes, sir.

20   Q.  Okay.  Then you're asked "And do you know what the Spanish

21   version of it is"?

22   A.  Yes, sir.

23   Q.  And you spell it too?

24   A.  Yes, sir.

25   Q.  Then you see the question "So when I say the phrase word in

1    this deposition, I'm referring to either the use in the English

2    or the Spanish version."  Do you see that?

3    A.  Yes, sir.

4    Q.  Okay.  When you were asked questions regarding the N-word

5    at your deposition, Ms. Bruner, what was your understanding of

6    the word?

7    A.  That they were referring to n-i-g-g-e-r.

8    Q.  Now, have you ever called anyone -- And when I use the

9    N-word this afternoon in this courtroom --

10   A.  Yes, sir.

11   Q.  -- I'm referring to the n-i-g-g-e-r word.

12   A.  Yes, sir.

13   Q.  Have you ever called -- used that slur against anyone in

14   anger?

15   A.  No, sir.

16   Q.  Now, the other term, spelled n-i-g-g-a --

17   A.  Yes, sir.

18   Q.  -- do you -- what's your understanding of that word?

19   A.  My understanding of it is if it's friends, family, you

20   know, towards, you know, like, hey, you know, like, kids from

21   the neighborhood, you know, we use that term, you know.  It's,

22   like, hello, you know, we're good friends or family members,

23   you know.

24   Q.  Is your husband African American?

25   A.  Yes, he is.

BRUNER - CROSS

```
 1   Q.  Tell the -- Tell the Court how long you've been married.
 2   A.  Actually he is not full-blooded African American, so I
 3   would like to --
 4   Q.  Not very many people are, but --
 5   A.  He is mixed.  He is Seminole Indian and black.
 6   Q.  Understood.  Does he identify as primarily African
 7   American?
 8   A.  He does not like to use that term African American because
 9   he's not from Africa.  He always just says, you know, refer to
10   me as Leonard or, you know, as other.  He just marks other.
11   Q.  Understood.  Tell the Court how long you've been married.
12   A.  I've been married 24 and a half years.
13   Q.  Okay.  Do most people take your husband as African
14   American?
15   A.  50 percent.  They always ask if he's native or he's Cuban.
16   Q.  Understood.  Have you ever -- Do you ever hang out with --
17   Does your husband have African American friends?
18   A.  Yes, sir.
19   Q.  And African American family members?
20   A.  Yes, sir.
21   Q.  And they're your family members too?
22   A.  Yes.
23   Q.  Your kids are part African American?
24   A.  Yes.
25   Q.  Do any of them identify as African American?
```

1   A.  Yes, they do.

2   Q.  Do you ever hear African American family members using the

3   n-i-g-g-a word?

4   A.  Yes.

5   Q.  And do they get into a fight right afterwards?

6   A.  No, sir.

7   Q.  Is it used insultingly?

8   A.  No, sir.

9   Q.  What is it used to mean?

10  A.  It's like brotherly love.  You know, they give hugs and

11  kisses or handshakes, you know, when they do that.

12  Q.  Do you use that term at work?

13  A.  No.

14  Q.  Now, do people at your home call each other -- pardon my

15  language -- nigger lovers?  Were you called a nigger lover at

16  work?

17  A.  Yes, I was.

18  Q.  By whom?

19  A.  By Ms. Chavez.

20  Q.  Did you find that hurtful?

21  A.  I did.  I did.

22  Q.  Were your children called nigger babies?

23  A.  Yes.

24  Q.  By whom?

25  A.  By Ms. Chavez.

1   Q.  Did you find that hurtful?

2   A.  Yes.

3   Q.  Now, do you and your family call each other N-word lovers

4   and N-word -- and call children N-word babies at home or on

5   Facebook?

6   A.  No.

7   Q.  Now, the times that you've referred to your husband as the

8   n-i-g-g-a, did you do that insultingly?

9   A.  No, sir.

10  Q.  Have you heard him refer to African Americans as that word?

11  A.  Yes.

12  Q.  When you said that your husband wrote a post about

13  niggadom, do you remember that?

14  A.  Yes, sir.

15  Q.  How do you know he did that?

16  A.  Because at that time he was on my Facebook a lot because he

17  didn't have Facebook.

18  Q.  Are you aware that in his deposition he admitted he did

19  that?

20  A.  No, I wasn't aware of that.

21  Q.  Now, did you give me access to your Facebook account?

22  A.  Yes, sir, I did.

23  Q.  Did you give my assistant access to your Facebook account?

24  A.  Yes, sir, I did.

25  Q.  Did you authorize me to give a guy named -- a computer

1   expert named Jerry Naumann access to your Facebook account?

2   A.  Yes, I did.

3   Q.  Do you remember that Saturday when we met at my offices

4   with the guy named Mark Cardwell?

5   A.  Yes, sir.

6   Q.  And he actually came over to the office, right?

7   A.  Yes, sir.

8   Q.  And did you give him your Facebook access information?

9   A.  Yes, sir.

10  Q.  Were you aware what he was going to do with the

11  information?

12  A.  Yes, sir.

13  Q.  What?

14  A.  He told us what he was looking for, what terminology he was

15  looking for, and that he was not going to look at anything

16  else, pictures, or, you know, anything to violate our privacy.

17  That's what he said.

18  Q.  Did you authorize him to share his results with me?

19  A.  Yes.

20  Q.  Did you authorize me to give the results of Mr. Caldwell's

21  search to the City?

22  A.  Yes.

23  Q.  Are you aware that it produced tons of data?

24  A.  I didn't know there was that much.

25  Q.  Did you -- Now, do you remember Exhibit 32?  It's the

1   exhibit with your Facebook conversation.  I guess it was a --

2   you were texting.  You can text on Facebook?

3   A.  It's not text.  It's through Messenger.

4   Q.  Is that like texting, or do you know?

5   A.  I don't.  I don't know if it's like texting.

6   Q.  Now, have you reviewed your Facebook account to comply with

7   the Court's order?  And, I mean, I know you authorized me and

8   my staff to and Mr. Naumann to and Mr. Caldwell to, but tell

9   the Court whether or not you've looked yourself.

10  A.  Yes, sir, I have.

11  Q.  What -- Tell the Court what you did to look.

12  A.  I went through everything.  You know, unfortunately there

13  is a lot of information on there, but I tried to, you know,

14  narrow it down to the specific word that they were looking for.

15  And I didn't find anything with that word.

16  Q.  Okay.  Would you please direct your attention to

17  Exhibit 50.  It might be in a different book.  Exhibit 50.  It

18  will be in a skinnier book.

19          MR. MONTOYA:  Your Honor, to save time, I'm just going

20  to put it up on the screen, if that's okay.

21          THE COURT:  That's fine.

22          MR. MONTOYA:  Thank you.

23  Q.  (BY MR. MONTOYA)  Now, Laura -- Anjelica --

24  A.  Yes, sir.

25  Q.  -- you understand that you're one of the plaintiffs in this

```
 1    case, right?

 2    A.  Yes, sir.

 3    Q.  Then do you see this is your response to defendant's second

 4    set of requests for production of documents?

 5    A.  Yes, sir.

 6    Q.  Are you aware when for the first time the City of Phoenix

 7    actually asked you for information on social media containing

 8    the N-word?

 9    A.  I'm thinking it was in September of 2018.  I can't

10    remember.

11         MR. MONTOYA:  Well, Your Honor, if I may publish

12    another document?

13         THE COURT:  You may.

14    Q.  (BY MR. MONTOYA)  Thank you.

15         Do you see this document, defendant's second set of

16    requests for production?

17    A.  Oh, yes, sir.

18    Q.  Do you see when it's dated?  April 16th of this year?

19    A.  Yes, sir.

20    Q.  Right?

21    A.  Yes, sir.

22    Q.  Okay.  Do you see request number 13?

23    A.  Yes, sir.

24    Q.  So -- And is it -- Is that the first time you were asked

25    for social media regarding the N-word --
```

1    A.   No.

2    Q.   -- to your knowledge?

3    A.   I don't -- No, I don't think so.

4         MR. MONTOYA:  Your Honor, this will be part of my

5    argument.  The record is uncontradicted that's the first

6    request for production.  That's the first written discovery

7    request when they asked for that stuff.

8         THE COURT:  Well, let me --

9         MR. MONTOYA:  Yes, Your Honor.

10         THE COURT:  -- give you my --

11         MR. MONTOYA:  I'm listening.

12         THE COURT:  -- finding with respect to that.

13         MR. MONTOYA:  Yes.

14         THE COURT:  The parties have an obligation under the

15    Mandatory Initial Disclosure Protocol's general order to

16    produce the information stated therein.  That I find to be the

17    operative responsibility trigger.  And I believe that document

18    was issued back in February 28th of 2018.

19         MR. MONTOYA:  Yes, Your Honor.  My response to that

20    is -- of course I've heard what Your Honor said -- but the

21    mandatory disclosure rule is very broad, and I think in

22    reference to the issue of sanctions, in reference to a motion

23    to compel, Your Honor, there might be some different analysis.

24         But I would think, you know, if that's -- if that's

25    broad enough to include all of someone's social media or

1    someone's private conversation, Your Honor, between spouses,

2    even in a social media context, Your Honor, I think that's

3    reading it too broadly.

4           THE COURT:  Well, I will point you to Paragraph B3

5    that obliges every party to list the documents, electronically

6    stored information, ESI, tangible things that they know to

7    exist, whether or not in their possession, custody, or control,

8    that you believe may be relevant to any party's claim or

9    defenses -- that is the operative language -- and to make that

10   available for inspection.

11          In addition to that, Mr. Montoya, Paragraph 11 does

12   indicate that Rule 37(b)(2) shall apply to the order.  And so I

13   do find that it covers this instance, and I do find the

14   operative obligation began on February the 28th of 2018.

15          MR. MONTOYA:  I understand, Your Honor.  My only

16   response to that would be that we respect Your Honor's ruling

17   and completely understand it.  We misunder -- misunderstood the

18   scope of that obligation to include all of this material, which

19   is very difficult to obtain.

20          Your Honor, the evidence will show that in order for

21   us to actually get this -- get this information, Your Honor, we

22   literally had to spend almost $12,000 or a little over $12,000.

23   That's how much it cost us to extract this information.  We

24   could not extract it ourselves, Your Honor.

25          And I don't think, with all -- I don't think it's

1    reasonable for us to have known that we had that obligation,

2    like, based upon the Court's general order.  We understand we

3    have that obligation now because Your Honor just ruled that we

4    did.

5              And, Your Honor, we have done --

6              THE COURT:  You're getting into argument.

7              MR. MONTOYA:  We are, Your Honor, and I want to close

8    with this.

9              THE COURT:  Please do.

10             MR. MONTOYA:  Thank you.

11   Q.  (BY MR. MONTOYA)  Now, did you direct Mr. Naumann to

12   withhold any information from me or from the City?

13   A.  No, sir.

14   Q.  Did you direct Mr. Caldwell -- Cardwell to withhold any

15   information from me or the City?

16   A.  No, sir.

17   Q.  Did you intentionally destroy any information?

18   A.  No, sir.

19   Q.  Did you know that there was information in your Facebook

20   account that you intentionally did not provide even though you

21   knew you had an obligation to provide it?

22   A.  No, sir.

23             MR. MONTOYA:  No further questions, Your Honor.  Thank

24   you.

25             THE COURT:  Thank you.  Ms. Burns.

REDIRECT EXAMINATION

BY MS. BURNS:

Q.  Liliana, may I have the monitor again please.  Just one
question, Your Honor.

        Ms. Bruner, in your deposition when my partner Kate
King asked you if you've ever used the N-word or the Spanish
version of it, you didn't just answer no.  You actually gave an
example of how you do refer to African American men.  Do you
remember that?  Do you remember that?

        Let's go ahead and play it.

     (The following deposition excerpt was played:

        Q.  Have you ever used the N-word or the Spanish

        version of it?

        A.  No.  Like if I'm talking to my mother and she asks

        me a question, you know, I would tell her, you know,

        that black gentleman over there, but that's probably

        the most, but I --

        Q.  Right.

        A.  But I don't use that term in any way.)

Q.  (BY MS. BURNS)  So you testified under oath that you don't
use the N-word in any way, correct?

A.  I don't use the n-i-g-g-e-r in any way.

Q.  Okay.  And you offered under oath the other thing that you
used to refer to African American men, right, the other term?
You volunteered that?

1    A.  Yes.

2    Q.  And that wasn't n-i-g-g-a, right?  You just listened to it.

3    You didn't say I use n-i-g-g-a?

4    A.  No, I didn't say that.

5    Q.  And you didn't say I use n-i-c-c-a, right?

6    A.  No.

7    Q.  Instead, you said I refer to African American men as black

8    gentlemen, right?

9    A.  If my mother asked me, yes.

10            MS. BURNS:  Thank you.  No further questions.

11            THE COURT:  All right.  You may stand down.

12            MR. MONTOYA:  Your Honor, can I ask her a couple of

13   questions so I don't have to call her back?

14            THE COURT:  You may.

15            MR. MONTOYA:  Thank you, and I'll be very brief.

16                      RECROSS-EXAMINATION

17   BY MR. MONTOYA:

18   Q.  Have you ever -- Is the n-i-g-g-a word confined to African

19   Americans, or have you ever called a Mexican American that or

20   heard a Mexican American referred to as that?

21            THE COURT:  Which question do you want her to answer?

22   You asked three questions there.

23   Q.  (BY MR. MONTOYA)  Thank you, Your Honor.  I'll rephrase.

24            Have you -- Have people that you've been around ever

25   referred to non-African Americans as n-i-g-g-a's?

1    A.  Yes.

2    Q.  Okay.  Have African -- Have you ever heard African

3    Americans refer to Mexican Americans as n-i-g-g-a's?

4    A.  Yes.

5              MR. MONTOYA:  Understood.  Thank you, Your Honor.

6              THE COURT:  I do have one question for you,

7    Ms. Bruner.

8              THE WITNESS:  Yes, ma'am.

9                         EXAMINATION

10   BY THE COURT:

11   Q.  Would you have filed your lawsuit against the City if

12   Ms. Chavez used the term n-i-c-c-a?

13   A.  It depends how she used it.  She's a very aggressive

14   person.

15   Q.  Would you have filed your lawsuit if she had used the term

16   n-i-g-g-a?

17   A.  It depends how she phrased it.  Like I said, she's a very

18   aggressive person.  And when she comes in your face and says it

19   to you, to me that finds it very aggressive and hurtful.

20             THE COURT:  Thank you.  You may stand down.  Thank

21   you.

22             THE WITNESS:  Thank you.

23             THE COURT:  Ms. Burns, any other witnesses?

24             MS. BURNS:  How much time do I have, Your Honor?

25   Because I want to save a few minutes.

1          THE COURT:  Seven minutes.  Why don't I do this.  You

2    can use your seven minutes for examination.  I will give you

3    each five minutes to wrap up.

4          MS. BURNS:  Okay.  That sounds reasonable.  Do you

5    mind if we just take a minute here, Your Honor, and talk about

6    what's next?

7          THE COURT:  Yes.

8          MR. MONTOYA:  And, Your Honor, does that seven minutes

9    include her cross-examination of my witnesses?

10          THE COURT:  I'm going to give you a little bit of

11    leeway here.

12          MR. MONTOYA:  Because at the threshold, Your Honor

13    said you were going to strictly enforce, as you recall.

14          THE COURT:  I do recall that, Mr. Montoya.

15          MR. MONTOYA:  Yes.

16          THE COURT:  But it is my courtroom.  I get to lay the

17    procedure.

18          MR. MONTOYA:  Yes.

19          THE COURT:  All right.

20          MS. BURNS:  Okay.  Your Honor, we'll go ahead and call

21    Jefford Englander to the stand.  I'll go grab him.

22          THE COURT:  Yes.  Who is this?  Mr. Englander?

23          MS. KING:  Yes, Your Honor.  Mr. Englander is the

24    City's expert in this case.  And I'm wondering if the

25    plaintiffs have any objection to Mr. Englander testifying as an

1    expert in this hearing?

2         MR. MONTOYA:  Your Honor, I think some foundation will

3    have to be established.  I don't think it's going to be a

4    problem once his background is put on the record.

5         THE COURT:  Then are you stipulating to his testifying

6    as an expert?

7         MR. MONTOYA:  Your Honor, first I'd like to hear what

8    he says.  An expert on what?

9         THE COURT:  Well --

10        MS. KING:  His --

11        THE COURT:  -- weren't you given information about

12   Mr. Englander before he was listed on the witness list?

13        MR. MONTOYA:  Not on this -- Not for purposes of this

14   hearing, Your Honor, no.

15        THE COURT:  Well, for purposes of any other matter in

16   this case.

17        MR. MONTOYA:  Yes, I was.

18        THE COURT:  Okay.  So you've reviewed his CV and what

19   he has been listed to testify as generally in the case?

20        MR. MONTOYA:  That's true, Your Honor, yes.

21        THE COURT:  All right.  So do you or do you not

22   stipulate to him testifying as an expert?  I just need an

23   answer, Mr. Montoya.

24        MR. MONTOYA:  Your Honor, let me put -- How about if I

25   do this.  It will ease things up.  I'm not going to object.

1          THE COURT:  All right.

2          Come forward and be sworn, sir.

3          JEFFORD ENGLANDER, DEFENDANT'S WITNESS, SWORN

4          THE CLERK:  If you would, please state and spell your

5     name for the record.

6          THE WITNESS:  Jefford Englander, J-e-f-f-o-r-d.

7     Englander is E-n-g-l-a-n-d-e-r.

8          THE COURT:  All right.  You may proceed.

9          MS. KING:  Thank you, Your Honor.

10         Your Honor -- Liliana, may I please have the HDMI

11    please.  Thank you.

12                        DIRECT EXAMINATION

13    BY MS. KING:

14    Q.  Mr. Englander, thank you for being here today.  I just have

15    a few questions.  You will see up on the screen I have put up

16    Exhibit 15 in this case.  Did you prepare an expert report in

17    this case?

18    A.  I did.

19    Q.  Okay.  And is your expert report, does it appear up on the

20    screen as Exhibit 15?

21    A.  It does.

22    Q.  Okay.  Your Honor, we would like to submit this as an

23    exhibit for purposes of this evidentiary hearing.

24         Mr. Englander, how hard is it for a user to preserve

25    their Facebook data?

1    A.  Extraordinarily easy.

2    Q.  Okay.  Why is it so easy?

3    A.  Facebook has made it so that it's about a four-click

4    process once you've logged into their Web page.  Users were

5    concerned about what Facebook data was holding about the users,

6    so Facebook implemented a process where you can archive your

7    data, and it's a very straightforward process.

8    Q.  Okay.  And when a Facebook user deactivates their account,

9    is all of their Facebook data recoverable when they reactivate?

10   A.  Not necessarily.  Facebook actually has a Web form

11   available for users because the failure to bring all the data

12   back is apparently such a prevalent problem that they've had to

13   create a Web form to support a -- or submit a support type

14   ticket.

15   Q.  Does a Facebook user have the option of making his or her

16   posts private?

17   A.  Absolutely.

18   Q.  And in contrast does a Facebook user have the option of

19   making their information public?

20   A.  Absolutely.

21   Q.  Okay.  Did you take screen captures of publicly available

22   information from Laura Cerda's and Leonard Bruner's Facebook

23   accounts?

24   A.  I did.

25   Q.  Okay.  Was this information in any way private or

1    confidential?

2    A.  Not at all.  It was completely public.

3    Q.  Okay.  What date did you take those screenshot -- those

4    screen captures of Ms. Cerda's and Mr. Bruner's Facebook

5    accounts?

6    A.  It was February 19 of 2019.

7    Q.  Okay.  I'm pulling up on the screen Exhibit 29.

8           And if you can see on the middle of the page, I'm

9    going to direct your attention to the January -- let me back

10   up -- the January -- the January 23rd, 2014, Facebook post by

11   Laura Christina Cerda.  Do you see that?

12   A.  I do.

13   Q.  Okay.  The N-word post in the center of the page?

14   A.  Yes.

15   Q.  Okay.  When you took your screen captures, were you able to

16   locate or recover this post that appears on Page 1 of Exhibit

17   29?

18   A.  No, I was not.

19   Q.  What does that tell you about what happened with that post?

20   A.  That sometime between the collection and the exhibit on the

21   screen and my collection on February 19th, that that post was

22   deleted.

23   Q.  When a Facebook post is deleted, what happens with the

24   information associated with that post?

25   A.  Well, the post is a conglomerate of a few things.  What we

1   see visually is the meme or the picture or the words or the

2   phrase or the video that someone has posted.  But in addition

3   to that, there is the date and time of the post, which is

4   considered metadata for the post.  Further, there are likes and

5   emojis that people can apply, other people can apply.  So if a

6   user likes the post, that is also lost when an item is deleted.

7   Comments about the post are lost when the item is deleted.  So

8   there's a significant amount of information other than the

9   actual post that's also deleted along with the post.

10  Q.  So have we now lost all of this information for the January

11  23rd, 2014, post?

12  A.  Yes.

13  Q.  Okay.  And did somebody like the January 23rd, 2014, post?

14  A.  Yes.

15  Q.  Okay.  Is there any way to determine who liked it?

16  A.  No.

17  Q.  Would whoever liked the post have a like on his or her own

18  Facebook profile?

19  A.  Certainly.

20  Q.  Okay.  And what would show up in the user's profile who

21  liked that post?

22  A.  If the post were still active, there be would a reference

23  to this particular post saying that that other user had liked

24  it.  In this case the post is no longer active, so it would

25  probably just be a reference to a generic like of a post.

1   Q.  Okay.  And that Facebook post was made on January 23rd,

2   2014; is that correct?

3   A.  Correct.

4   Q.  Okay.  And I'm going to point you down to the end of

5   Exhibit 29 where -- What do you see at the bottom -- the bottom

6   of Page 5 of Exhibit 29?

7   A.  There is an entry where Ms. Bruner liked a post, but it

8   simply says liked a post in contrast to the other entries that

9   I'm seeing on the page that indicate that it was a post by a

10  particular individual.

11  Q.  And was that Ms. Bruner like on a post made within a day or

12  so of Ms. Cerda's deleted Facebook post?

13  A.  Yes.

14  Q.  No further questions.

15          Oh, I'm sorry.  Excuse me.  One further question.

16          Mr. Englander, once any data is deleted from Facebook,

17  is it possible to recover it and see what it is?

18  A.  No.  No.  Once it's deleted, it's deleted.

19  Q.  Okay.  There's no way to recover?

20  A.  If you deactivate an account, there's a 30-day grace

21  period.  I'm sorry.  If you requested a full deletion of an

22  account, there's a 30-day grace period.  But, generally

23  speaking, if you just delete content off your Facebook, there's

24  no trash bin for Facebook where you can go back and recover it.

25  There's no recovery available.  There's just simply too much

```
 1    content.
 2    Q.  Okay.  So when you delete a post, there's no way to recover
 3    it?
 4    A.  That is correct.
 5              MS. KING:  Okay.  Thank you.
 6              THE COURT:  Thank you.  Mr. Montoya.
 7                      ENGLANDER - CROSS
 8    BY MR. MONTOYA:
 9    Q.  Thank you.  Mr. Englander, when did you review Laura
10    Cerda's Facebook account?
11    A.  February 19 of 2019.
12    Q.  Where did you review it?
13    A.  Online on Facebook's Web page.
14    Q.  But on your -- in your office or where physically?
15    A.  Yes, my office.
16    Q.  Okay.  Did you take a photograph of the whole -- of every
17    post?
18    A.  A majority of them.  I don't know that I captured all of
19    them.  There were a tremendous number of them.
20    Q.  Were you -- If you would have wanted to photograph every --
21    what is -- You're a computer expert?
22    A.  I'm a computer forensics expert, yeah.
23    Q.  Okay.  Was there any way for you to download the contents
24    of Ms. Cerda's post?
25    A.  The only way to download the full content of her Facebook
```

1    profile, for lack of a better term, would have been by using

2    her user name and password credentials to access her account,

3    and I did not have those.

4    Q.  Was there a way to photograph or take a computer image of

5    everything that you saw on your computer screen?

6    A.  That is in essence what I did.  I don't know that I

7    captured every single post, but that is generally in essence

8    what I was attempting to do.

9    Q.  Okay.  And what were you looking for?

10   A.  I was simply looking to document the status as of that date

11   of her Facebook profile page with respect to, you know, certain

12   types of posts that were raised as an issue.

13   Q.  But you found something, right?

14   A.  I'm sorry?

15   Q.  Please direct your attention to Exhibit No. 9, Page 15.  Do

16   you see that?  There's -- You see those big books before you?

17   A.  Yes.

18   Q.  You're familiar with those?

19   A.  Which one am I looking at?

20   Q.  Yeah.  It's the one with Tab 9.  There should only be one

21   with a Tab 9.  Do you see it?

22   A.  I'm sorry.  I'm getting there, sir.

23   Q.  Yes, sir.

24   A.  Tab 9.

25   Q.  The last page, it's Page 15.  It's the last page on Tab 9,

1    Mr. Englander.

2    A.  The last page is the screen capture that I was just looking

3    at on the screen.  Is that what you're referring to?

4    Q.  Yeah.

5    A.  I see that.

6    Q.  Yeah.  You took a picture of this?

7    A.  No, I did not.

8    Q.  You didn't?

9    A.  This is not my picture.

10   Q.  Okay.

11   A.  This post was not available when I did the screen capture.

12   Q.  Okay.  It was not available.  What did you do with all the

13   stuff you took pictures of?

14   A.  I presented it to counsel.

15   Q.  How many pages was it?

16   A.  That's a good question.  I don't recall.  It was many

17   pages.

18   Q.  Hundreds of pages?

19   A.  Again, I just don't remember.  It was --

20   Q.  Thousands of pages?

21   A.  Probably hundreds of pages.  But, again, I don't have a

22   good number for you.  I apologize.

23   Q.  I understand.  How did you transmit it to counsel?

24   A.  Electronically.

25   Q.  Okay.  So you e-mailed it to them or --

1    A.   I think it was probably too large.  I may have sent them a

2    download link.

3    Q.   Okay.  And what's too large?

4    A.   I think most e-mail systems can handle up to about five or

5    six megabytes of data, but, again, I don't remember what the

6    size of this particular set was.  I may have e-mailed it if it

7    was smaller.  I just don't recall.

8              MR. MONTOYA:  Mr. Englander, thank you.

9              Thank you, Your Honor.

10             THE COURT:  Any follow-up?

11             MS. KING:  No, Your Honor.

12                              EXAMINATION

13   BY THE COURT:

14   Q.   Sir, I do have one question.  I want to make sure I

15   understand this, because I might have confused -- gotten

16   confused during your testimony.

17             When someone deactivates a Facebook account, you said

18   some data is lost?

19   A.   Facebook has recognized that the reactivation process is

20   not always entirely complete, and they have very specifically

21   for that particular process a Web support form designed just

22   for folks who have a problem when they're reactivating a

23   deactivated account whereby they can complain that all of their

24   data did not get brought back.  And it certainly seems to

25   suggest if Facebook has a form to rectify that issue, that it

1    is a more than very infrequent issue.

2    Q.  And that is something separate and apart from deleting an

3    account?

4    A.  Correct.  Deleting the account permanently erases the

5    entirety of the account, and there's no recoverability of any

6    of it, whereas deactivating simply puts it on a not available,

7    completely private, maybe recover everything when you bring it

8    back out type of status.

9    Q.  All right.  And so the only recoverable information if

10   someone were to deactivate their account -- Well, I guess I

11   should -- If I understand what you just said, if someone

12   deactivates the account, it's possible that they may lose some

13   of what was on their Facebook account.  It just is sort of a

14   case-by-case basis.

15   A.  That's my understanding, yes, Judge.

16   Q.  And the only way to really ensure that full activation is

17   complete is to go through this reactivation program?

18   A.  Well, I don't know that that would even ensure that it was

19   complete.  I think you can simply complain that some of your

20   posts may not have come back, and Facebook may or may not be

21   able to rectify that issue if you had deactivated it.  But

22   certainly if you delete the account, everything would be gone.

23   If you deactivated, most of your things should come back.  But

24   I guess what Facebook is saying is we're not going to guarantee

25   that.

1              THE COURT:  Okay.  All right.  Thank you, sir.  You

2    may step --

3              MR. MONTOYA:  Your Honor, can I make a follow-up on

4    Your Honor's question?

5              THE COURT:  Yes.

6              MR. MONTOYA:  Thank you.  And I'll be super brief, as

7    Your Honor will see.

8                          RECROSS-EXAMINATION

9    BY MR. MONTOYA:

10   Q.  Sir, in reference to Ms. Cerda's account, you understand it

11   was deactivated, right?

12   A.  At what point?

13   Q.  At any point.

14   A.  I believe I've been made aware of that, yes.

15   Q.  Okay.  You don't know whether or not any data was lost or

16   not, do you?

17   A.  Well, I know the posting that was shown to me that's not

18   there is not there.

19   Q.  Well, are you saying that was lost with deactivation?  Is

20   that your testimony?

21   A.  I don't know why it was lost.  I just know that it is no

22   longer there.

23   Q.  Understand.  I want -- see if -- This is a simple question.

24   Do you know -- Can you tell the Court with any certitude that

25   data was lost from Ms. Cerda's Facebook account because of

1    deactivation?

2    A.  No.

3              MR. MONTOYA:  Understood.  Thank you, sir.

4              Thank you, Your Honor.

5              THE COURT:  Thank you.  You may step down, sir.

6              THE WITNESS:  Thank you, Judge.

7              THE COURT:  All right.  Ms. Burns.

8              MS. BURNS:  We have no further witnesses, Your Honor.

9    We do have a couple of exhibits that we'd like to just ensure

10   that we get in the record for your review, which is

11   correspondence between counsel in which counsel for the City

12   repeatedly requested and clarified its discovery requests.

13   That's at Exhibits 8, 10, 12, 13, 19, 22, and 28.

14             And we might have some additional exhibits, but I need

15   to spend a little bit of time during these next witnesses to

16   figure out if anything else.

17             THE COURT:  All right.

18             MS. BURNS:  Thank you, Your Honor.

19             THE COURT:  It's at 3:53.  Let's resume in about --

20   Well, let's take about a seven-minute break.

21             MR. MONTOYA:  Your Honor, may I ask you a question?

22             THE COURT:  Yes.

23             MR. MONTOYA:  How much time do I have left?  I'm

24   keeping track, but it's Your Honor's track that's governing.

25             THE COURT:  I think you've only used roughly 41, 42

1   minutes.

2           MR. MONTOYA:  Thank you, Your Honor.

3       (Proceedings recessed from 3:54 p.m. until 4:06 p.m.)

4           THE COURT:  Mr. Montoya, you may continue.

5           MR. MONTOYA:  Yes, Your Honor.  Thank you.  I'd like

6   to call our first witness.  His name is Mr. Jerry Naumann, and

7   he's already in the courtroom.

8           THE COURT:  Sir, please come forward and be sworn.

9            JERRY NAUMANN, PLAINTIFFS' WITNESS, SWORN

10          THE CLERK:  If you would, please state and spell your

11  name for the record.

12          THE WITNESS:  My name is Jerry Naumann.  That's

13  J-e-r-r-y N-a-u-m-a-n-n.

14          THE COURT:  Does that work for you?

15          THE WITNESS:  I'll be fine.

16          THE COURT:  Thank you.  All right.  You may proceed.

17          MR. MONTOYA:  Your Honor.

18          THE COURT:  Yes.

19          MR. MONTOYA:  Thank you.

20                      DIRECT EXAMINATION

21  BY MR. MONTOYA:

22  Q.  Sir, good afternoon.

23  A.  Good afternoon.

24  Q.  Please state your full name for the record.

25  A.  It's Jerry Naumann.

1    Q.  Sir, what do you do for -- What do you do for a profession?

2    What do you do to earn a living?

3    A.  I'm an IT professional.

4    Q.  And when you say an IT professional, explain what you mean

5    by that.

6    A.  Well, I've been an IT professional for about 20 years

7    mostly working for lawyers and law firms.  It encompasses

8    litigation support, law office support, data discovery,

9    document discovery, document production, Web scraping, Web

10   searches.  You name it.  Anything that has to do with lawyers

11   and the law, I pretty much have done it if it has something to

12   do with a computer.

13   Q.  And when you say IT, is that information technologies?

14   A.  It is.

15   Q.  Understood.  How long -- Have you ever performed a search

16   of a digital -- or an examination of a digital database?

17   A.  Yes, many.

18   Q.  How long have you been examining digital databases?

19   A.  For about 20 years.

20   Q.  Okay.  How did you learn how to do that, sir?

21   A.  I pretty much taught myself how to do it.

22   Q.  Okay.  And when did you teach yourself how to do it?

23   A.  Well, I've been into computers very early on, late '70s,

24   early '80s as a kid.  And then I've always been involved with

25   computer and computer technology since then.  So I basically

1    just -- you just teach yourself.

2    Q.  Understood.  Did you go to college?

3    A.  Yes.

4    Q.  Where?

5    A.  I have a bachelor's degree from the University of Redlands

6    in California.

7    Q.  And when did you earn that, sir?

8    A.  In 1984.

9    Q.  And do you have any other degrees?

10   A.  I do.  I have a master's degree from London School of

11   Economics in London, England.  That was in the year 1990.

12   Q.  Understood.  Do you have any other advanced studies?

13   A.  I have -- I did a Ph.D. program in the University of

14   Nottingham in England from 1991 to '95, did everything but

15   completed the dissertation, so I do not have that degree.

16   Q.  Understood.  Now, did I retain you to search the Facebook

17   accounts of two of my clients?

18   A.  Yes.

19   Q.  Were the clients named Laura Cerda and Anjelica Bruner?

20   A.  Yes.

21   Q.  Did you accomplish what I retained you to do?

22   A.  Yes, I believe so.

23   Q.  Now, what did I retain you to do?  Explain that to the

24   Court, sir.

25   A.  What you wanted me to do was to search these two Facebook

1    sites for a specific term.  The term was the N-word.

2    Q.  What did you mean the N-word?  Tell the Court.  I know --

3    We've been discussing these words for awhile this afternoon.

4    So the Court is going to understand I'm going to ask you to

5    either say the N-word or spell the N-word, whichever you

6    prefer, on the record for the Court so it's clear.

7    A.  Well, I don't have a problem doing either.  You

8    specifically asked me to search for the word nigger spelled

9    n-i-g-g-e-r.

10   Q.  Okay.  Did you do so?

11   A.  I did.

12   Q.  And I asked you to search it in the Facebook database of

13   Laura Cerda?

14   A.  Yes.

15   Q.  And Anjelica Bruner?

16   A.  Yes.

17   Q.  Tell the Court how -- Did I tell you how to conduct the

18   search?

19   A.  You did not.

20   Q.  Did I make any suggestions as to how to conduct the search?

21   A.  No.

22   Q.  Did you ask me for any suggestions how to conduct the

23   search technically?

24   A.  Not technically.  We discussed the various options of what

25   type -- what type of searches could be conducted either in

1    Facebook or on Facebook itself or logging into Facebook itself

2    and using the internal Facebook search tools or other types of

3    searches which would involve a lot more time and money like

4    archiving the site off-line and running OCRs and then searches

5    based on that.

6    Q.   Okay.  Did you recommend a particular search or was a

7    particular search selected?

8    A.   I discussed the options with you, and I recall that based

9    upon the certain costs that might be involved, that you merely

10   wanted to know if the words -- the word nigger appeared in

11   either of the Facebook sites.

12   Q.   And how did you effectuate the search?

13   A.   I tried two methods.  One is what's called a front facing

14   or public facing search.

15   Q.   Explain that for the Court.

16   A.   Well, there's two components to Facebook.  It's what

17   everybody in the world can see.  And then if you log in,

18   there's private parts of Facebook.  But you also get access to

19   internal tools that Facebook has such as search tools and

20   things that you don't get on the public facing site.  If you

21   want to run searches on the public side, then you have to know

22   how to construct queries based on certain addresses for

23   Facebook.  And it's also a moving target because Facebook is

24   constantly changing, and what works and what doesn't work over

25   time changes.

1          So you have to kind of figure out what to do and how

2    to do it and move with it as Facebook changes.  It's much

3    easier to log in and run searches as the user.

4    Q.  When you and I discussed this project, Mr. Naumann, did I

5    seem very familiar with Facebook and its operations?

6    A.  No.

7    Q.  Did you explain to me what you've just explained for the

8    Court moments ago?

9    A.  Not in the detail I explained now.  I'm fair -- a very

10   brief discussion, which wouldn't have imparted all that much.

11   Q.  And which search, the public search or the private log-in

12   search, which one did you perform?  Tell the Court.

13   A.  Well, I actually did both and didn't find anything on the

14   public search.  So I recommended if you wanted definitively to

15   know if that word was contained in any of those Facebook sites,

16   that logging in as the user and performing searches there would

17   be definitive.

18   Q.  And did -- And what happened next?  Did I tell you, "Oh,

19   no, don't do that" --

20   A.  No.

21   Q.  -- "I'm happy with your answer"?

22   A.  No.  You --

23   Q.  What did I tell you?

24   A.  You arranged for your staff to get and provide the

25   credentials to log into Facebook.

1  Q.  So you were provided with all the -- My office provided you

2  with all the office -- all the information that you needed to

3  actually log in to the Facebook accounts?

4  A.  Yes.

5  Q.  And tell the Court what you did after you logged in.

6  A.  Well, once I logged in, I performed the search using

7  internal Facebook tools, looking at texts and posts, and ran

8  several searches just to make sure and didn't come up with any

9  hits or results.

10  Q.  On either one?

11  A.  On either one.

12  Q.  Now, I'm going to show you what has been identified as

13  Exhibit 45.  There we go.  This is the search history for

14  Laura -- Assume, Mr. Naumann, that this is the search history

15  for Laura Cerda.

16  A.  Okay.

17  Q.  Do you see here on July 22nd there's a search for the

18  N-word?

19  A.  Yes.

20  Q.  And then on July 27th there's another search for it.  There

21  are three more searches for it, actually four more searches for

22  it on July 27th.

23  A.  Yes.

24  Q.  Did you conduct those?

25  A.  I did the ones on June 27th.

```
 1    Q.   Okay.  Did you do the one on July 22nd, or do you know?
 2    A.   July 22nd I did not.
 3    Q.   Okay.  And you did the same thing for Anjelica Bruner?
 4    A.   Yes.
 5    Q.   Do you remember how much time you spent on this project?
 6    A.   In total from the first time we talked about it and
 7    discussed it and working with your office to get credentials
 8    and then doing public searches and then private searches, about
 9    four and a half hours or so.
10    Q.   Okay.  And do you remember charging my firm $550 for that?
11    A.   Yes.
12    Q.   Understood.  Did I -- Did I try to shape the results of
13    your search in any way?
14    A.   No.
15    Q.   Did I try to restrict the scope of your search in any way?
16    A.   No.
17    Q.   Did I try to -- Did I tell you to hide anything?
18    A.   No.
19    Q.   Did I tell you that our communications were private and
20    confidential, protected by the attorney-client privilege
21    because you were acting as my agent in a lawsuit?
22    A.   I don't recall you specifically telling me that in this
23    instance, but I already know that's the case.
24    Q.   Okay.  Well, if you believe that's the case, with all due
25    respect, sir, you're inaccurate, so you're free to tell the
```

1   Court anything that I told you.  Do you understand that?

2   A.  Yes.

3   Q.  Okay.  So did I tell you -- Did I try to verbally persuade

4   you to shape the results of your search in any way?

5   A.  No.

6   Q.  And were you -- How many -- How many times have you

7   searched a database like Facebook or Facebook?

8   A.  Probably hundreds of times.

9   Q.  Were you satisfied that you had done a complete search?

10  A.  Yes.

11  Q.  Were you satisfied with the result?

12  A.  The result is the result.

13          MR. MONTOYA:  Understood.  Mr. Naumann, I don't have

14  any further questions.  Thank you, sir.  Thank you, Your Honor.

15          THE COURT:  Thank you.  Ms. --

16          MS. KING:  Your Honor, I just have a few questions.

17          THE COURT:  Yes, please come forward.

18                          CROSS-EXAMINATION

19  BY MS. KING:

20  Q.  Mr. Naumann, did I pronounce that correctly?

21  A.  You did.

22  Q.  Okay.  Thank you.  What date were you engaged by

23  Mr. Montoya?

24  A.  I'm not sure of the exact date.  It was probably on or

25  around June 10th, but I'd have to go back to my records to know

1   for certain.

2   Q.  Okay.  Liliana, can I please have the -- Thank you.

3        Mr. Naumann, this is a declaration that you submitted

4   yesterday --

5   A.  Yes.

6   Q.  -- in this case.  I'll point your attention to Paragraph 8

7   of your declaration that does indicate that you were retained

8   on June 10th, 2019.  So just to refresh your recollection, were

9   you retained on June 10th, 2019, to perform a Facebook search?

10  A.  The statement says on approximately.

11  Q.  On approximately.  Okay.  So on or about June 10th, 2019?

12  A.  That would be correct.

13  Q.  Okay.  And are you aware that's 16 months after Ms. Bruner

14  and Ms. Cerda filed this lawsuit?

15  A.  I'm not aware of that.

16  Q.  And you searched the Facebook accounts of Ms. Bruner and

17  Ms. Cerda; is that right?

18  A.  Yes.

19  Q.  And your search was limited to one word?

20  A.  That's correct.

21  Q.  And you were asked to just search one word?

22  A.  That's correct.

23  Q.  And that one -- And that one word is n-i-g-g-e-r; is that

24  correct?

25  A.  That's correct.

1    Q.  Okay.  And your search did not extend to examining any

2    words containing pictures or images or memes; is that correct?

3    A.  That's correct.

4    Q.  So if the N-word appeared in a photo, for example, or in a

5    GIF, you would not have found it; is that correct?

6    A.  That's correct.

7              MS. KING:  Okay.  No further questions.

8              THE COURT:  Mr. Montoya.

9                      REDIRECT EXAMINATION

10   BY MR. MONTOYA:

11   Q.  Mr. Naumann, you informed me of the limits of your search,

12   right?

13   A.  Yes.

14   Q.  You informed me that you could only look for words that

15   were inputted into the Facebook account by means of some type

16   of keyboard, actual or like a Surface, right?

17   A.  Yes, characters rather than images of words.

18   Q.  Understood.  And do you remember telling you that we had

19   reviewed the images, that we would review the images ourselves?

20   A.  Yes.

21             MR. MONTOYA:  Understood.  Thank you, sir.  No further

22   questions, Your Honor.

23             THE COURT:  I do have a question.

24

25

1                              EXAMINATION

2     BY THE COURT:

3     Q.  Were you only asked, Mr. Naumann, to search Facebook?

4     A.  Yes.

5     Q.  So no other social media accounts like Twitter or Snapchat

6     or Instagram?

7     A.  That's correct.  Only Facebook.

8     Q.  Did you ever have an occasion to suggest searching

9     modifications of the word term?

10    A.  I did not.  Mr. Montoya gave me a task, and I limited my

11    work to the task that he gave me.

12    Q.  All right.  And so just to be clear, you only searched

13    Facebook; no other social media accounts?

14    A.  That is correct.

15            THE COURT:  All right.  Thank you.  You may step down.

16            Do you have another witness?

17            MR. MONTOYA:  Yes, Your Honor.  His name is Mark

18    Caldwell.  Can I go get him?

19            THE COURT:  Yes.

20            MR. MONTOYA:  Thank you.

21            Your Honor, here he is.

22            THE COURT:  Sir, please come forward and be sworn.

23            MARK S. CARDWELL, PLAINTIFFS' WITNESS, SWORN

24            THE CLERK:  If you would, state your name and spell it

25    for the record please.

1           THE WITNESS:  Pardon?

2           THE CLERK:  If you would, state your name and spell

3    it.

4           THE WITNESS:  Mark S. Cardwell, C-a-r-d-w-e-l-l.

5           MR. MONTOYA:  May I, Your Honor?

6           THE COURT:  Yes.

7                        DIRECT EXAMINATION

8    BY MR. MONTOYA:

9    Q.  Sir, please introduce yourself to the Court for the record.

10   A.  I'm Mark Cardwell.

11   Q.  And, Mr. Cardwell, what do you do for a living?

12   A.  I'm a digital forensics expert.

13   Q.  What does a digital forensics expert do?  Please explain.

14   A.  In a nutshell, it means that I find and collect digitally

15   stored electronic information from a wide variety of media

16   sources like hard drives, phones, et cetera.

17   Q.  And, sir, how long have you been doing that?

18   A.  About 18 years.

19   Q.  Okay.  How did you learn how to do that?

20   A.  Back then a lot of it was self-teaching, because it was the

21   early stage for anything outside of law enforcement.  But there

22   came to be major software producers and training programs that

23   I could take advantage of.

24   Q.  Okay.  Now, sir, I'm going to be asking you some questions,

25   and it would make it easier for you to follow if you were to

1    direct your attention to Exhibit 56.  If you find in those

2    booklets in front of you, you'll see a tab with a 56 on it.

3              THE COURT:  I think it's in the thinner notebook.

4              MR. MONTOYA:  It's going to be in that one, yeah.

5              THE WITNESS:  I have it.

6    Q.  (BY MR. MONTOYA)  Is that a declaration by you?

7    A.  Yes, it is.

8    Q.  Did you sign it under penalty of perjury?

9    A.  I did.

10   Q.  Did you write it?

11   A.  Yes.

12   Q.  Did you sign it yesterday?

13   A.  Yes, I did.

14   Q.  Is it true?

15   A.  Yes.

16   Q.  Did you graduate with a bachelor of science in economics

17   and mathematics from the University of Oregon in 1880 -- 1980?

18   A.  1980.

19   Q.  I said 1880.  I'm sorry about that.  1980?

20   A.  Yes.

21   Q.  Did you get an MBA with emphasis in strategic management in

22   information systems from Boston College's Carroll Graduate

23   School of Management in 1988?

24   A.  Yes.

25   Q.  And for the past three decades has your primary

1    professional focus been digital information systems?

2    A.  Yes.

3    Q.  What is a digital information system?

4    A.  It's any system, any hardware that receives and processes

5    and produces electronic data.

6    Q.  Now, is a copy of your -- Was a copy of your curriculum

7    vitae attached to your declaration?

8    A.  Yes.

9    Q.  Is it true?

10   A.  Yes, it is.

11   Q.  Sir, how many times have you testified in court regarding

12   your work as a computer forensics examiner?

13   A.  You know, I couldn't tell you right off the top of my head.

14   I'd have to count it in my CV.

15            THE COURT:  He's been before this Court on at least

16   one prior occasion about two years ago.

17            MR. MONTOYA:  I saw that, Your Honor.

18   Q.  (BY MR. MONTOYA)  Isn't it true that you've testified in

19   depositions and courtrooms a couple of dozen times or so?

20   A.  Looks like about that, yes.

21   Q.  Understood.  Have I ever worked with you professionally

22   before this case?

23   A.  No.

24   Q.  Okay.  Do you remember me calling you after I received an

25   order from the Court?

1    A.  Yes, I do.

2    Q.  And do you remember me telling you that I had been referred

3    to you by a lawyer that we both know named Pavneet Uppal?

4    A.  Yes.

5    Q.  And that I needed you to help me?

6    A.  Yes.

7    Q.  And that I didn't have any technical expertise, and I

8    needed someone who did?

9    A.  Yes.

10   Q.  To examine some Facebook accounts?

11   A.  Yes.

12   Q.  Do you remember me telling you that another expert had done

13   an internal look, but I needed someone to go deeper?

14   A.  Yes.

15   Q.  Did you agree to do that?

16   A.  Yes, I did.

17   Q.  Now, I want you to tell the Court do you remember me giving

18   you copies of the Judge's order that was telling us what we

19   were required to produce in this case?

20   A.  Yes.

21   Q.  And I gave -- Did I give you a physical copy of it or an

22   electronic copy?

23   A.  I don't remember which.  I think you e-mailed it to me,

24   yes.

25   Q.  Did you read it?

1    A.   I did.

2    Q.   Did we talk about it?

3    A.   Yes.

4    Q.   Now, did I tell you, Mr. Cardwell, our communications are

5    strictly private and protected by the attorney-client

6    privilege?  Did I try to cloak our communications --

7             THE COURT:  Please speak from the podium.

8    Q.   (BY MR. MONTOYA)  -- with the attorney --

9             THE COURT:  Yes.  Thank you.

10   Q.   (BY MR. MONTOYA)  I'm sorry, Your Honor.  I understand.

11            Did I try to cloak our communications with the

12   attorney-client privilege in any way?

13   A.   No.

14   Q.   Okay.  And you understand that when you're asked questions

15   before this Court this afternoon, that you're to answer --

16   there's no privilege being invoked?  Understood, right?

17   A.   Yes.

18   Q.   Did I in any way try to -- Did I give you some words to

19   search?

20   A.   Yes.

21   Q.   And are those words set forth on Page 2 of Paragraph 14 of

22   your declaration, Exhibit 56?

23   A.   Yes, yes.

24   Q.   And were those words city, employment, fat, mayate, nicca,

25   nigga, nigger, and within word Phoenix, weight, and work?

1   A.   Yes.

2   Q.   Did you search the Facebook accounts for those words?

3   A.   I did.

4   Q.   Okay.  Did I -- Do you remember meeting my clients at my

5   offices?

6   A.   Yes.

7   Q.   What happened when you got there?

8   A.   Well, I had ordered the creation of an archive from

9   Facebook.  That takes a day, two days to do.  And then it

10  becomes available for download.

11       And the users, the custodians, your clients had to be

12  present to do that because they have to go through an

13  identification process with Facebook where it shows them photos

14  of friends, and they have to name them so that Facebook is

15  confident that it's being done with their permission and by

16  them.

17  Q.   Did they provide you with that?

18  A.   Yes.

19  Q.   Did they cooperate with you in every way?

20  A.   Yes, they did.

21  Q.   Now, you need to tell the Court, answer the Court this

22  question:  Did my clients in any way try to limit your work?

23  A.   No.  They actually had very little to say.  They showed up

24  faster than I expected them to, virtually immediately, to give

25  me access to the data.  And that's really the only interaction

1    I had with them.

2    Q.  Okay.  Did they give you any instructions?

3    A.  No.

4    Q.  Okay.  And you collected the data?

5    A.  Yes.

6    Q.  Did I -- And you ran searches on the data?

7    A.  I did.

8    Q.  Now, tell the Court did I tell you what search to run?

9    A.  No.  In fact, I would say that I'm the one that suggested

10   any changes.  You gave me the keywords, and we talked about how

11   I might reconfigure the words to be a little more focused and,

12   you know, save us some iterations of search.

13   Q.  Did I ever suggest to you that you should choose a

14   methodology of doing your work that narrowed your search?

15   A.  No.

16   Q.  Did you feel pressured by me in reference to your search in

17   structuring the scope of your search or determining the results

18   of your search?

19   A.  Not in the least.

20   Q.  So you conducted the search?

21   A.  Yes.

22   Q.  And you gave me the results?

23   A.  I did.

24   Q.  And did you collect a lot of data?

25   A.  Yes.  It was quite a lot.

1   Q.  Did you read it all?

2   A.  No.  I did kind of visual scans to make sure that it wasn't

3   just junk coming out of the search.

4   Q.  Now, had you ever done a search like that on Facebook

5   before?

6   A.  Yes, I have.

7   Q.  How many times?  Tell the Court.

8   A.  Facebook, probably a half dozen times.  Those social media

9   searches are really a fairly recent phenomenon.

10  Q.  Okay.  And you gave me the results of the search?

11  A.  Yes.

12  Q.  Did I tell you that I gave the results to the City of

13  Phoenix?

14  A.  Yes.

15  Q.  Did -- And in fact isn't it true that you gave me the first

16  results of your search -- Didn't I tell you that we had a

17  deadline?

18  A.  Yes.

19  Q.  And you completed that -- you made the deadline, right?

20  A.  As far as I know I did, yes.

21  Q.  And the deadline was sometime before August 13th of this

22  year, right?

23  A.  Yes.

24  Q.  Was it your understanding that the Court had imposed that

25  deadline?

1    A.  Yes.

2    Q.  So you gave me everything that I asked within the deadline?

3    A.  I think I did, yes.

4    Q.  Understood.  Now, did I subsequently tell you that I had

5    asked the City of Phoenix to, if they thought that there were

6    more words that we should search or another -- anything, that I

7    asked them for it?  Did I tell you that I had made that request

8    from the City?

9    A.  You did.

10   Q.  Did I subsequently tell you that the City had actually

11   complied with the request?

12   A.  Yes.

13   Q.  But isn't it true that that was after August 13th of this

14   year --

15   A.  I --

16   Q.  -- a few days?

17   A.  I don't remember exactly what day that they came in.

18   Q.  Okay.  And isn't it true -- Do you see Page 15 -- Paragraph

19   15 of Paragraph 2 of your declaration?

20   A.  Yes.

21   Q.  Isn't it true that then I then asked you -- Did I forward

22   you an e-mail from the City, like, from Kate Baker with a bunch

23   of words?

24   A.  You know, all I remember is the keywords coming in.  I

25   didn't pay attention to the metadata in the e-mail.

1    Q.  Understood.  Understood.  Were the words anxiety, Chavez,

2    Christina, Christina within one of Chavez, Christine, Christine

3    within one of Cordova, city, city within one of Phoenix, co

4    within one of worker, Cordova, co-worker, cried, cry, crying,

5    depressed, depression, fear, fearful, hair, headache, health,

6    job, panic, race, racial, sad, sex, sexual, sleep, stress,

7    stressed, swinger, Thompson, Vonda, Vonda within one of

8    Thompson, weight, wetback, and work?

9    A.  Yes.  Those are -- Excuse me.

10   Q.  It's okay.

11   A.  Those are not the words that came from the City, but they

12   include the words that came from the City.  I, before I get

13   into a search, I will take variations.  For example, Vonda

14   Thompson would have been one of the terms that came to me.  But

15   sometimes it makes more sense to split them up and to add, for

16   example, a W/1, which means those two words have to appear

17   within one word of each other to be a valid search return.  So

18   it helps keep clutter down.

19   Q.  Okay.  So isn't it true then that you actually reformulated

20   slightly -- And this is not a criticism, sir.  To the contrary,

21   isn't it true that you reformulated the list that I gave you to

22   make it more inclusive?

23   A.  Yeah.  I would say broader but more focused.

24   Q.  Understood.  But broader?

25   A.  It saves a lot of time and review on the back end.

1    Q.  And did you conduct the search?

2    A.  Yes.

3    Q.  Did you find any -- Did you find -- And did you give me the

4    results?

5    A.  Yes.

6    Q.  Did I tell you that I was going to give the results, quote,

7    in toto, unquote, to the City of Phoenix?

8    A.  Yes.

9    Q.  Did I -- When you gave me the results, tell the Court

10   whether or not I asked you to take anything out.

11   A.  No.

12   Q.  Did I -- Okay.  Sir, I need you to tell the Court did I ask

13   you to alter your results in any way for the first search?

14   A.  Not in any way.  And that would have -- We would have had a

15   discussion about that had you --

16   Q.  Had I told you to alter -- Well, let's get into that.

17           What are you suggesting?

18   A.  That would be out of bounds from my perspective.

19   Q.  You would have told me no, no way?

20   A.  Yes.

21   Q.  Did I suggest you to -- Did I even suggest for you to mess

22   with your results in any way?

23   A.  No.  You asked me very little about the results other than

24   volume.  And we didn't talk about evaluating them.

25   Q.  Understood.  Now, was the volume for your second search,

1    which is on page -- cataloged on Paragraph 15 of Pages 2 and 3

2    of your declaration, did you get a lot of hits?

3    A.  It was quite large, yes.

4    Q.  And when you say -- Try to help the Court understand how

5    large that was, sir.

6    A.  I don't remember numbers, but it was, I think, in the

7    hundreds of thousands of hits across hundreds of files,

8    actually several thousand files.

9    Q.  And you gave them all to me?

10   A.  Yes.

11   Q.  Understood.  Now, search number three, do you see Paragraph

12   16 of your declaration?

13   A.  Yes.

14   Q.  Then explain to me search three.  You talk about it a

15   little bit in Paragraph 13, sir, of your declaration.  Was

16   search three different from the two previous searches?

17   A.  Yes, it was, in the sense that it was looking for -- it

18   wasn't a straightforward keyword search.  What I was doing more

19   than anything was looking for syntax that Facebook uses

20   internally to manage data.  For example, likes was an important

21   thing, you know.  You can like an item on Facebook by marking

22   the like box.  But if one searches for like, it comes up

23   hundreds of thousands of times in all sorts of incidental ways

24   like I liked the dress you were wearing that day.  That doesn't

25   help us.

1              So what I had to do was arrange syntax so that it fit

2     the form that Facebook uses for likes so that my hits would

3     only find that data and not pick up all this incidental

4     garbage.

5     Q.   Okay.  Did I tell you to devise that?

6     A.   No, you didn't.  I don't think I even asked you about it.

7     Q.   Did I seem like I knew about all of that kind of computer

8     detail or software detail in Facebook?

9     A.   No, not until I explained it.

10    Q.   And how long did it take you to run the third search?

11    A.   Actually, running the search didn't take very long because

12    the number of files it was searching was quite limited.

13    Facebook stores that information in a very limited number of

14    files.

15             Constructing the keyword terms, several hours to -- I

16    had to survey the data in Facebook and see how they used their

17    syntax and whether there were variations on it in different

18    files before I was comfortable that I actually knew what I was

19    asking for and would get it.

20    Q.   Isn't it true that when you looked for -- Do you remember

21    this?  Do you remember looking for the N-word?  And by the

22    N-word, I mean n-i-g-g-e-r --

23    A.   Yes.

24    Q.   -- as opposed to nigga or nicca.  Do you remember finding

25    no hits in their accounts for that word?

1    A.  Either no hits or one hit.  I don't recall offhand.  But,

2    yes, I was kind of surprised at the lack of that, given what I

3    thought I understood the subject matter to be.

4    Q.  Understood.

5    A.  So more the colloquial usage words.

6    Q.  And there were hits for nicca, right?

7    A.  Yes.

8    Q.  And there were hits for nigga, right?

9    A.  Yes.

10   Q.  Okay.  After you -- After you were done with the third

11   search, did you and I talk?

12   A.  We did.

13   Q.  Did I tell you that I was going to give the results of your

14   third search in toto completely to the City?

15   A.  Yes.

16   Q.  Did I tell you that the reason why I was not going to try

17   to winnow anything out that might be irrelevant is because I

18   didn't want them to accuse me of hiding stuff from them?

19   A.  Yes.

20   Q.  Did I -- Now, I need you to tell the Court this, sir.

21          Did my clients or I try to get you to narrow or

22   control your search in any way?

23   A.  Not at all.  Not at all.

24   Q.  Now, isn't it true, Mr. Cardwell, that you spent -- that

25   you spent at least, not including the work that you did on your

1    declaration, but isn't it true that you spent 47.8 hours on

2    these three searches?

3    A.  That's about right, yes.

4    Q.  Okay.  And isn't it true that your bill for that -- And

5    this is not a criticism, sir.  In fact, I commended your work,

6    didn't I?

7    A.  Yes, you did.

8    Q.  Did I criticize your work in any way?

9    A.  No.

10   Q.  Did I -- Didn't I tell you you had done an excellent job

11   and thank you?

12   A.  Yes.  You were very generous with your kudos.

13   Q.  And your bill for that was $11,980?

14   A.  Yes.

15   Q.  Understood.  If I gave you more terms or other things to

16   search from these databases, you still have the databases,

17   right?

18   A.  I do.

19   Q.  Would you do it?

20   A.  Sure.

21           MR. MONTOYA:  Mr. Cardwell, I don't have any further

22   questions for you.  Thank you, sir.  And thank you, Your Honor.

23           MS. KING:  Your Honor, we have a few questions.

24           THE COURT:  Yes, please come forward.

25           MS. KING:  Thank you.

1                        CROSS-EXAMINATION

2       BY MS. KING:

3       Q.  Hello.  Good afternoon, Mr. Cardwell.  What date were you

4       engaged by the plaintiffs in this case?

5       A.  I think it was August 7th.

6       Q.  August 7th of 2019?

7       A.  Yes.

8       Q.  Okay.  Are you aware that is 17 months after the plaintiffs

9       filed this lawsuit?

10      A.  No.

11      Q.  Are you aware that August 7, 2019, is actually the same

12      date that the Court issued its second order requiring the

13      plaintiffs to produce social media?

14      A.  I don't recall whether I knew that or not, no.

15      Q.  Okay.  So the Facebook searches that you conducted happened

16      after -- on or after August 7th, 2019; is that correct?

17      A.  Yes.

18      Q.  And so your searches happened in the last 30 days?

19      A.  Yes.

20      Q.  And you used search terms provided by Mr. Montoya, correct?

21      A.  That's correct.

22              MR. MONTOYA:  Objection, Your Honor.  The testimony is

23      that she also used search -- he also used search terms provided

24      directly from the City by means of me.  That was the second

25      search.

136

1              THE COURT:  Well, overruled.

2    Q.  (BY MS. KING)  And in your searches, you found tens of

3    thousands of pages of documents; is that correct?

4    A.  That's right.

5    Q.  And in your searches, you found multiple instances of the

6    plaintiffs using the N-word in different variations; is that

7    correct?

8              MR. MONTOYA:  Objection to form, Your Honor.  The

9    N-word in different variations is vague, especially in light of

10   the testimony of this afternoon.

11             THE COURT:  Well, I think we all know the multiple

12   variations we're talking about.  It's been spoken about

13   ad nauseam here.  So you can move forward.  Overruled.

14   Q.  (BY MS. KING)  Mr. Cardwell, you found multiple instances

15   of the plaintiffs using the n-i-g-g-a phrase; is that correct?

16   A.  Yes.  But I would say that I didn't really do a review that

17   was focused on making any kind of determination about who was

18   using it or how many times it was used.  I was just -- I

19   reviewed some of the data to make sure that the hits were in

20   fact coming out as I expected for the words I was looking for.

21   Q.  Okay.  And you had multiple hits for n-i-g-g-a; is that

22   correct?

23   A.  That's correct.

24   Q.  And multiple hits for n-i-c-c-a; is that correct?

25   A.  Yes.

1   Q.  And do you know that this information was produced to the

2   City after this -- Let me rephrase.  Excuse me.

3           Do you know that thousands of pages of documents from

4   your searches were produced to the City after this hearing was

5   scheduled?

6   A.  No, I don't think so.  I mean, that's not really part of

7   what I do is tracking, you know, how a case is run.  What I do

8   is kind of forward looking, what I've been chartered to do and

9   getting it done.

10  Q.  Okay.  Are you aware then that the City received much of

11  this information on Friday and even more pages just yesterday?

12  A.  I was not aware of when you received it, no.

13          MS. KING:  Okay.  No further questions.

14                            EXAMINATION

15  BY THE COURT:

16  Q.  All right.  And then just one further follow-up,

17  Mr. Cardwell.  Were you asked at all to search any other social

18  media accounts such as Instagram, Snapchat, or any of those

19  types of accounts?

20  A.  I was not.

21  Q.  Only Facebook?

22  A.  Yes.

23          THE COURT:  All right.  Thank you, sir.  You may step

24  down.

25          MR. MONTOYA:  Your Honor --

```
 1              THE COURT:  Yes.
 2              MR. MONTOYA:  I didn't mean to interrupt you.  You
 3    looked like you were about to say something.
 4              THE COURT:  I was going to say, Mr. Montoya, do you
 5    have any other witnesses?
 6              MR. MONTOYA:  Yeah, Your Honor.  I just want to make
 7    something clear based upon Your Honor's follow-up questions.
 8    My clients don't have Snapchat, and they don't -- they don't
 9    really use those.  That's why the only one that he was given
10    was Facebook.
11              THE COURT:  Well, my understanding is Ms. Bruner
12    indicated she had Instagram.
13              MR. MONTOYA:  No.  Do you have Instagram?  No.  You
14    have Instagram, but you don't -- Do you use it?
15              THE COURT:  Well, there was an indication during
16    deposition that there was a use of an Instagram account.
17              MS. KING:  Correct, Your Honor.  Ms. Cerda --
18    Ms. Cerda used Instagram, and it was an exhibit in her
19    deposition.
20              THE COURT:  Yes, that's my recollection.
21              All right.  Sir, you may step down.
22              MR. MONTOYA:  Thank you.
23              THE COURT:  Mr. Montoya, you have roughly about I
24    would say eight minutes.  Do you have another witness?
25              MR. MONTOYA:  I do not, Your Honor.
```

```
1               THE COURT:  All right.  And --

2               MR. MONTOYA:  Thank you, sir.

3               THE COURT:  Is there argument, Ms. Burns?

4               MS. BURNS:  I'd like to do a short summation, Your

5    Honor.

6               THE COURT:  Yes, please.

7               MS. BURNS:  May I approach?

8               THE COURT:  You may.

9               MS. BURNS:  May I approach, Your Honor?

10              THE COURT:  Yes.

11              MS. BURNS:  Thank you.  Your Honor, we would not be

12   here today if it were not for one post, one post made by Laura

13   Cerda on her public Facebook feed referring to an African

14   American man as an n-i-g-g-a, a post that was discovered by the

15   City of Phoenix after the plaintiffs verified under oath that

16   they had no social media that was responsive or relevant to

17   this case.

18              It was produced by the City of Phoenix.  And then

19   despite the plaintiffs' obligation to produce the information,

20   it was intentionally deleted by Laura Cerda the day before her

21   deposition, thereby eliminating the City from ever accessing

22   any of that metadata.

23              If it weren't for that one post, which then led to the

24   discovery of Ms. Bruner's use of the N-word on her husband's

25   Facebook account, public Facebook account, the plaintiffs would
```

1     have gotten away with this ruse.

2          They would have been able to stay consistent with

3     their sworn deposition testimony that they used Facebook,

4     quote, very little, that they never used Facebook to

5     communicate with anyone about work or about the City, that they

6     used Facebook just to communicate with their family members,

7     that they never used the N-word, that they were always offended

8     by the N-word, that they suffered from emotional distress by

9     being exposed to racial slurs and crude language, and that they

10    never called Christina Chavez names.

11         But Ms. Cerda's destruction of that post and Ms. Cerda

12    and Ms. Bruner's deactivation of their Facebook accounts

13    following their depositions, which compromised their data as

14    testified to by Mr. Englander, allowed the City of Phoenix to

15    get the Court's assistance in uncovering the truth.

16         Now, amazingly, the plaintiffs have come to this Court

17    today in an attempt to address just one of their lies

18    under oath.  They now claim that n-i-g-g-a and n-i-c-c-a

19    somehow are different than n-i-g-g-e-r, and that they were only

20    responding to the request as it related to n-i-g-g-e-r.

21         The City would submit, Your Honor, that this is a word

22    game.  This has been devised solely for the purposes of this

23    hearing.

24         This is the very first time in this lawsuit that these

25    plaintiffs have taken this position.

1          A year of discovery and not a single objection that

2     the N-word is vague or confusing or overbroad.  Not a single

3     piece of written discovery that contained an objection.  Not an

4     objection in a deposition that the use of the N-word was

5     confusing or contained variations.  No attempt to clarify that

6     they used different variations of the word but not others.

7          And after the City of Phoenix made it clear in their

8     correspondence that they were seeking evidence of any and all

9     racial slurs, sexual or crude language, we never got a response

10    that, well, we used some words, but we don't use other.

11         In fact, it was not even raised in either of the

12    plaintiffs' briefs in response to either of the motions for

13    sanctions, nor was it explained in their declarations to this

14    Court regarding their preservation of data.

15         So now they're trying to use the City's efforts to be

16    respectful, to play word games, and come up with some excuse.

17         But it flies in the face of their conduct in this

18    case.  Ms. Cerda deleted her G-G-A post, n-i-g-g-a post.  If it

19    wasn't offensive or harmful to her in this case, why would she

20    do that?

21         She testified that she deleted it because she doesn't

22    condone that word.  And in the affidavit that she presented to

23    this Court at Exhibit No. 26, she testified that she found the

24    post, quote, offensive and consequently deleted it.

25         Ms. Bruner lied about even knowing what the n-i-c-c-a

1    term meant.  Why on earth would she make that falsity if she

2    was not trying to hide this information from the City?

3              Both plaintiffs testified under oath unequivocally

4    that they never use the N-word, they always find it offensive,

5    their friends and family never use the word.

6              And, Your Honor, it's really important to remember

7    this is discovery.  They can try to make arguments to a jury

8    that these words have different meanings, but any reasonable

9    reading of the term N-word would include every variation,

10   particularly when the very first document discovered by the

11   City -- documents discovered by the City used the term

12   n-i-g-g-a and n-i-c-c-a.  And those were the ones that the City

13   turned over last fall.

14             It is undisputed that the plaintiffs evaded discovery

15   in this case.  They verified under oath that they didn't have

16   responsive discovery and despite their obligations under the

17   Mandatory Initial Disclosure Protocol and this rule and the

18   civil rules of procedure and this Court's orders.

19             It's also undisputed that they deleted relevant

20   evidence, and they compromised their other discoverable

21   evidence when they deactivated and failed to take reasonable

22   measures to preserve their data.

23             Their Facebook Messenger exchanges also produced a

24   year late on Friday of last week demonstrate that these women

25   constantly complain to each other in the workplace about

1      virtually everyone, their managers, their co-workers, and

2      Ms. Chavez.  But glaringly absent from any of their

3      communications is any suggestion that anyone, including

4      Ms. Chavez, ever engaged in any type of racial harassment.

5              Once they were forced to produce these documents,

6      their social media documents, it illustrated that they

7      themselves engaged in offensive and crass sexual and racial

8      language and that they do so regularly, making it impossible

9      for them to claim that they were subjectively offended by the

10     allegations or that the language caused them emotional

11     distress.

12             It is because these documents are so harmful to their

13     case that they went to such great lengths to keep them from the

14     City.

15             As set forth in our two motions as well as the

16     evidence presented to the Court today, plaintiffs engaged in a

17     pattern of discovery abuse, deception, and lies under oath to

18     prevent the City from discovering documents that are harmful to

19     their case and reveal the truth about their claims.

20             This is precisely what General Order 17-08, the

21     Mandatory Discovery Protocol, Rule 37, Rule 34, and Rule 26 are

22     designed to prevent.  And for these reasons the City of Phoenix

23     asks this Court to fashion an appropriate sanction up to and

24     including monetary sanctions and dismissal of this case.

25             Thank you, Your Honor.

1          THE COURT:  Thank you, Ms. Burns.

2          Mr. Montoya.

3          MR. MONTOYA:  Thank you.

4          Your Honor, let me address the initial mandatory

5   discovery requests of the Court.  Those are set forth on Page

6   5, Paragraph 3, of the Court's order, which is document number

7   four, was filed by the Court on February of 2018.

8          THE COURT:  I have it here.

9          MR. MONTOYA:  Thank you, Your Honor.  If there are any

10  disputes regarding that issue, Your Honor, Your Honor's order

11  sets -- creates a process that's on Pages 6 and 7.  There's a

12  duty to confer, and there's a way to resolve disputes.

13         Now, Your Honor, getting this information -- And I

14  think it's important to remember in the Court's orders, both of

15  the Court's discovery orders in this case, let's start with the

16  first one.

17         Your Honor, the first one, as you recall, was filed on

18  June 27th, but in that -- in your order, Your Honor, you

19  acknowledge that the defendants want all of my clients' social

20  media information.  That's what they asked for.  And here's

21  what Your Honor concluded:

22         Your Honor says, "The Court finds plaintiffs' social

23  media to be relevant to plaintiffs' claims and defendant's

24  defenses.  However, the Court will limit the scope of

25  production."

1          And Your Honor imposed limits.  And Your Honor gave us

2     a deadline by which to comply with that.

3          Then Your Honor's second order, Your Honor's order of

4     August 7th of this year, on Page 2 at the bottom of the page

5     reads "The Court notes that defendants initially requested

6     complete access to plaintiff Facebook accounts, which the Court

7     denied."

8          So Your Honor has already acknowledged in both of its

9     discovery orders that the defendants were seeking more

10    information than was appropriate.

11         Your Honor did not state, Your Honor did not suggest

12    that somehow the City's discovery demands were narrowly

13    tailored and proportionate to the issues at hand.

14         To the contrary, Your Honor limited the scope of

15    discovery.  And that's what we think is important, Your Honor.

16    We get your point.  We heard Your Honor loud and clear.  And in

17    the future we'll be very, very mindful of what Your Honor's

18    understanding of the scope of the mandatory disclosures is.

19         But at that time we did not know.  And, Your Honor,

20    the duty to confer, that didn't happen until a lot later.  And

21    when Your Honor got involved, Your Honor did not grant the City

22    wholesale access to the social media accounts of either of my

23    clients but narrowed it.

24         Then, Your Honor, after that -- Before that we had

25    already retained Jerry Naumann to look for the N-word because

1    we couldn't find it, Your Honor.  As our affidavits state that

2    are already part of the record that Your Honor has reviewed, in

3    response to Your Honor's orders but also in response to the two

4    motions for sanctions, as Your Honor recalls, both of my

5    clients set forth what they had done to comply with Your

6    Honor's order, how they spent hours going through their

7    Facebook accounts, how my office spent hours going through

8    their Facebook accounts, how we retained Jerry Naumann to go

9    through their accounts, how, when that wasn't enough, Your

10   Honor, to the tune of almost $12,000, we hired another expert

11   to go through it who really inundated us, Your Honor, with

12   information.  Much of it is irrelevant, page after page of just

13   private communications between my clients and parties that have

14   nothing to do with this case.

15           We gave all of that in response to Your Honor's

16   discovery orders to the City of Phoenix.

17           So the City of Phoenix cannot point to anything, Your

18   Honor, that it was deprived of.  The only thing that the City

19   can point out that we did that was clearly ill advised, Your

20   Honor, was when Ms. Cerda deleted that one post that the City

21   already had a copy of.

22           Now, Your Honor, if I delete something, if I burn a

23   page to the book, but you have a copy of the book, Your Honor,

24   I haven't deprived you of anything.

25           And certainly, Your Honor, I see Your Honor shaking

1       her head, but, Your Honor, certainly there was no malintent to

2       deprive the City of information.

3               My clients have given the City gigabytes of

4       information from my client's social media, Your Honor, so we've

5       done -- When we had a dispute regarding the scope of the

6       mandatory disclosures, that dispute was taken to Your Honor.

7       Your Honor resolved that dispute.  And we worked hard to comply

8       with Your Honor's resolution of that dispute when the City,

9       beyond Your Honor's mandatory discovery order -- Your Honor,

10      this is Exhibit 50 -- when the City actually asked us for an

11      unredacted, unedited digital copy of any instance when you

12      published, wrote, and/or posted the N-word on any social media

13      account, we provided that to the defendant, Your Honor.

14              On Pages 411 to Page 439, that was in response to that

15      request for production, Your Honor.  It was after the entry of

16      Your Honor's discovery orders, and it was timely, Your Honor.

17      It was respectfully submitted on August 13, 2019.  That was the

18      deadline that Your Honor gave us.

19              And if you look at those posts, Your Honor, they're

20      all the ones that they're complaining about.

21              We hired the experts.  We paid the thousands and

22      thousands of dollars, reminding the Court that both of my

23      clients are administrative assistants for the City of Phoenix

24      making corresponding salaries.

25              All the things of which they complained, Your Honor,

1    were provided after your court resolved the discovery dispute

2    in accordance with Your Honor's discovery protocols.  We timely

3    complied with Your Honor's orders.

4            And, Your Honor, due to the nature of the evidence,

5    the potential evidence in question, I think what we did was

6    reasonable under the circumstances.

7            Your Honor, how could my -- How could have my clients

8    done what Mark Cardwell did?

9            It would be impossible for them to do that.  It was

10   impossible for me to do that.  I didn't know how to do that,

11   Your Honor.  I know how to go through hard copies of documents.

12   But going through vast amounts of electronic information, Your

13   Honor, that's not what lawyers do, and that's not what I do.

14   And I certainly don't feel confident enough to be able to

15   certify anything to that effect to the Court.  In fact, Your

16   Honor, I told that to Ms. King.  I said, hey, you know, Kate, I

17   don't feel competent to, like, make this search because I do

18   not have the technical expertise to.  So I had to reach for

19   outside experts, Your Honor, especially when we had these

20   allegations that we were destroying evidence, that we were

21   hiding evidence.

22           Lastly, Your Honor, I would like to point out to this.

23   Your Honor, I made certain reports that were -- that reflect

24   investigations conducted by the City of Phoenix.  They're part

25   of the record.  And the reason why I made them part of the

1    record, Your Honor, is I wanted you to know what this case --

2    the causes of action are about.  This individual who still

3    works at the City of Phoenix and who hasn't been disciplined

4    was heard by not only my clients but --

5              THE COURT:  That -- The factual information that

6    you're going through, Mr. Montoya, is not relevant to the

7    particular motion at issue, so please --

8              MR. MONTOYA:  I understand, Your Honor.  Let me bridge

9    it.  Your Honor, in a recent case that Your Honor decided

10   regarding discovery sanctions, I was reading it the other day.

11   It involved, like, lying under oath and a destruction of a

12   document.  Your Honor pointed out that what the people were --

13   the evidence they were destroying went to the heart of the

14   case.

15             Your Honor, these posts between their friends and

16   their family members that don't even contain the word that was

17   used against them, those are private, personal posts that were

18   communicated between private consenting adults outside of the

19   workplace.

20             Sometimes, Your Honor, women will joke with each other

21   and call each other the B-word.

22             THE COURT:  One minute, Mr. Montoya.

23             MR. MONTOYA:  Yes, Your Honor.  Thank you.

24             But when friends are joking, cussing at each other,

25   that's a far -- Sometimes friends will even grab each other's

1    butts.  But, Your Honor, when that happens at work, that is a
2    completely different thing.

3            So these allegations of discovery dispute, they don't
4    go to the heart of the case, Your Honor.  They took place --
5    They involved people outside of the workplace in private
6    conversations that had nothing to do with work.

7            So the discovery issues in this case do not go to the
8    heart of this case, unlike the other case that Your Honor
9    recently resolved.  So we think a different result is
10   appropriate.

11           And, Your Honor, we apologize if we haven't done
12   everything that we needed to do.  We certainly did the best
13   that we could.  Your Honor, I think that our efforts to comply
14   with the rules and to comply with the orders of this Court are
15   demonstrated by all the -- the two different experts that we've
16   hired and the huge amount of money that we spent on the experts
17   just to try to comply with the orders of this Court and try to
18   satisfy the City of Phoenix.

19           We did enough, Your Honor, we believe, to satisfy this
20   Court that we were proceeding in good faith.  I hope that we
21   can do a better job in the future.  And what I've learned from
22   this experience, I can assure the Court that we can.  But as we
23   stand now, Your Honor, we did a lot of work and spent a lot of
24   money and did the best that we could.

25           Your Honor, thank you.

1          THE COURT:  All right.  Thank you.

2          Let me just say that at the outset I took the motion,

3     the motion for sanctions originally was with regard to a claim

4     of spoliation and spoliation referring to the deletion of the

5     Facebook posting at Exhibit 9, the end page, prior to

6     Ms. Cerda's deposition.

7          And in looking at the standard of review for sanctions

8     related to spoliation, there's a different standard or I should

9     say the Ninth Circuit hasn't squarely adopted a particular

10    standard.  It has -- There have been a number of cases where

11    three sort of standards or three sort of questions are posed to

12    the court who I think in many cases are looking at dismissal as

13    a sanction.

14         One of them is whether the party having control over

15    the evidence had an obligation to preserve it at the time it

16    was destroyed, the second being the records were destroyed with

17    a culpable state of mind, and, third, that the evidence was

18    relevant to the parties' claim or defenses such that a

19    reasonable trier of fact could find that it would support that

20    claim or defense.

21         Those standards are generally adopted in the Apple

22    versus Samsung Electronics case, and many courts in the Ninth

23    Circuit have adopted that standard.

24         The burden of proof here of course would go on the

25    movant.

1         In other case law where parties have asked for

2    sanctions of either an adverse inference or default, there's

3    additional guidance that the Court has found.  And there are,

4    again, there is a five-part test.

5         And the Court has looked at those five particular

6    parts of the test, and those five factors that the Court must

7    weigh include the public's interest in expeditious resolution

8    of the litigation;

9         Two, the Court's need to manage its own docket;

10        Three, the risk of prejudice to the opposing party;

11   and

12        Four, the public policy favoring disposition of cases

13   on their merits; and

14        Five is the available -- the availability of less

15   drastic sanctions.

16        And it should be noted that where a Court order is

17   violated, the first and second factors will favor sanctions,

18   and the fourth will cut against them.

19        Let me go to the allegation of spoliation.  It is

20   clear by Ms. Cerda's testimony when she answered the question

21   that Ms. Burns posed that she acknowledged that the posting

22   with the African American man, the black man, in the wheelchair

23   in Exhibit 9, that that was evidence in her case, it was

24   relevant evidence in her case, yet she deleted it.  She

25   answered yes.  So she acknowledges that she deleted relevant

1    evidence.  So that is clear.

2         I want to also mention to the parties that what is

3    guiding my determination here is not only these standards, but

4    I've also looked at Federal Rule 26(a)(1), Rule 34, and

5    Rule 37(b)(2)(A).

6         And at the outset, because we have both plaintiffs

7    here, I want them to understand very clearly what this Court is

8    finding and what it is basing its ruling on.

9         Now, anytime a party brings a lawsuit in the federal

10   courts, they have an obligation to preserve what is relevant

11   evidence.  That is clearly stated in Rule 26(a).  And it

12   provides specifically that without waiting for a party's

13   request, a party must disclose all documents, electronically

14   stored information, and tangible things that the disclosing

15   party has in its person, its possession, its custody or

16   control, and may use to support its claim or defenses.

17        And Rule 37(b)(2)(A) states -- it does provide that a

18   court may order sanctions, quote, if a party fails to obey an

19   order to provide or permit discovery.

20        And the rule then lists a number of sanctions that the

21   court can impose.

22        Now, I want to make sure that Ms. Cerda and Ms. Bruner

23   understand this.  They have both filed Title VII claims against

24   the City of Phoenix, and those claims include racial

25   harassment, sexual harassment, and retaliation.  There is a

1    vague workplace claim that I'll address in a few moments.

2         Now, the racial harassment claims of Ms. Bruner are

3    included in Paragraphs 14 and 15 of the complaint.  Ms. Cerda's

4    racial harassment claims are included in Paragraphs 22, 25, and

5    27.  And those claims can be generally characterized as the

6    plaintiffs, both Ms. Cerda and Ms. Bruner, being subject to

7    frequent use of the N-word, and in particular the word

8    n-i-g-g-e-r was referred to.

9         And both plaintiffs have sought compensatory and

10   punitive damages against the City because their employees used

11   those terms and that they found them to be so offensive that it

12   caused them damages.

13        Now, the plaintiffs filed their complaint on February

14   the 28th of 2018, and it also included the two EEO Form 5

15   documents, that is, the charge of discrimination forms.  And

16   those forms include almost the verbatim allegations of racial

17   harassments that are in the complaint.

18        Also on February 28th the Court issued its Mandatory

19   Initial Discovery Protocols, and that is General Order 17-08.

20   And that protocol states, again, that Rule 37(b)(2) shall apply

21   to the discovery responses that are required in it.

22        And I already indicated what the MIDP order states.

23        It also, as Mr. Montoya has pointed out to the Court,

24   points out how to preserve ESI.  The critical issue here is

25   preservation of relevant discoverable evidence.

1          And I want to say also I looked at the parties' joint

2     case management plan, that is, document 22, that was submitted

3     to the Court on August the 20th of 2018.  And in that plan it

4     states the City anticipates the need to obtain discovery of

5     plaintiffs' social media history, text messages, and e-mail

6     messages relating to the issues in this case, and you both

7     agreed on how those matters are to be produced.

8          And the joint statement also states that plaintiffs

9     provided their initial MIDP responses on August the 9th of

10    2018.

11         Let me just say a word about this term or terms that

12    have now been expanded.  There's a -- the term n-i-g-g-e-r.

13    There are now variations of the term spelling n-i-g-g-a,

14    n-i-g-g-a-h, n-i-c-c-a.

15         I, in making my finding of credibility, I do find

16    Ms. Cerda in some ways to be credible, and I found her credible

17    when she answered truthfully some questions, but I found her to

18    be flailing in other ways.

19         And I found Ms. Bruner not so credible, and here is

20    why.  Ms. Cerda, as painful as it was, she had to admit that

21    she deleted that Facebook posting.  She also admitted that she

22    used the very terms that she found distasteful.

23         And Ms. Bruner, however, apparently has a bright line

24    distinction about how offensive the spelling of the word

25    n-i-g-g-e-r is versus her almost daily use of these other

1    variations of the phrase.

2         And what is very interesting to me is when I asked

3    Ms. Bruner if Ms. Chavez used these two other variations,

4    n-i-g-g-a, n-i-c-c-a, n-i-g-g-a-h, would this suit have been

5    filed, and she hemmed and hawed, and she says, well, it depends

6    on the context and how she said it.

7         But when I look at these Facebook posts, the context

8    in which these phrases are used -- it doesn't matter the

9    spelling, n-i-c-c-a, n-i-g-g-a-h, n-i-g-g-a -- they are

10   repugnant.  They're adjectives, modifiers.  They're used to

11   refer to people, people that they don't like.

12        It is not a credible thing to say to this Court that

13   you find one use of the word offensive, but yet even in a

14   derogatory way, the other phrasing of the word, however you

15   pronounce it, is not offensive.  It's just not credible.

16        And so here I want to say that it is important for

17   Ms. Bruner and Ms. Cerda to understand that this evidence, the

18   social media statements, they are relevant to your claims.

19   They are also relevant to the City's defenses.

20        So, in other words, a reasonable jury or juror could

21   find that the use of the N-word, no matter how you spell it, no

22   matter how you pronounce it, or the condoning of it, or the

23   liking of it on a Facebook post, would negate each of your

24   claims of racial harassment or that the production of that

25   information could support the City's defenses that you were not

1   offended by these phrases, either subjectively offended or

2   objectively offended by them, because you engaged in the very

3   same use of the phrases in a derogatory manner.

4          And so how then could you say in the one instance you

5   are subjectively and objectively offended and in the other that

6   you were not?

7          So it is, in my view, crystal clear it is relevant to

8   the claims in your complaint.

9          Now, I have already found that there have been and

10  there has been an attempt to destroy or spoliate evidence as

11  well by both Ms. Cerda and Ms. Bruner when they deactivated

12  their Facebook accounts.  They did it with the intent to

13  prevent the City from discovering relevant information.

14         And I think the crux of the problem here or the

15  conduct here, Mr. Montoya, I appreciate that you don't have the

16  technology, Ms. Cerda, Ms. Bruner, I don't have the technology

17  to deep dive into metadata.  But it's very simple.  Every

18  lawyer, when they bring a case, they have an obligation to tell

19  their client preserve, don't get rid of anything.  In the old

20  days it used to be boxes of documents.  Don't shred.  Don't

21  burn.  Don't trash.  Now we're dealing with electronic

22  communication.  Store it.  Don't alter it.  We'll have somebody

23  come and capture that data so that we are making sure that we

24  preserve potentially relevant information in a case.

25         That is precisely what Rule 26 is for.  There should

1    never be an instance where a court has to order a party to turn

2    over what they are already obligated to turn over under the

3    Mandatory Initial Disclosure Protocols and Rule 26.

4            And here I also find it very concerning that

5    Mr. Cardwell was not hired until after the first order to

6    produce had expired.

7            I also find it very concerning, as I just mentioned a

8    bit ago, that Ms. Cerda also has an Instagram account, yet

9    there appears to have been no indication that any expert was

10   hired or asked to even review those accounts.

11           And in terms of the five factors, again, because there

12   were orders in place, the first factor, the public's interest

13   in expeditious resolution of the litigation, it obviously has

14   prolonged itself a bit now because you've asked for an

15   extension for a deadline in which to file your dispositive

16   motions.  The Court needs to manage its own docket.  I've had

17   to spend an afternoon in this hearing.  I've had to look

18   through volumes of exhibits.  I've had to issue two orders.

19   I've had to read through your briefings.  And, again, as I

20   mentioned, this evidence goes to the heart of the plaintiffs'

21   claims with respect to racial harassment.

22           And in terms of the risk of prejudice to the opposing

23   party, to the City here, again, I have already found that this

24   is relevant evidence that goes to the heart of their claims.

25   It is discoverable information, if not discoverable, at least

1    preserved.  It should have been preserved.

2         And clearly on the record neither plaintiffs presented

3    the evidence in accord with the Court's order.  Otherwise we

4    wouldn't have trickled information this week, last week.  And

5    so I do find that the orders have not been complied with.

6         And in terms of a sanction, I will say I have

7    considered the City's statement to, in my view, warrant severe

8    sanctions because had they not produced the very document, none

9    of this relevant information would have ever come forward.

10   That is a critical part of this conduct that had Ms. Cerda

11   known that the City -- She obviously found out some way that

12   the City had that Facebook posting.  She chose to delete it

13   before her deposition.

14        Immediately after the depositions or right around that

15   time frame, they also deactivated their account.  And they

16   originally responded to the RFP -- I believe it was RFP number

17   six -- that they had no social media.

18        That is inconsistent with the testimony.  It is

19   inconsistent with the volumes of exhibits that are here today.

20   And so I also take that into consideration.

21        And the Court therefore will impose the following

22   sanctions:

23        I'm going to enter default judgment in favor of the

24   defendants on each of Ms. Bruner and Ms. Cerda's racial

25   harassment claims.

1          The following claims are stricken from the complaint:

2          They include Paragraph 14, Paragraph 15, Paragraph 22,

3     Paragraph 25.  They will exclude in Paragraph 27 the claim of

4     racial slurs.

5          And I will order that the remainder of the complaint,

6     throughout the remainder of the complaint, the plaintiffs are

7     precluded from introducing any claims of racial harassment to

8     support the retaliation claim that is alleged in the complaint.

9          Now, in preparing for this hearing and in today's

10    hearing, I am going to reserve for further review the claim in

11    Paragraph 31 of the complaint that the City also knew or should

12    have known of the harassment because it pervaded the workplace

13    and created a hostile work environment.

14         I am going to review the exhibits further because I

15    saw some exhibits there that were communications between

16    Ms. Cerda, Ms. Bruner, and other employees in the City that are

17    somehow listed as witnesses or are involved in these particular

18    areas of complaint to determine whether or not I will strike

19    any reference to hostile work environment.

20         And so that is -- I will look at that further, and you

21    will have a further ruling on that.

22         Now, the Court will also order that the defendant's

23    fees and costs associated with bringing their two motions for

24    sanctions will be paid by the plaintiffs.  And I will issue a

25    deadline by which the defendants shall submit their itemized

1    costs to the Court.  And certainly Mr. Montoya will have an

2    opportunity to respond.

3           And that is my ruling, and I hope that we can go

4    forward now.  You have a fact deadline that is coming up at the

5    end of the week.  We have extended your dispositive motions

6    deadline.

7           And is there anything further, Mr. Montoya?

8           MR. MONTOYA:  No, Your Honor.  Thank you.

9           THE COURT:  Ms. Burns?

10          MS. BURNS:  No, Your Honor.  Thank you.

11          THE COURT:  If there's nothing further, then this

12   matter's adjourned.

13      (Proceedings recessed at 5:31 p.m.)

1                          **C E R T I F I C A T E**

2

3              I, LINDA SCHROEDER, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7      a full, true, and accurate transcript of all of that portion of

8      the proceedings contained herein, had in the above-entitled

9      cause on the date specified therein, and that said transcript

10     was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 20th day of September,

12     2019.

13

14

15                                    s/Linda Schroeder
                                    Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**