**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Bruner, et al., | No. CV-18-00664-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendant. | |

Before the Court is Defendant City of Phoenix's (the "City") Motion for Attorneys' Fees and Costs (Doc. 121). Plaintiffs Maria Bruner and Laura Cerda (collectively "Plaintiffs") filed a Response (Doc. 126) and the City filed a Reply (Doc. 127).[1]

## I. BACKGROUND

Plaintiffs, who are City employees, allege three claims against the City under Title VII: (1) racial harassment, (2) sexual harassment, and (3) retaliation. (Doc. 1 ¶ 1). Ms. Cerda, who is "Hispanic in race" and whose "husband is African-American in race," alleges that since 2010, a co-worker, Ms. Christina Chavez, repeatedly used racial slurs and other discriminatory language towards her, including calling her a "nigger lover" and

---

[1] The City also filed a Motion to Seal Exhibits A, B, and C to its Motion for Attorneys' Fees and Costs (Doc. 122). Therein, the City provides that "Exhibits A, B, and C include attorney billing descriptions, which contain confidential attorney-client privileged and work product information" and therefore requests leave to file these exhibits under seal. (*Id.* at 1). Plaintiffs did not respond to the City's Motion to Seal and the time to do so has expired. *See* LRCiv. 7.2(c). The Court may construe Plaintiffs' failure to respond to the City's Motion as consent to the Court granting this Motion. *See* LRCiv. 7.2(i). The Court finds good cause to seal Exhibits A, B, and C. *See Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).

referring to "African-Americans as 'niggers' and 'mayates[.]²'" (*Id.* ¶¶ 5, 19-25; Doc. 120 at 17). Additionally, Ms. Cerda alleges that Ms. Chavez "also falsely claimed that Ms. Cerda has cheated on her husband by having sex in the workplace and has spread other false rumors about Ms. Cerda's alleged sexual behavior at work." (Doc. 1 ¶ 26). Ms. Bruner, who is "Hispanic in race" and whose husband "is African-American and Hispanic in race[,]" alleges that since May 2011, Ms. Chavez has harassed her based on her race and gender. (*Id.* ¶¶ 5, 12-13, 22). Specifically, Ms. Bruner alleges that Ms. Chavez told other co-workers not to interact with her, "refused to help train [her] because she [was] a 'nigger lover[,]'" and heard Ms. Chavez use "nigger" and "mayate [] dozens and dozens of times." (*Id.* ¶¶ 14-15). Additionally, Ms. Bruner alleges that Ms. Chavez "falsely said that [she was] a 'swinger' who engage[d] in extramarital sexual affairs in the workplace." (*Id.* ¶ 16).

Plaintiffs allege that they both "did <u>not</u> encourage or consent to the discrimination" and repeatedly complained of Ms. Chavez's regular use of racial slurs and other discriminatory language to supervisors; however, the City failed to timely and meaningfully investigate the complaints or discipline Ms. Chavez. (*Id.* ¶ 17, 27-28, 32) (emphasis in original). Moreover, Plaintiffs allege that the City "knew or should have known of the harassment because it pervaded the workplace and created a hostile working environment." (*Id.* ¶ 31). Plaintiffs further allege that the City retaliated against them after they complained of the harassment "by (among other things) falsely accusing them of misconduct and subjecting them to unwarranted investigations." (*Id.* ¶ 33). In August 2017, Plaintiffs filed Charges of Discrimination against the City with the United States Equal Employment Opportunity Commission (the "EEOC"). (*Id.* ¶ 34). Plaintiffs initiated this lawsuit on February 28, 2018. (*Id.*) Plaintiffs have been, and continue to be, represented by Mr. Stephen Montoya.

On September 7, 2018, the City served a Request for Production of Documents (the "RFP") on Plaintiffs. RFP No. 6 ("RFP No. 6") requested that Plaintiffs:

produce an unredacted, unedited digital copy of [their] social media archives

---

² "Mayate" is the Spanish equivalent of "nigger." (Doc. 1 ¶ 15).

(including without limitation Twitter, Instagram, LinkedIn, and Facebook), from January 1, 2010 through present, including all postings, comments, or pictures that in any way relate to, [their] employment with the City, any current or former City employee, the City, [their] claims and allegations in the Lawsuit, the facts and circumstances giving rise to the Lawsuit, [their] decision to bring the Lawsuit, Defendant's defenses to the Lawsuit, any witnesses or potential witnesses in the Lawsuit, [their] alleged damages in the Lawsuit, and [their] efforts to mitigate [their] damages relating to the Lawsuit. A full and fair response to this Request will include posts, comments and pictures that in any way relate to [their] emotional, mental or psychological state during the period in question.

(Doc. 127 at 4; Doc. 86-2 at 35). Plaintiffs did not initially object to RFP No. 6; rather they simply answered: "None." (Doc. 86-2 at 35).

Despite Plaintiffs' assertion that they had no relevant social media posts, the City independently obtained a copy of a Facebook post from Ms. Cerda in which she said a post that contained the word "nigga" was "to [sic] funny." (Doc. 86 at 4; Doc. 86-2 at 52). Ms. Cerda deleted this post the day before she was deposed in this case. (Doc. 86 at 2; Doc. 120 at 21).

On June 25, 2019, the parties notified the Court of a discovery dispute regarding Plaintiffs' social media. (Doc. 86). Therein, the City argued that Plaintiffs had deleted at least one relevant social media post and had deleted their respective Facebook accounts. (*Id.* at 2). Plaintiffs admitted that Ms. Cerda deleted the identified Facebook post because she found the post to be "offensive" and she knew the City already possessed a copy of it; however, Plaintiffs stated that they only "temporarily 'deactivated'" their Facebook accounts. (*Id.* at 3). Plaintiffs additionally argue that they "did *not* delete anything, and the contents of their Facebook accounts are still readily available to them." (*Id.*) (emphasis in original). Moreover, they stated that they provided the City with all Facebook postings that relate to their employment. (*Id.*)

After reviewing the discovery dispute, the Court found that it could not reconcile Plaintiffs' statement that they did not delete anything with their concession that Ms. Cerda did delete the post that contained the word "nigga." (Doc. 83 at 3; Doc. 86-2 at 52). Thus,

the Court concluded that "Plaintiffs have deleted at least one Facebook post, a post which [the City] alleges was harmful to Plaintiffs' case." (Doc. 83 at 3-5). Accordingly, Court granted the City leave to file a motion for sanctions. Additionally, the Court ordered Plaintiffs to produce:

> (1) Any online social media communications by Plaintiffs, including: profiles, postings, event invitations, messages, Facebook Chat messages/conversations, status updates, wall comments, Plaintiffs' "likes" on other users' posts, "likes" on Plaintiffs' posts, account status history, causes joined, groups joined, activity streams, applications, blog entries, photographs, videos, or media clips, as well as third-party online social media communications that place Plaintiffs' own communications in context;
> (2) from January 2010 to the present for Plaintiff Cerda, and from May 2011 to present for Plaintiff Bruner;
> (3) that reveal, refer, or relate to:
> > (a) any significant emotion, feeling, or mental state allegedly caused by Defendant's conduct;
> > (b) events or communications that could reasonably be expected to produce a significant emotion, feeling, or mental state allegedly caused by Defendant's conduct;
> > (c) Plaintiffs' employment with Defendant; or
> > (d) to the allegations contained in Plaintiffs' Complaint.

(*Id.* at 4). The Court further remarked that it "expects counsel to determine what information falls within the scope of this Court's Order in good faith and consistent with their obligations as officers of the court." (*Id.*) (internal citation and alterations omitted).

On July 11, 2019, the City filed its First Motion for Sanctions (Doc. 86), and Plaintiffs filed their Response on July 18, 2019 (Doc. 88).[3] On August 6, 2019, the City notified the Court that they had received "Plaintiffs' social media disclosures, and they [were] wholly inadequate and fail to comply with the Court's Order." (Doc. 92 at 2). The Court permitted the City to file a Second Motion for Sanctions. (Doc. 94). Additionally, the Court ordered Plaintiffs to file an affidavit that detailed "the process and steps that they have taken to comply with the Court's June 27, 2019 Order" and to show cause why they

---

[3] The Court did not permit the City to file a Reply. (Doc. 83).

failed to produce all relevant social media content. (*Id.* at 2). In their affidavits and response to the Court's Order to show cause, Plaintiffs provided that each reviewed the Court's Order and "painstakingly examined their Facebook account"; they retained two different "computer Specialists" to review their Facebook accounts; and that they produced "161 pages from Plaintiffs' respective Facebook accounts to [the City]." (Docs. 96, 97).

On August 20, 2019, the City filed its "Second Motion for Sanctions to address conduct that has occurred in Plaintiffs' filings and disclosures since the City filed its First Motion for Sanctions on July 11, 2019." (Doc. 99 at 1). In their Response to the City's Second Motion, Plaintiffs argue that they had fully complied with the Court's June 27, 2019 Order. (Doc. 103). The Court set an evidentiary hearing on September 11, 2019 as to the City's two pending Motions for Sanctions (the "Evidentiary Hearing"). (Doc. 104, 109). Days before the Evidentiary Hearing, Plaintiffs produced "tens of thousands" of pages of responsive Facebook data. (Doc. 120 at 28, 31, 45-46, 131, 136).

## II. Evidentiary Hearing

On September 11, 2019, the Court held the Evidentiary Hearing. (Doc. 110).

### A.    Ms. Cerda's Testimony

During her testimony at the Evidentiary Hearing, Ms. Cerda testified that she has both a Facebook account and an Instagram account and acknowledged that she did not produce any social media evidence until after her deposition. (Doc. 120 at 14, 62-63). Ms. Cerda was questioned regarding the Facebook post that contained the word "nigga" and she conceded that it was posted on January 23, 2014, which was the same time period that she claims she was suffering from emotional distress by being exposed to the word "nigger" in the workplace. (Doc. 120 at 15-21). However, Ms. Cerda attempted to distinguish between "nigger" and "nigga".[4] (*Id.*) (emphasis added).    Ms. Cerda also

---

[4] The Court notes that despite Ms. Cerda's proposition that "nigga" is not offensive, she was hesitant to read the word aloud at the Evidentiary Hearing and did so only after the Court directed her to. (Doc. 120 at 15). Moreover, Ms. Cerda previously stated that she deleted that specific Facebook post because "[she] found the post offensive . . . ." (Doc. 82 at 3). Additionally, during her deposition, Ms. Cerda stated that she deleted the Facebook post because she "didn't condone it" and "didn't approve of it . . . ." (Doc. 120 at 19). In other words, during the Evidentiary Hearing, Ms. Cerda—for the first time—made a distinction between the "nigger" and "nigga" and stated that "nigga" was not offensive and

- 5 -

admitted to deleting the Facebook post and stated that "[she] didn't think that [she] was deleting evidence" because the City already had a copy of the post.[5] (*Id.* at 21). Ms. Cerda also admitted to deactivating[6] her Facebook account shortly after her deposition without taking any steps to preserve the data. (*Id.* at 25-26).

Ms. Cerda testified that she reviewed the Court's June 27, 2019 Order, which ordered her to produce by July 19, 2019, all social media, including Facebook Chat messages, from 2011 to present that related to her employment with the City or any allegations contained in the Complaint. (*Id.* at 26-28) (citing Doc. 83)). Ms. Cerda also testified that she did not produce any social media on July 19, 2019, because she did not find any responsive Facebook messages. (*Id.*) However, on September 6, 2019, Ms. Cerda produced numerous Facebook messages between her and Ms. Bruner regarding their employment with the City. (*Id.* at 31-43). Furthermore, despite being ordered to produce by July 19, 2019, all "Facebook Chat messages/conversations" that refer or relate to Plaintiffs' lawsuit, Ms. Cerda failed to produce a Facebook message in which she was specifically asked about her "lawsuit against City of Phoenix 'cuz of [Ms. Chavez]" until September 6, 2019. (*Id.* at 43-44). Additionally, throughout her testimony, Ms. Cerda maintained that she had never used the "N-word" and that she found it to be an offensive term, despite being presented with numerous instances where she used the term "nigga" in Facebook messages. (*Id.* at 47). For example, Ms. Cerda's Facebook messages included the following: "Hey hey. What up, what up, my nigga[]"; "My lil nigga[]"; and "Wow that's what you call a motha fucking low life nigga punk ass dick." (*Id.* at 47-48).

---

unrelated to "nigger." (*Id.* at 17-20). The Court finds this distinction to be disingenuous and self-serving.

[5] However, at her deposition, Ms. Cerda testified that she understood that the post was evidence in this lawsuit, and deleted it nonetheless. (Doc. 86-2 at 74-75).

[6] Facebook's platform allows a user to delete or deactivate his or her account. When a Facebook user deactivates his or her account, the profile is no longer searchable or visible to anyone on Facebook; however, the user can reactivate the Facebook account by logging in with his or her email and password. In contrast, deleting a Facebook account is a much more permanent step, and it means all of the account information will be erased from the site completely. There is no option to reactivate and get back the account information.

**B.    Ms. Bruner's Testimony**

Ms. Bruner testified that she has a Facebook account that she deactivated after this lawsuit commenced.  (*Id.* at 69). As with Ms. Cerda, Ms. Bruner also makes a distinction between "nigger" and the terms "nicca" and "nigga", which she used multiple times in Facebook messages and posts.  (*Id.*)  Moreover, despite testifying in her deposition that she had never heard of the term "nicca" and didn't know what it meant, during the Evidentiary Hearing she conceded to using it several times in Facebook posts.  (*Id.* at 70-72). Moreover, Ms. Bruner acknowledged that she referred to her husband—who, accordingly to the Complaint[7] is "is African-American and Hispanic in race"—as a "big ass nicca[]" and a "half-breed nicca" on Facebook.  (*Id.* at 73).

Ms. Burner testified, that although she finds the term "nigger" to be "offensive because its hateful[,]" she does not find the terms "nigga" or nicca" to be offensive or to be racial slurs.  (*Id.* at 76).  Ms. Bruner was adamant that she was justified in not producing any of her social media posts that included the terms "nigga" and "nicca" because those terms are distinct from the racial slurs that Ms. Chavez allegedly used in the workplace. (*Id.* at 76-77).  Ms. Bruner's use of the terms "nigga" and "nicca" in her social media include: "Time to kick some peeps out of niggadom[]";[8] "Hell, no, nicca[]"; and "Selling my husband six foot half-breed nicca jack-of-all-trades loves the Cowboys and drinks Hennessy might get on your nerves cause he's on mine." (*Id.* at 72-73). Ms. Bruner acknowledged that she and Ms. Cerda had exchanged numerous Facebook messages regarding their employment and Ms. Chavez that were not produced to the City until days before the Evidentiary Hearing.  (*Id.* at 75).  In these messages, Ms. Burner and Ms. Cerda discuss their boss, Ms. Robyn Cramer, and they refer to Ms. Chavez as a "heifer."  (*Id.*)

**C.    Court's Ruling**

At the conclusion of the Evidentiary Hearing, the Court found that this lawsuit

---

[7] Ms. Bruner testified at the Evidentiary Hearing that her husband was "Seminole Indian and black."  (Doc. 120 at 82).

[8] Ms. Bruner claims that her husband had access to her Facebook account, and he was the one who posted this post.  (*Id.* at 73).

included allegations that Plaintiffs were subjected to racial harassment, sexual harassment, and retaliation. (*Id.* at 153). With regards to Plaintiffs' racial harassment claims, both Plaintiffs allege that they were subjected to Ms. Chavez's frequent use of the term "nigger". (*Id.* at 154). Both Plaintiffs allege that they found the term so offensive that it caused them damage. (*Id.*)

As for the distinction between "nigger" and "nigga" and "nicca", the Court found that Ms. Cerda was somewhat credible; however, the Court found that Ms. Bruner was not credible. (*Id.* at 155). Specifically, the Court found that "Ms. Cerda, as painful as it was, . . . admit[ed] that she deleted that Facebook posting" and she "admitted that she used the very terms she found distasteful." (*Id.*) On the other hand, Ms. Bruner "apparently [had] a bright line distinction about how offensive the spelling of the word [nigger was] versus her almost daily use of [those] other variations of the phrase." (*Id.* at 155-56). The Court found this distinction to be disingenuous and self-serving. (*Id.* at 156). Examining the way in which these phrases were used in the Facebook posts and messages, the Court found that no matter the spelling, "they are [all] repugnant." (*Id.*) Plaintiffs used these terms to refer to people that they didn't like. The Court stated "[i]t is not a credible thing to say to this Court that you find one use of the word offensive, but yet even in a derogatory way, the other phrasing of the word, however you pronounce it, is not offensive. It's just not credible." (*Id.*) Specifically, the Court found that a reasonable juror could find that Plaintiffs' use of the terms "nigga" and "nicca" could "negate each of [their] claims of racial harassment or that the production of that information could support the City's defenses that [the Plaintiffs] were not offended by these phrases, either subjectively offended or objectively offended by them, because [the Plaintiffs] engaged in the very same use of the phrases in a derogatory manner." (*Id.* at 156-57).

The Court found that it was "crystal clear" that the thousands of pages of social media evidence produced to the City just days before the Evidentiary Hearing was relevant to Plaintiffs' claims and the City's defenses. (*Id.*) Moreover, it is clear that Ms. Cerda deleted at least one relevant Facebook post and that both Ms. Cerda and Ms. Bruner

deactivated their Facebook accounts with the intention of preventing the City from discovering relevant information. (*Id.* at 157). The Court specifically found that even if a plaintiff or their counsel does not have the technical knowledge to understand metadata, every lawyer has a clear obligation to help their client to preserve all relevant evidence. (*Id.*) Simply put, a lawyer must instruct their client on how to preserve potentially relevant evidence and clearly inform their client that they cannot alter or delete any potential evidence.

Furthermore, the Court found that "[t]here should never be an instance where a court has to order a party to turn over what they are already obligated to turn over under the Mandatory Initial Disclosure Protocols[9] and Rule 26." (*Id.* at 157-58). The Court explicitly found that Plaintiffs had not complied with the Court's Orders, otherwise Plaintiffs would not have produced relevant social media just days before the Evidentiary Hearing. (*Id.* at 159). It was also concerning to the Court that Mr. Cardwell, one of Plaintiffs' computer experts, was not hired until August 7, 2019, which was almost three weeks after the first Court ordered deadline to produce social media had expired. (*Id.* at 158). Additionally, the Court noted that it was troubled by the fact that Ms. Cerda has an Instagram account, "yet there appears to have been no indication that any expert was hired or asked to even review [that] account[]." (*Id.*)

The Court found that Plaintiffs' failure to produce the relevant social media posts have: (1) prolonged this litigation, (2) unnecessarily used the Court's resources, and (3) prejudiced the City. (*Id.* at 158-59). The Court further found that Plaintiffs' behavior—specifically the deletion of relevant evidence, attempts to evade discovery, and failure to comply with two Court Orders—warranted severe sanctions. (*Id.* at 159). Moreover, the

---

[9] Beginning on May 1, 2017, the District of Arizona began a three-year pilot project, known as the Mandatory Initial Discovery Pilot Project ("MIDP"), which studies whether requiring parties in civil cases to respond to a series of standard discovery requests before undertaking other discovery will reduce the cost and delay of civil litigation. The MIDP applies to cases filed on or after May 1, 2017, and requires, among other things, that parties must provide information relevant to the parties' claims and defenses, whether favorable or unfavorable, and regardless of whether they intend to use the information in presenting their claims and defenses. MIDP responses must be timely supplemented as additional relevant information becomes available. *See* General Order 17-08; (Doc. 4).

Court found that had the City not independently obtained Ms. Cerda's Facebook post, none of the thousands of pages of social media would have ever been produced to the City. (*Id.* at 159). Accordingly, pursuant to the Court's inherent authority to levy sanctions in response to abusive litigation practices and Rules 24, 26, and 37, the Court dismissed Plaintiffs' racial harassment claims and struck from the Complaint all allegations of racial harassment. (*Id.* at 151-53, 159-60). The Court further ordered Plaintiffs to pay the City's fees and costs associated with bringing their two Motions for Sanctions. (*Id.* at 160).

## III. Motion for Attorneys' Fees and Costs

The City now moves this Court for an award of attorneys' fees and costs incurred as a result of the discovery abuses. (Doc. 121). The City has grouped its requested attorneys' fees and costs into three categories: (1) fees and costs associated with its initial efforts to obtain relevant social media prior to Court involvement ("Initial Efforts Fees"), (2) fees and costs associated with presenting the discovery disputes to the Court ("Discovery Dispute Fees"); and (3) fees and costs associated with its two Motions for Sanctions and Evidentiary Hearing ("Sanctions and Evidentiary Hearing Fees"). (*Id.* at 2-4). Specifically, the City requests $16,862.00 for Initial Effort Fees, $4,895.50 for Discovery Dispute Fees, and $82,168.00 for Sanctions and Evidentiary Hearing Fees. (*Id.*) Plaintiffs contend that the requested fees are unreasonable. (Doc. 126).

### A. <u>Legal Standard</u>

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co*., 370 U.S. 626, 630–31 (1962). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc*., 501 U.S. 32, 44–45 (1991); *see also E. & J. Gallo Winery v. Gibson, Dunn & Crutcher LLP,* 432 F. App'x 657, 659 (9th Cir. 2011) ("A court may levy a sanction on the basis of its own inherent power when a party has acted in bad faith, vexatiously, wantonly or, for oppressive reasons.") (internal quotation omitted)). And one permissible sanction is an "assessment of attorney's fees"—an order instructing a party

that has acted in bad faith to reimburse legal fees and costs incurred by the other side. *Chambers*, 501 U.S. at 45.

"Rule 37(b) . . . provides a wide range of sanctions for a party's failure to comply with court discovery orders." *United States v. Sumitomo Marine & Fire Ins. Co., Ltd*., 617 F.2d 1365, 1369 (9th Cir. 1980). Instead of or in addition to another sanction, the district court must require "the delinquent party or his attorney to pay the reasonable expenses, including attorney's fees, incurred by the innocent party as a result of the failure to obey the order." *Id*. Rule 37 authorizes the imposition of various sanctions for discovery violations, including a party's failure to obey a court order to provide discovery. Additionally, pursuant to Rule 37(b)(2)(C), the Court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified . . . ."

Moreover, "Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." *See* Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment. In short, Rule 26(g) requires a signing attorney to certify that a reasonable inquiry has been made with respect to the factual and legal basis for any discovery request or response.[10] *Id.* It should be noted that "Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." *Id.* The reasonableness of the inquiry is measured by an objective standard; there is no required

---

[10] Similarly, MIDP responses must be signed under oath by the parties, certifying that they are complete and correct as of the time they are made based on the parties' knowledge, information, and belief formed after reasonable inquiry. If a party is represented by counsel, its attorney must also sign the responses, thereby making the certifications required by Rule 26(g).

showing of bad faith.  *Id.*  If a lawyer or party makes a Rule 26(g) certification that violates the rule, without substantial justification, the court (on motion, or *sua sponte*) must impose an appropriate sanction, which may include an order to pay reasonable expenses and attorney's fees, caused by the violation. Fed. R. Civ. P. 26(g)(3).

Such sanctions, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.  *See Mine Workers v. Bagwell*, 512 U.S. 821, 826–30 (1994). A court, when using its inherent sanctioning authority, must establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party.  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017).  The Supreme Court has framed this kind of causal connection is as a but-for test: The complaining party may recover "only the portion of his fees that he would not have paid but for" the misconduct.  *Id.* at 1187.  "'The essential goal' in shifting fees is 'to do rough justice, not to achieve auditing perfection.'" *Id.* (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).   "The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's 'superior understanding of the litigation,' are entitled to substantial deference on appeal."  *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).   Moreover, courts may impose sanctions jointly and severally against multiple parties for their misconduct.  *See Hyde & Drath v. Baker*, 24 F.3d 1162, 1172 (9th Cir. 1994), *as amended* (July 25, 1994).

**B.    Analysis**

On the record at the Evidentiary Hearing, the Court made an explicit finding that Plaintiffs' misconduct warranted severe sanctions, including paying the City's attorneys' fees and costs.  However, Mr. Montoya's, Plaintiffs' counsel, own misconduct here cannot be overlooked.  It is evident that, contrary to the Federal Rules of Civil Procedure, this District's MIDP, and two Court Orders, Plaintiffs *and* their counsel, Mr. Montoya, failed to produce and preserve discoverable evidence and repeatedly failed to conduct thorough and appropriate document searches and reasonable factual inquiries prior to serving various

discovery responses. The Court recognizes that to the extent possible, sanctions should be imposed only upon the person or entity responsible for the sanctionable conduct. Accordingly, the Court finds that pursuant to Rules 26(g) and 37(b)(2)(C), Plaintiffs and Mr. Montoya shall be jointly and severally responsible for the City's reasonable attorneys' fees. [11] *See* Fed. R. Civ. P. 26(g) (requiring a signing attorney to certify that a reasonable inquiry has been made with respect to the factual and legal bases for any discovery response); Fed. R. Civ. P. 37(b)(2)(C) (where a party disobeys a discovery order, "the court must order the disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the failure was substantially justified or other circumstances make an award of expenses unjust.") *see also Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 554–56 (N.D. Cal. 1987) (discussing counsel's obligations pursuant to Rule 26(g), and sanctioning a party and its counsel for failure to "establish a coherent and effective system to faithfully and effectively respond to discovery"). The Court will analyze Mr. Montoya and Plaintiffs' conduct together when addressing the amount of compensatory fees warranted.

### i. *Causal Link*

The Court is not required to perform a tedious, line-by-line investigation of the hours performed, rather the Court "may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct." *Goodyear*, 137 S. Ct. at 1187. Keeping in mind

---

[11] The Court notes that both Plaintiffs and Mr. Montoya were notified of the sanctions and had an opportunity to be heard at the Evidentiary Hearing and in their Response to the City's Motion for Attorneys' Fees. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164–65 (9th Cir. 2003) (finding that plaintiff provided due process protection in the context of Rule 37 discovery sanctions in that plaintiff received notice of the possibility of sanctions when defendant filed motion for costs and the court provided an opportunity to be heard by allowing plaintiff to submit a responsive brief.); *see also Greenawalt v. Sun City W. Fire Dist.*, 2006 WL 1688088, at *2 (D. Ariz. June 10, 2006) (same). Furthermore, during the Evidentiary Hearing, the Court informed the parties that it would be relying, among other things, on Rules 26 and 37—both of which contain provisions that requires the Court to sanction the party, counsel, or both for violating the rule without justification—when determining whether sanctions, including attorneys' fees were warranted. (Doc. 120 at 153); *see also* Fed. R. Civ. P. 26(g) and 37(b)(2)(c). In other words, the Court finds that Plaintiffs and Mr. Montoya were on notice that attorneys' fees may be levied against all of them individually or collectively.

the "rough justice" principles from *Goodyear*, the Court will analyze each category of fees.

### a. Initial Discovery Fees

The Initial Discovery Fees are comprised of the fees and costs associated with the City's significant efforts to locate and obtain from Plaintiffs the relevant social media prior to Court intervention. (Doc. 121 at 2-4). This category includes fees and costs incurred from October 17, 2018 through August 9, 2019.[12] (Doc. 123 at 22-34). The City argues that but-for Plaintiffs and Mr. Montoya's misconduct they would not have incurred the Initial Discovery Fees. Plaintiffs argue that the City is not entitled to any Initial Efforts fees because the "the Court explicitly concluded that the City's attempt to obtain the entirety of Plaintiffs' respective social media was overreaching." (Doc. 126 at 3) (emphasis in original). The Court determined no such thing.[13]

At the Evidentiary Hearing, the Court held that the MIDP triggered Plaintiffs' obligation to produce the relevant social media evidence. (Doc. 120 at 88-89). Moreover, as the Court noted, the failure to comply with the MIDP is sanctionable conduct pursuant to Rule 37(b)(2). In response, Mr. Montoya stated that he "misunderstood the scope of [the MIDP] obligation . . . ." (*Id.* at 89). Additionally, Mr. Montoya stated that it is "very difficult to obtain" social media evidence and that he "could not extract it" without the help of an expert. (*Id.*) The Court disagrees. As the Court noted in its June 27, 2019 Order, Facebook has made it easy for Facebook users to download their account data for a specific timeframe. (Doc. 83 at 4 n.3). Additionally, Instagram has also made it easy for a user to download their account data. See *How do I access or review my data on Instagram?*, INSTAGRAM, https://help.instagram.com/181231772500920 (last accessed January 29,

---

[12] This category excludes fees and costs that were incurred in connection with notifying the Court of the discovery dispute on June 25, 2019 (Doc. 82), the First Motions for Sanctions filed on July 11, 2019 (Doc. 86), or the Motion for Leave to File Second Motion for Sanctions (Doc. 92).

[13] Plaintiffs mischaracterize this Court's Orders. The City requested—only after Plaintiffs had failed to produce relevant social media and Ms. Cerda deleted at least one relevant social media post—that the Court order "Plaintiffs produce their entire social media profiles[.]" (Doc. 83 at 2). The Court, at that time, declined to do so. Despite Plaintiff's contentions to the contrary, the Court in no way "concluded that Plaintiffs were justified in refusing" to respond to the City's RFP No. 6.

2020).[14]  To proffer his and his client's ignorance of the tools available for downloading social media data as an excuse for their noncompliance with discovery demonstrates a fundamental misunderstanding of Rule 26(g)'s obligation to make a "reasonable inquiry" into the factual basis of a discovery response.  *See* Rule 26(g) advisory committee's notes to 1983 amendment ("The rule simply requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection.").  Put simply, Mr. Montoya's failure to establish a coherent and effective system to, in good faith, respond to discovery did not satisfy his obligations to conduct a reasonable inquiry pursuant to Rule 26(g).  Rather, when the City sought relevant social media evidence, Mr. Montoya simply stated "[n]one" existed.  (Doc. 86-2 at 35).

Moreover, despite Plaintiffs' contentions to the contrary, the Court finds that the City's RFP No. 6 was narrowly tailored.  That RFP only requested social media from January 1, 2010 through the present that related to their employment with the City, their current and past co-workers, this Lawsuit and their decision to bring this lawsuit, the City's defenses, any witnesses or potential witnesses in this lawsuit, and Plaintiffs' alleged damages in the Lawsuit.  (Doc. 86-2 at 35).  This RFP was not overreaching or, as Plaintiffs characterize it, an "attempt to obtain the <u>entirety</u> of Plaintiffs' respective social media[.]" (Doc. 126 at 3) (emphasis in original).  Furthermore, the City specifically put Mr. Montoya on notice of the gaps and underproduction of Plaintiffs' social media on November 14, 2018, when it notified him that they were aware that Plaintiffs had discussed their employment with the City in Facebook posts and that there was a Facebook post by Ms. Cerda that contained "the same language that she takes offense to in this lawsuit." (Doc. 86-2 at 44).  Plaintiffs responded that they "stand by their Response to [RFP No. 6] because they have already accurately and completely responded to this Request." (*Id.* at

---

[14] It appears that Instagram launched this feature in April 2018—four months before Plaintiffs served their MIDP responses—and allows a user to download their profile info; photos; videos; archived stories; posts and story captions; uploaded contacts; the usernames of their followers and people they follow; direct messages; non-ephemeral direct messages, photos, and videos; comments; likes; searches; and settings.  Josh Constine, *Instagram launches "Data Download" tool to let you leave*, TECH CRUNCH (April 24, 2018 9:44 AM), https://techcrunch.com/2018/04/24/instagram-export/.

48).

Thus, the Court finds that all Initial Discovery Fees after November 14, 2018, were incurred as a direct result of Mr. Montoya and Plaintiffs' misconduct. Specifically, the Court finds that Mr. Montoya was not sufficiently proactive in ensuring that his clients were conducting thorough and appropriate document searches, especially in light of obvious gaps and underproduction. Under such circumstances, it is not reasonable for counsel to simply give instructions to his clients and count on them to fulfill their discovery obligations. The Federal Rules of Civil Procedure place an affirmative obligation on an attorney to ensure that their clients' search for responsive documents and information is complete. *See* Fed. R. Civ. P. 26(g) (requiring a signing attorney to certify that a reasonable inquiry has been made with respect to the factual and legal bases for any discovery response). By October 2018, Mr. Montoya was on notice of Plaintiffs' Facebook accounts and Ms. Cerda's Instagram account. (Doc. 86-2 at 5). In their Responses to the City's September 7, 2018 RFP—signed by Mr. Montoya on October 30, 2018—Plaintiffs both admit to having Facebook accounts and Ms. Cerda admits to having an Instagram account under the handle "kikicerda."[15]  (*Id.*)  Therefore, where, as here, Mr. Montoya had knowledge of the social media accounts and was on notice of the obvious gaps in the production of documents by his clients, he was obligated to make a reasonable inquiry as to the thoroughness of that search. He failed to make that "reasonable inquiry" required by Rule 26(g) before he signed the discovery responses from his clients in this case. This conduct violates Mr. Montoya and Plaintiffs' obligation to make diligent, good-faith responses to legitimate discovery requests.

Moreover, the search performed by Mr. Naumann, one of Plaintiffs' computer experts, of Plaintiffs' respective Facebook accounts falls far short of a reasonable inquiry.

---

[15] At the Evidentiary Hearing, the Court questioned why Mr. Montoya had not directed either computer expert to search Ms. Cerda's Instagram account. (Doc. 120 at 119, 137-38). Mr. Montoya responded that Plaintiffs "don't really use" other social media platforms, and that is why he only directed the experts to search Plaintiffs' Facebook account for responsive evidence. (*Id.* at 138). In other words, despite Mr. Montoya's knowledge of Ms. Cerda's Instagram account he failed to direct either expert to search that Instagram account for response evidence.

Mr. Montoya directed Mr. Naumann to <u>only</u> search Plaintiffs' Facebook accounts for the term "nigger" and nothing else. (Doc. 120 at 111). Mr. Naumann testified at the Evidentiary Hearing that Mr. Montoya "merely wanted to know if . . . the word nigger appeared in either" of Plaintiffs' Facebook accounts. (*Id.* at 112). Mr. Naumann further testified that "Mr. Montoya gave [him] a task, and [he] limited [his] work to the task that [Mr. Montoya] gave [him]." (*Id.* at 119). At best, Mr. Montoya's search parameters were woefully inadequate; at worst, the search parameters were designed to purposefully evade identifying relevant social media posts. What is more, Mr. Montoya retained Mr. Cardwell on August 7, 2019, which was nearly three weeks *after* the deadline for Plaintiffs to produce their social media and the same day that the Court issued its second Order regarding the production of social media. In light of the date on which Mr. Cardwell was hired, his hiring could not be characterized as an attempt to comply with the Court's June 27, 2019 Order and produce the social media discovery by the deadline. (*See* Doc. 96 at 2) (claiming that Mr. Cardwell was retained in an effort "to ensure compliance with the Court's [June 27, 2019] Order[.]")).

The Court cannot reconcile Mr. Montoya's discovery strategy and decisions with his obligation under Rule 26(g) to "pause and consider the reasonableness of his . . . response" or his "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment. Mr. Montoya and Plaintiffs' conduct was wholly inconsistent with their obligations to conduct discovery in good faith. The Federal Rules of Civil Procedure and judicial precedent prohibit this type of gamesmanship. The Court finds that Plaintiffs and Mr. Montoya's conduct was the but-for cause of the Initial Effort Fees incurred after the City put Mr. Montoya and Plaintiffs on notice of the gaps and underproduction of Plaintiffs' social media on November 14, 2018. Therefore, the Court will award the City the Initial Effort Fees incurred after November 14, 2018.

### b. Discovery Dispute Fees

The Discovery Dispute Fees are comprised of the fees and costs associated with presenting the social media discovery dispute process to the Court.  The City argues that it "would never have been required to spend time and money seeking the Court's involvement had Plaintiffs complied with their obligations under the Federal Rules of Civil Procedure and General Order 17-08, or had Plaintiffs worked with the City in good faith to resolve the issues during the meet and confer process."  (Doc. 121 at 4).  The Court agrees.

The Court requires that before parties can notify the Court of a discovery dispute, they must attempt to resolve the issue through "sincere efforts." (Doc. 23 at 4).  In the parties' Joint Summary of Discovery Dispute, Plaintiffs and Mr. Montoya provide that they "have already provided the City with all Facebook postings that relate to their employment with the City." (Doc. 82 at 3).  This statement was untrue, as days before the Evidentiary Hearing, Mr. Montoya and Plaintiffs produced more than fifty pages of Facebook messages that related to Plaintiffs' employment with the City.  (Doc. 120 at 31-45, 74-76).  Moreover, Plaintiffs and Mr. Montoya also claimed that their failure to produce relevant social media was justified.  (*Id.*).  As previously explained in this Order and at the Evidently Hearing, the City's RFP No. 6 was not overly broad and this District's MIDP required the disclosure of this relevant social media.  In other words, Mr. Montoya and Plaintiffs were not justified in failing to produce this evidence.

Plaintiffs not only failed to be forthcoming with relevant discovery, but they also took affirmative steps—by deleting at least one Facebook post and deactivating their Facebook accounts in February 2019—to prevent the City from discovering relevant information.  (*Id.* at 157).  What is more, Plaintiffs' position in the Joint Summary of Discovery Dispute was unreasonable in light of their conduct.  (Doc. 82 at 3).  Plaintiffs provided that they "did *not* delete anything" from their Facebook accounts.  (*Id.*) (emphasis in original).  However, it is clear that assertion was untrue.

Furthermore, this discovery dispute resulted in the Court's June 27, 2019 Order, which among other things, required Plaintiffs to produce the responsive social media and permitted the City leave to file its First Motion for Sanctions. At the Evidentiary Hearing, the Court noted that "[t]here should never be an instance where a court has to order a party to turn over what they are already obligated to turn over under the Mandatory Initial Disclosure Protocols and Rule 26." (Doc. 120 at 157-58). Moreover, the Court held that had the City not produced Ms. Cerda's Facebook post using the term "nigga," "none of this relevant information would have ever come forward." (*Id.* at 159).

The Court finds that had Mr. Montoya and Plaintiffs complied with the Federal Rules of Civil Procedure, the MIDP, and this Court's Order to meet and confer in good faith before filing notifying the Court of a discovery dispute, none of the Discovery Dispute Fees would have been incurred. In other words, but-for Mr. Montoya and Plaintiffs' conduct the Discovery Dispute Fees would not have been incurred. Thus, the Court will award the City the entirety of the requested Discovery Dispute Fees.

### c.    Sanctions and Evidentiary Hearing Fees

The Sanctions and Evidentiary Hearing Fees include the City's attorneys' fees and costs associated with its two Motions for Sanctions, the Evidentiary Hearing, and the time spent preparing this Motion for Attorneys' Fees. Plaintiffs, without further elaboration, contend that the City is not entitled to these fees. (Doc 126 at 3 n.2).

The causal link is easily apparent between Plaintiffs and Mr. Montoya's misconduct and the Sanctions and Evidentiary Hearing Fees. As previously discussed in this Order, under the circumstances, it was not enough for Mr. Montoya to simply give instructions to his clients and count on them to fulfill their discovery obligations. Moreover, Plaintiffs' responses to the City's RFP No. 6 were inadequate and patently deficient under the Federal Rules of Civil Procedure. Moreover, the failure to produce the social media defied this District's MIDP and two of Court's Orders. This type of conduct is wholly inconsistent with the litigants and counsel's obligations to conduct discovery in good faith. The Court finds that but-for Plaintiffs and Mr. Montoya's actions, the City would not have had to draft

either Motion for Sanctions, prepare for the Evidentiary Hearing, or draft the Motion for Attorneys' Fees. Thus, the Court will award the City the entirety of the requested Sanctions and Evidentiary Hearing Fees.

### ii. *Reasonableness of Attorneys' Fees and Costs*

Plaintiffs do not appear to dispute the reasonableness of the City's attorneys' hourly rates; however, they do take issue with the number of hours billed by the City's attorneys. (Doc. 126). Plaintiffs argue, without support, that the City's "law firm over-staffed and over-billed this issue"; however, Plaintiffs do not provide any records or any evidence of how much time their attorneys spent in connection with these matters. (*Id.* at 3); *Democratic Party of Wash. v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004) (noting that opposing counsel's billing records are "useful" in determining the amount of a reasonable fee); *see also Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) ("Although opposing counsel's billing records may be relevant to determining whether the prevailing party spent a reasonable number of hours on the case, those records are not dispositive.").

Nonetheless, the Court has closely reviewed the itemized billing entries and costs. Plaintiffs contend that the 20.2 hours that Mr. David Barton, a named-partner at the law firm retained by the City, was unnecessary. (Doc. 126 at 2). The City provides that "the majority of attorney Barton's time on the sanctions issue was spent reviewing the tens of thousands of pages of documents Plaintiffs produced days before the hearing and helping to evaluate how to use that information at the hearing." (Doc. 127 at 3). The City further provides that "Mr. Barton also spent time addressing computer expert issues." (*Id.*) In other words, the majority of the 20.2 hours billed by Mr. Barton was spent doing document review. The Court appreciates that the law firm retained by the City employs a limited number of attorneys and therefore Mr. Barton may have been the only attorney with bandwidth to assist in the document review of the late-disclosed social media. However, the Court finds Mr. Barton's billing rate of $405.00 per hour was disproportionate to the

skill required and complexity of the legal task.[16] Thus, the Court will reduce Mr. Barton's billing rate for his 20.2 hours from $405.00 to $195.00, which is the billing rate of an associate at his law firm. (Doc. 123).

Other than Mr. Barton's fees, the Court finds that costs and attorneys' fees incurred were reasonable. The City's counsel diligently pursued the relevant social media posts for almost a year, hired an expert in an attempt to independently obtain this information, had numerous phone calls with Mr. Montoya regarding this information, drafted two Motions for Sanctions, reviewed tens of thousands of pages of social media content that was produced to the City just days before the Evidentiary Hearing, and expertly presented the evidence at the Evidentiary Hearing. Moreover, the City's attorneys avow that the billing entireties have been "edited based on [their] billing judgment to eliminate any unnecessary, administrative, duplicative and excessive time entries." (Doc. 121 at 12). The City expended a significant amount of resources attempting to obtain evidence that was relevant, and Plaintiffs and Mr. Montoya were unreasonable in not producing it. Accordingly, the Court finds the City's attorneys' fees and costs, aside from the aforementioned fees billed by Mr. Barton, to be reasonable.

## IV.   CONCLUSION

Based on the entirety of the record, the Court finds that Plaintiffs and Mr. Montoya's conduct was the but-for cause of the Initial Effort Fees incurred after November 14, 2018, the Discovery Dispute Fees, and Sanctions and Evidentiary Hearing Fees. The Court finds that an award of attorneys' fees and costs in the amount of $99,683.50 is directly related to the extent of the misconduct.

As to joint and several liability, the Court has found that Plaintiffs and Mr. Montoya were all complicit in attempting to evade discovery and this Court's Orders. Therefore, in

---

[16] In part, the Court is making this finding based on the fact that Mr. Barton has not entered a notice of appearance in this case and it appears that his assistance on this case was only required due to the short timeframe in which the City had to review the thousands of pages of discoverable social media evidence. In other words, the Court is not making a finding that Mr. Barton's billing rate is always unreasonable for document review; rather the Court's finding here regarding Mr. Barton's billing rate is limited to this case and these circumstances.

order to make the City whole, the Court will award the City's attorneys' fees and costs in the total amount of $99,683.50, jointly and severally against Plaintiffs and Mr. Montoya.

Accordingly,

**IT IS ORDERED** that the City's Motion for Attorneys' Fees and Costs (Doc. 121) is **GRANTED in part** and **DENIED in part**.  The City is awarded attorneys' fees and costs in the amount of $99,683.50 jointly and severally against Plaintiffs, Ms. Cerda and Ms. Bruner, and their counsel, Mr. Montoya.

**IT IS FURTHER ORDERED** that the City's Motion to Seal (Doc. 122) is **GRANTED**.  The Clerk of Court is respectfully directed to file under seal the documents currently lodged at Doc. 123.

Dated this 4th day of February, 2020.

Honorable Diane J. Humetewa
United States District Judge